## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
LAURA C. JONES,                              )
                                             )
                    Plaintiff,               )
                                             )
            v.                               )    Civil Action No. 07-2164 (RWR)
                                             )
GEORGE W. BUSH, PRESIDENT OF                 )
THE UNITED STATES, AND ALAN R.               )
SWENDIMAN, DIRECTOR, EXECUTIVE               )
OFFICE OF THE PRESIDENT,                     )
                                             )
                    Defendants.              )
———————————————————— )

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants, George W. Bush, President of the United States, and Alan R. Swendiman,

Director of the Office of Administration ("OA"), Executive Office of the President ("EOP"), by

and through undersigned counsel, respectfully move  to dismiss Plaintiff *pro se*'s Complaint

pursuant to Rule 12(b)(6) due to Plaintiff's failure to state a claim upon which relief can be

granted.  Additionally, Defendants respectfully move to dismiss George W. Bush, President of

the United States, as an improper party to this action.  In the alternative, Defendants move for

summary judgment because there is no genuine issue as to any material fact, and Defendants are

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

In support of this motion, Defendants respectfully refer the Court to the accompanying

Memorandum of Points and Authorities and Statement of Material Facts as to Which There is No

Genuine Dispute.  A proposed Order consistent with this Motion is attached hereto.

Plaintiff, who is proceeding *pro se*, is hereby advised that failure to respond to this

motion may result in the district court granting the motion.  *See Fox v. Strickland*, 837 F.2d 507, 509 (D.C. Cir. 1988).  Plaintiff also should take notice that any factual assertions contained in the affidavits and other attachments in support of Defendants' motion will be accepted by the Court as true unless Plaintiff submits her own affidavits or other documentary evidence contradicting the assertions in Defendants' attachments.  *See Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992), Local Civil Rule 7(h) and Fed. R. Civ. P. 56(e), which provides as follows:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.  The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Respectfully submitted,


 /s/
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


 /s/
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


 /s/
MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-6531
Marian.L.Borum@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **LAURA C. JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-2164 (RWR)** |
| | ) | |
| **GEORGE W. BUSH, PRESIDENT OF** | ) | |
| **THE UNITED STATES, AND ALAN R.** | ) | |
| **SWENDIMAN, DIRECTOR, EXECUTIVE** | ) | |
| **OFFICE OF THE PRESIDENT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____ )

### DEFENDANTS' STATEMENT OF MATERIAL FACTS
### AS TO WHICH THERE IS NO GENUINE DISPUTE

Defendants, George W. Bush, President of the United States, and Alan R. Swendiman,

Director of the Office of Administration ("OA"), Executive Office of the President ("EOP"),

submit this Statement of Material Facts As To Which There Is No Genuine Dispute in

accordance with Local Rule 7(h).

1.  Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq*., ("Title VII"), and the Rehabilitation Act, 29 U.S.C. § 701 *et*

*seq*., alleging discrimination based upon race, gender and disability. *See* Complaint ("Compl.")

at p. 1. Plaintiff also alleges that she was subjected to retaliation and a hostile work environment

for prior protected activity. *Id*.

2.  At all times relevant to the Complaint, Plaintiff was employed as a Lead Mail

Assistant, Grade 8/4, in the Mail and Messenger Branch, General Services Division, Office of the

Chief Operating Officer, Office of Administration, Executive Office of the President. *See*

Exhibits A (Equal Employment Opportunity Commission Decision, *Jones v. Bertocchi*, 2007 WL 436564, at *1 (E.E.O.C. January 30, 2007); and Exhibit B (Position Description).

3. The Office of Administration is the employing office and Alan R. Swendiman, Director of OA at the time this Complaint was filed, is the only proper defendant for this action. *See* 3 U.S.C. § 401, 402, 411.

4. On April 6, 2004, Plaintiff reported to the Equal Employment Opportunity ("EEO") Director that a box had entered the White House without being "processed according to . . . security (radiation) procedures . . . ." Compl. at p. 3.

5. Plaintiff also complained that a subordinate disrespected her by pointing a finger in her face and telling her to leave the matter alone, and a supervisor told her, "When I see a red bull[,] you see a red bull." *Id*. at 3-4.

6. On June 9, 2004, Plaintiff volunteered to work on June 11, 2004. *See* Compl. at p. 5; Exhibit C (Affidavit of Jon Laurich, Deputy Chief Operating Officer, EOP/OA) at p. 2.

7. On June 11, 2004, Plaintiff did not report to work, did not call in, and had not completed a Request for Leave or Approved Absence Form for that day in accordance with applicable procedures. *See* Exhibit D (Letter of Reprimand dated June 16, 2004).

8. On June 16, 2004, Plaintiff received a Letter of Reprimand because she failed to report to work on June 11, 2004, and used offensive language. *See* Compl. at p. 6; Exhibit D at pp. 1-2; Exhibit A at p. 12.

9. On June 16, 2004, Plaintiff filed an informal administrative complaint of discrimination alleging that she had been discriminated against on the basis of her race (Caucasian), color (Caucasian), sex (female) and in reprisal for prior EEO activity. *See* Exhibit E

2

(Information for Informal Complaint of Discrimination dated June 21, 2004).

10.  On July 15, 2004, Plaintiff was told that she was being reassigned from the West Wing Mailroom to the mailroom at 1800 G Street, N.W., and that her work hours were being altered one hour.  *See* Compl. at p. 6.

11.  Six other employees also were reassigned or relocated during the same period.  *See* Exhibit F (Affidavit of Kenneth Miller, Deputy Director, General Services Division, EOP-OA) at p. 3.

12. Plaintiff did not wish to be reassigned and reacted poorly to that information.  *See* Exhibit G (Notice of Proposed Suspension dated July 27, 2004) at p. 3; Exhibit F at p. 3.

13. In response to her behavior, on July 27, 2004, Plaintiff was issued a Notice of Proposed Suspension for Insolent Behavior towards her supervisors.  *See* Exhibit G.

14. On August 13, 2004, a Notice of Decision on Suspension was issued, and Plaintiff was suspended for three days.  *See* Exhibit H (Notice of Decision on Proposed Suspension dated August 13, 2004).

15. On August 13, 2004, Plaintiff filed a formal administrative complaint of discrimination alleging that she had been discriminated against based upon her race (Caucasian), color (Caucasian), sex (female) and in reprisal for prior EEO activity, when a Letter of Reprimand was placed into her personnel file on June 16, 2004, and when she was reassigned from the West Wing Mailroom to the mailroom at 1800 G Street, N.W., and her work hours were changed effective July 19, 2004.[1]  Exhibit I (Formal Complaint of Discrimination); Exhibit J at p.

---

[1]The formal administrative complaint of discrimination was dated July 30, 2004. It was received by facsimile on August 13, 2004, however, and considered filed on that date.  Exhibit J (Correspondence from EEO Director, Linda Sites, to Plaintiff, dated September 13, 2004).

1.

16.  On September 24, 2004, Plaintiff amended her formal complaint of discrimination alleging that she also had been discriminated against "because of [her] race (Caucasian), color (Caucasian); sex (female), and reprisal for prior protected activity" when she was suspended for insolent behavior toward her supervisors.  Exhibit K (Correspondence from EEO Director, Linda Sites, to Plaintiff's Attorney, Mary E. Henry, dated October 5, 2004); Exhibit I.

17.  In her informal and formal complaints, Plaintiff did not claim that she had been discriminated against on the basis of disability.  *See* Exhibits E and I.

18.  On June 1, 2005, Plaintiff was issued a Notice of Proposed Removal.  *See* Compl. at p. 6; Exhibit L (Notice of Proposed Removal dated June 1, 2005).

19.  On July 8, 2005, Plaintiff was removed from Federal Service.  Compl. at p. 6.

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


/s/
MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-6531
Marian.L.Borum@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **LAURA C. JONES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 07-2164 (RWR)** |
| ) | |
| **GEORGE W. BUSH, PRESIDENT OF** ) | |
| **THE UNITED STATES, AND ALAN R.** ) | |
| **SWENDIMAN, DIRECTOR, EXECUTIVE** ) | |
| **OFFICE OF THE PRESIDENT,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### I.  FACTUAL BACKGROUND

Plaintiff *pro se*, Laura C. Jones, filed her Complaint on November 30, 2007, naming as

Defendants, George W. Bush, President of the United States, and Alan R. Swendiman, Director

of the Office of Administration ("OA").[1]  Plaintiff was an employee of OA,[2] and worked as a

Lead Mail Assistant in the West Wing Mailroom.  *See* Complaint ("Compl.") at pp. 2, 4; Exhibit

A.

---

[1] Plaintiff inaccurately has referred to Defendant Alan R. Swendiman as the Director of the Executive Office of the President ("EOP").  His position was Director of the Office of Administration ("OA"), a component within EOP.  Mr. Swendiman has resigned as Director of OA.  Pursuant to Fed. R. Civ. P. 25(d), Sandra K. Evans, who is currently serving as the Acting Director, should be substituted as Mr. Swendiman's successor in her official capacity.

[2] As discussed *infra*, OA is not an agency, but rather a component or office within the Executive Office of the President ("EOP").  Pursuant to 3 U.S.C. § 401, OA is the proper entity, and the Director of OA as the head of OA is the proper Defendant in this action.

According to the Complaint, Plaintiff's action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c).   *See* Compl. at p. 2.  Plaintiff alleges that she was discriminated against on the bases of her race (Caucasian), gender (female), and disability, and that she was subjected to retaliation and a hostile work environment because of prior protected activity.  *Id*. at 1.  More specifically, Plaintiff claims that, "an unsecured box entered the White House Mailroom en route to President Bush, wife Laura Bush and their immediate staff."  *Id*. at 3.[3]  Plaintiff contends that the box "had not been processed according to stringent security (radiation) procedures due to Ricin precautions."  *Id*.  Therefore, she objected to the box being allowed to bypass security procedures.   *Id*.  On April 6, 2004, Plaintiff told the Equal Employment Opportunity ("EEO") Director of her concern that she had been disrespected when she made her objection "because [she] was the only white female working in the mailroom."  *Id*. at 3-4.  In addition, Plaintiff argues that, after speaking with the EEO Director, she was subjected to harassment and hostile working conditions.  *Id*. at 4.

On April 9, 2004, Plaintiff broke her toe in a non-job related incident.  *Id*.  *See* Defendants' Exhibit F.  Plaintiff asked that she be allowed "to park closer to the building until her toe healed."  Compl. at p. 4.  Plaintiff's request was denied.  *Id*.  Plaintiff also asserts that she was "given difficult assignments during th[is] period of an established injury . . . ."  *Id*. at 6.

On June 9, 2004, Plaintiff volunteered to work and was scheduled to work on June 11, 2004.  *See* Exhibit M (Affidavit of Kenneth Haskins, Manager, Mail/Messenger Operations,

---

[3] A senior White House staffer requested that the gift box be delivered.  *See* Compl. at p. 3.

EOP, OA) at p. 2.  That day was the national day of mourning for former President Ronald

Reagan.  *Id.*  Plaintiff submitted Request for Leave or Approved Absence Forms for June 9 and

10, 2004.  *See* Exhibit D (Letter of Reprimand dated June 16, 2004) at p. 1.  She did not submit a

Request for Leave or Approved Absence Form for June 11, 2004.  *Id.*; Exhibit M at pp. 2-3.

Although Plaintiff volunteered to work, she did not call in and failed to report for work on June

11, 2004.  *Id.*

On June 16, 2004, Plaintiff received a Letter of Reprimand for not reporting to work.  In

response, Plaintiff stated that she was "the last one around" and that "no spic [was] going to

make [her] leave."  *See* Exhibit D at p. 4.  Plaintiff alleged that she was "written up" for not

working in "reprisal for her filing an official EEO complaint."  Compl. at p. 5.

On July 15, 2004, Plaintiff was told that she was being reassigned from the West Wing

Mailroom to the mailroom at 1800 G Street, N.W., effective July 19, 2004.  *See* Compl. at p. 6.

Her work hours were altered one hour, from 10:30 a.m. to 7:00 p.m. to 9:30 a.m. to 6:00 p.m.

This "reassignment was a part of an ongoing series of personnel reassignments" in OA.  Exhibit

M at p. 3; Exhibit F at p. 2.  In fact, six other employees also were reassigned or relocated during

the same period.  *See* Exhibit F at p. 3.  Two employees were reassigned in October of 2003.

Two were reassigned in July of 2004, and two were reassigned in August of 2004.  One of these

employees was a Hispanic male, three were African American males, and one was an

Asian/Pacific Islander female.  *See id*; Exhibit F.  Because of the reassignment, Plaintiff's

security badge access level was changed from permitting her access to the White House to

permitting access to 1800 G Street, N.W.

When Plaintiff was told about her reassignment, she said that she did not wish to comply,

and left the mailroom.  Plaintiff returned and thrust her access badge close to her supervisor's face.  She asked if he was going to take the badge as well.  *Id*.  In response to this behavior, on July 27, 2004, Plaintiff was issued a Notice of Proposed Suspension.  *See* Exhibit G.  On August 13, 2004, a Notice of Decision on Suspension was issued, and Plaintiff was suspended for three days.  *See* Exhibit H.  In a written response, Plaintiff apologized for her behavior.  Exhibit O (Plaintiff's Written Response to Suspension dated August 5, 2004).  Plaintiff indicated that she believed that she was being punished for reporting the purported security violation.  *See id*. at 1.

Upon being notified of her transfer, Plaintiff attempted to contact several Senior White House Staff Members to ask them to intervene on her behalf.  Exhibit F at p. 3.  *See* Exhibit P (Affidavit of Susie Shannon, Director, Human Resources Management Division) at p. 2. Plaintiff attempted to speak to Andrew H. Card, Jr., Assistant to the President and Chief of Staff; Harriet Miers, Deputy Assistant to the President and Deputy Chief of Staff; Linda Gambatesa, Assistant to the President and Director of Oval Office Operations; and Tim Campen, Special Assistant to the President and Director, Office of Administration.  *See* Exhibit I at pp. 5, 6.

On June 1, 2005, Plaintiff was issued a Notice of Proposed Removal.  *See* Exhibit L; Compl. at p. 6.  On July 8, 2005, Plaintiff was removed from Federal Service.  *See id*.

## II.  PROCEDURAL BACKGROUND

On April 6, 2004, Plaintiff contacted the EEO director in order to report that, on March 24, 2004, a purportedly "unsecured box entered the White House en route to President Bush, wife Laura Bush and their immediate staff."  Compl. at p. 3-4.  On June 16, 2004, Plaintiff filed an informal complaint indicating that she had been discriminated against on the basis of race,

color, sex and reprisal for participating in prior EEO activity.[4]  *See* Exhibit E.

On August 13, 2004, Plaintiff filed a formal EEO complaint.[5]  *See* Exhibit J.  Plaintiff alleged that she had been discriminated against based upon her race (Caucasian), color (Caucasian), sex (female) and in reprisal for prior EEO activity.  *See id*.; Exhibit I (Formal Complaint of Discrimination); Exhibit J at p. 1.[6]  Specifically, Plaintiff complained about two issues:

1) the placement of a letter of reprimand into her personnel file on June 16, 2004;  and

2) the reassignment from the West Wing Mailroom to the mailroom at 1800 G

Street, N.W., and the change of her work hours, effective July19, 2004.

*See id*. at 1.  On September 13, 2004, Plaintiff was informed in writing that these claims would be accepted for investigation.  *Id*.

On September 24, 2004, as a result of her three-day suspension, Plaintiff amended her complaint to include an additional issue - - discrimination based upon "race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity," motivated her suspension. Exhibit K at p. 1.  On October 5, 2004, Plaintiff was informed in writing that the three claims were accepted for investigation.  *See id*. at 2.

At the conclusion of OA's investigation, Plaintiff requested a hearing before an EEOC

---

[4]Plaintiff alleged that this EEO activity took place on March 24, 2004. *See* Compl. at p. 3.

[5]In her Complaint, Plaintiff alleges that she filed her formal complaint on July 30, 2004. Compl. at p. 2.  The formal complaint was dated July 30, 2004, but was received by facsimile and determined to be filed on August 13, 2004.  *See* Exhibit J.  Plaintiff amended her Complaint on September 24, 2004.  *See* Exhibit K.

[6]This correspondence mistakenly indicated that the prior EEO activity occurred on April 9, 2004.

Administrative Judge.  *See* Exhibit A at p. 1.  On October 7, 2005, the OA filed a Motion for

Findings and Conclusions Without a Hearing.  *See* Exhibit Q (Motion for Findings and

Conclusions Without a Hearing, *Jones v. Straub*, EEOC Case NO. 100-2005-0382x (October 7,

2005)).  The Administrative Judge made a determination of the claims before the Commission.

*See* Exhibit R (Determination of Claims Before the Commission, *Jones v. Straub*, EEOC Case

No. 100-2005-00382 (January 27, 2006)("The only claims before the Commission are the

original three claims accepted by the Agency in 2004)).  On April 26, 2006, the Administrative

Judge granted OA's motion, and found that Plaintiff failed to prove that she was subjected to

discrimination.  *See* Exhibit S (EEOC Decision, *Jones v. Straub*, EEOC Case NO. 100-2005-

0382x (April 26, 2006)).  On May 23, 2006, OA issued a final order implementing the decision.

*Id*.

On June 22, 2006, Plaintiff filed an appeal from OA's final order to the Equal

Employment Opportunity Commission ("EEOC").  *See* Exhibit A at p. 1.  On January 30, 2007,

the EEOC upheld the decision of the Administrative Judge.  The EEOC determined that the

Administrative Judge properly found that OA articulated legitimate, non-discriminatory reasons

for issuing Plaintiff the Letter of Reprimand, for assigning Plaintiff to a different work location,

and for suspending Plaintiff for three days.  *Id*. at 2-3. The Administrative Judge also found that

Plaintiff had not shown that OA's explanations for these actions were a pretext for discrimination

or retaliation.[7]  *Id*. at 3.  Moreover, the Judge ruled there were no issues of material fact that

---

[7]The EEOC noted that Plaintiff did "not specifically address the issues [which she appealed], nor explain why a hearing [should] have been conducted concerning [her] claims."  *Id*. at 3.

6

necessitated a hearing.[8]  *Id.*  On August 6, 2007, Plaintiff's request for reconsideration of the

decision was denied.  *See* Exhibit T (EEOC Denial of Motion for Reconsideration, *Jones v.*

*Straub*, EEOC Case No. 100-2005-0382x (August 6, 2007)).

## III.  **STANDARDS OF REVIEW**

### A.  **Standard of Review Under Fed. R. Civ. P. 12(b)(6)**

A complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a

claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief

that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, __U.S. ___, 127 S. Ct. 1955, 1974

(May 21, 2007) (clarifying the standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46

(1957)); *see also Aktieselskabet v. Fame Jeans, Inc.*, -- F.3d --, 2008 WL 1932768 (D.C. Cir.

Apr. 29, 2008); *In re Sealed Case*, 494 F.3d 139, 145 (D.C. Cir. 2007) (citing *Twombly*).

This standard applies equally in employment cases.  *See, e.g., Kassner v. Second Ave.*

*Delicatessen, Inc.*, 496 F.3d 229, 240 (2d Cir. 2007); *EEOC v. Concentra Health Servs., Inc.*,

496 F.3d 773 (7th Cir. 2007); *Ofori-Tenkorang v. Am. Int'l Group, Inc.*, 460 F.3d 296, 307 (2d

Cir. 2006). The allegations in a plaintiff's complaint are presumed true at this stage and all

reasonable factual inferences must be construed in a plaintiff's favor.  *Maljack Prods., Inc. v.*

*Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995).  However, "the court need

---

[8]The EEOC also properly determined that Plaintiff's removal was not before the EEOC.
*See* Exhibit A.  On August 8, 2005, Plaintiff filed an appeal of her removal with the Merit
Systems Protection Board ("MSPB").  *See* Exhibit U (Merit Systems Protection Board Appeal
Form).  On December 15, 2005, Plaintiff requested that her MSPB appeal be dismissed without
prejudice pending the proceeding before the EEOC.  *See* Exhibit V (MSPB Initial Decision,
*Jones v. Office of Admin.*, Docket Number DC-0752-05-0689-I-1 (December 16, 2005)) at p. 1.
The MSPB Administrative Judge dismissed the appeal without prejudice to appellant's right to
refile.  *Id.* at 2.  Plaintiff was to refile her appeal no later than February 17, 2006.  *Id.*  However,
Plaintiff failed to do so.

not accept inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Comm. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl.*, 127 S. Ct. at 1965.

### B. Standard of Review Under Fed. R. Civ. P. 56

Where no genuine dispute exists as to any material fact, summary judgment is required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Id.* at 247. "The burden on the moving party may be discharged by 'showing' -- that is, pointing out to the [Court] -- that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987).

Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, to avoid summary judgment, the plaintiff must present some objective evidence that would enable the court to find that he or she is entitled to relief. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), the Supreme Court held that, in responding to a proper motion for summary judgment, the party who bears the burden of proof on an issue at trial must "make a sufficient showing on an essential element of [her] case" to establish a genuine dispute.

In *Anderson*, the Supreme Court explained under what circumstances summary judgment

is appropriate:

> If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted . . . [T]he mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff.

*Anderson*, 477 U.S. at 252; *see also Laningham v. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (the non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor). In *Celotex*, the Supreme Court further instructed that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## IV.  ARGUMENT

### A.  The Director of the Office of Administration is the Only Proper Defendant in this Suit.

In the caption of her complaint, Plaintiff names George W. Bush, President of the United States, and Alan R. Swendiman, Director, Executive Office of the President, as defendants in this matter. Generally, civil actions proceeding under Title VII and the Rehabilitation Act are restricted to naming only the head of the department, agency, or unit in which the allegedly discriminatory acts transpired. *See* 42 U.S.C. § 2000e-16(c); *Nichols v. Truscott*, 424 F. Supp.2d 124, 132 (D.D.C. 2006). In 1997, Congress extended certain rights and protections, including rights and protections under Title VII and the Rehabilitation Act, to employees of Presidential Offices, and provided that the term "employing office" would include each office, agency, or other component of the Executive Office of the President. *See* 3 U.S.C. §§ 401, 402, 411. In this

case, Plaintiff's employing office is the Office of Administration. Therefore, the only proper Defendant in this case is the Director of OA, in his official capacity.  Notably, the EEOC's decision in this matter named only Alan R. Swendiman, Director of OA as the defendant.  *See* Exhibit S.  Accordingly, George W. Bush, President of the United States, should be dismissed as a party to this action.[9]

## B. <u>Plaintiff Has Failed to Exhaust Her Administrative Remedies.</u>

### 1. Governing Law

Prior to filing a civil action in federal court, a federal employee must exhaust administrative remedies before the concerned Federal agency or office.  *See* 42 U.S.C. § 2000e-16(c); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002); *Jarrell v. United States Postal Serv.*, 753 F.2d 1088, 1091 (D.C. Cir. 1985) (a timely administrative charge is a prerequisite to initiation of a Title VII action in district court); *Park v. Howard Univ.*, 71 F.3d 904, 905 (D.D.C. 1995), *cert. denied*, 519 U.S. 811 (1996) (plaintiff must first exhaust administrative remedies by contacting an EEO counselor within 45 days of the alleged discriminatory events and subsequently filing an administrative complaint); *Brown v. Gen. Servs.*

---

[9]Additionally, in the body of the Complaint, Plaintiff avers that she "complains against" nine other individuals "jointly, individually and severally . . . . "  *See* Compl. at p. 2.  Because the only proper Defendant in this case is the Director of OA, in his or her official capacity, however, these individuals are also improper Defendants and, therefore, should be dismissed. Furthermore, in the event that Plaintiff is deemed to be suing these individuals in their personal capacities, Defendants reserve the right to assert other defenses, including lack of proper service, lack of personal jurisdiction, and qualified immunity, and to substitute the United States as the sole defendant for any alleged common law torts.  Moreover, in the event that Plaintiff is deemed to be bringing this action under the Federal Tort Claims Act, Defendants reserve the right to argue applicable defenses including failure to exhaust, sovereign immunity, and the exclusive remedial scheme of Title VII for claims of discrimination in federal employment.  *See Brown v. Gen. Serv. Admin.*, 425 U.S. 820, 835 (1976); *Boyd v. O'Neill*, 273 F. Supp. 2d 92, 95 (D.D.C. 2003).

*Admin.*, 425 U.S. 820, 832 (1976); *Bowden v. United States*, 106 F.3d 433, 437-38 (D.C. Cir. 1997); *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985); *Siegel v. Kreps*, 654 F.2d 773, 776 (D.C. Cir. 1981); *Smith v. Dalton*, 971 F. Supp. 1, 4 (D.D.C. 1997).

"[T]he 1978 amendments to the Rehabilitation Act incorporated § 717 of Title VII, which make exhaustion a prerequisite to filing a judicial complaint alleging a Title VII violation in the federal workplace." *Thorne v. Cavazos*, 744 F. Supp. 348, 350 (D.D.C. 1990). *See Doe v. Garrett*, 903 F.2d 1455, 1461 (11th Cir. 1990); *Spence v. Straw*, 54 F.3d 196, 200-201 (3d Cir. 1995); *Milbert v. Koop*, 830 F.2d 354 (D.C. Cir. 1987). Hence, a federal employee cannot simply file a Rehabilitation Act complaint in federal court; she must first exhaust administrative remedies. *See* 42 U.S.C. § 2000e-16(c); 29 U.S.C. § 794(a); 29 C.F.R. § 1614.407.[10]

The purpose of the exhaustion requirement is to provide the employing office with notice of the claim of alleged discrimination, to provide the employing office with an opportunity to rectify any wrong through the conciliation process or through administrative relief, and "to ensure that the federal courts are burdened only when reasonably necessary." *Brown v. Marsh*, 777 F.2d at 14*; see also Brown v. Gen. Servs. Admin.*, 425 U.S. at 833-35. Because conciliation

---

[10]Plaintiff alleges that she is bringing claims pursuant to 29 U.S.C. §§ 791 and 794(c) of the Rehabilitation Act of 1973. *See* Compl. at p. 2. Although there is conflict as to whether suits by federal employees alleging violations of the Rehabilitation Act must be brought under section 501, 29 U.S.C. § 791(b), or section 504, 29 U.S.C. § 794(a), Defendants submit that section 501 of the Rehabilitation Act is the exclusive remedy for federal employees. *See Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1994) (strongly suggesting that federal employees should sue under section 501 rather than section 504); *Rivera v. Heyman*, 157 F.3d 101, 104-5 (2d Cir. 1998); *McGuinness v. United States Postal Serv.*, 744 F.2d 1318, 1321 (7th Cir. 1984); *but see Little v. FBI*, 1 F.3d 255 (4th Cir. 1993) (federal employee may sue employing agency under both § 791 and § 794)). Defendants assert that there has been no waiver of sovereign immunity for a jury trial or compensatory damages in section 504 cases and reserve the right to further briefing on this affirmative defense in the event that Plaintiff's Rehabilitation Act claim is not dismissed. *See Lane v. Pena*, 518 U.S. 187, 194 (1996).

and employing office resolution, rather than litigation, are the objectives of Title VII, the courts have found exhaustion of statutory administrative remedies a prerequisite to judicial relief. *Siegel*, 654 F.2d at 776-77; *Battle v. Rubin*, 121 F. Supp.2d 4, 7 (D.D.C. 2000) ("a party must timely file all applicable administrative complaints and appeals in order to bring a claim in federal court"). As the Supreme Court reiterated in *Morgan*, "'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" 536 U.S. at 108 (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980)).

### 2. Plaintiff Has Failed to Exhaust Her Disability Claim.

On June 16, 2004, Plaintiff filed an informal complaint of discrimination.[11] In that complaint, Plaintiff indicated that she was discriminated against on the basis of race, color, sex, and reprisal for participation in protected EEO activity. *See* Exhibit E. On this form, there was a box for Plaintiff to check to indicate that she had been discriminated against on the basis of disability, but Plaintiff failed to do so. *Id*. Plaintiff next filed a formal complaint of discrimination in which she indicated that she had been discriminated against on the basis of race, color, sex and reprisal. *See* Exhibit I. Again, there was a box on the form for Plaintiff to

---

[11]Plaintiff states that she contacted the "EEO Director about her EEO concerns related to racial disrespect due to [the report of the purported] security violation" on April 6, 2004. Compl. at p. 4; *see* Exhibit W (Information for Informal Complaint of Discrimination dated April 15, 2004). Plaintiff alleges that she "went back to [the] EEO Director . . . and again discussed filing an EEO complaint with her concerns" on April 15, 2004. Compl. at p. 4. After a meeting did not resolve Plaintiff's concerns, she alleges that, "[o]n May 20, 2004, [she] informed [an EEO counselor] that she definitely wanted to file a formal EEO complaint of reprisal activity . . . ." *Id*. at 5. On June 16, 2004, Plaintiff filed an informal complaint of discrimination. *See* Exhibit E. By correspondence dated July 30, 2004, Plaintiff specifically was informed of her "right to file a discrimination complaint on the matters brought to [the] attention [of the] EEO official [on] *June 16, 2004."  See* Exhibit X (Correspondence from Shalini Benson, EEO Counselor, to Plaintiff, dated July 30, 2004) (emphasis added). Plaintiff offered no objection to June 16, 2004 as the filing date of her informal complaint.

check to indicate that she had been discriminated against on the basis of disability.  However, Plaintiff failed to do so.  *See id*.

By letter dated September 13, 2004, the EEO Office acknowledged receipt of Plaintiff's complaint of discrimination and advised that her claims of discrimination based upon race (Caucasian), color (Caucasian) and sex (female) and reprisal for prior protected activity had been accepted for investigation.[12]  *See* Exhibit J.  There was nothing in this letter to suggest that a disability discrimination claim had been filed or was being investigated.  *See id.*

By letter dated September 24, 2004, Plaintiff amended her complaint to include another claim of discrimination after she was suspended for three days for insolent behavior.[13]  *See* Exhibit K, Exhibit Y.  Yet, Plaintiff again failed to include any reference to a disability discrimination claim in her allegations of discrimination.

 Despite being given numerous opportunities to make such an allegation at the administrative level, now, for the first time, Plaintiff asserts a disability discrimination claim in her complaint and alleges that she was denied a reasonable accommodation.  *See* Compl. at pp. 2, 4.  Because exhaustion of administrative remedies is a prerequisite to bringing a claim in federal court, however, Plaintiff's claim under the Rehabilitation Act must be dismissed.  *See Bayer v. U.S. Dep't of Treasury*, 956 F.2d 330, 332 (D.C. Cir. 1992); *Kizas v. Webster*, 707 F.2d 524, 543 (D.C. Cir.1983).  *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) ("the EEOC

---

[12] The claims accepted concerned the letter of reprimand issued on June 16, 2004, and Plaintiff's reassignment to another mailroom effective July 19, 2004.  *See* Exhibit J.

[13] Plaintiff listed only her race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity as the bases for her new claim.  *See* Exhibits K and Y (Correspondence from Mindy Farber, Plaintiff's Attorney, to EEO Director, Linda Sites, dated September 24, 2004).

charge defines the scope of the plaintiff's right to institute a civil suit") (internal quotations and citations omitted).

### 3. Plaintiff Has Failed to Exhaust Certain Title VII Claims.

In her Complaint, Plaintiff claims that she was discriminated against:

> on the basis of her race by denying her promotional opportunities, placing her on forced leave, threaten[ing] her federal career because of her protected EEO activity, harassed her because of her sex, placed her on a Performance Improvement Plan and fired her in retaliation and in violation of Title VII . . . .

Compl. at p. 6.[14]

However, Plaintiff failed to raise each of these Title VII claims at the EEO administrative level. *See* Exhibits A, E and I.; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. at 122 (2002) (a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period); *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005) (It is well settled that "issues not raised before an agency are waived and will not be considered by a court on review."); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (arguments not raised before agency are deemed waived). Accordingly, these Title VII claims should be dismissed.

### C. Plaintiff Has Failed to State a Claim Upon Which Relief Can Be Granted.

### 1. Plaintiff Has Failed to Allege a Claim Under the Rehabilitation Act.

To sustain a disability claim pursuant to the Rehabilitation Act, a plaintiff must as a threshold matter establish that he or she has a disability. *See Lester v. Natsios*, 290 F. Supp. 2d

---

[14]Plaintiff did file an action with the Merit Systems Protection Board challenging her removal. However, that action voluntarily was dismissed by Plaintiff. *See* Exhibit V. In addition, the claim of "threaten[ing] her federal career because of her protected EEO activity" is a retaliation claim, not a discrimination claim based upon race or gender.

11 (D.D.C. 2003) (citing *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002); *Stein v. Ashcroft*, 284 F.3d 721, 724 (7th Cir. 2002)).  An "individual with a disability" is one who has "a physical or mental impairment which *substantially* limits one or more of such person's major life activities." 29 U.S.C. § 705(20)(B); 29 C.F.R. § 1630.2(g).  In *Toyota v. Williams*, the Court held that "substantially" suggests "considerable" or "to a large degree."  534 U.S. 184, 196 (2002).  Citing the *Toyota* decision, this Supreme Court has explained that "[i]mportantly, 'merely having an impairment does not make one disabled.'"  *Lester*, 290 F. Supp.2d at 24 (citing *Toyota*, 534 U.S. at 195).  This Court also has found that "[a] claimant must instead demonstrate that the impairment substantially limits a major life activity, and is permanent or long-term."  *Lester*, 290 F. Supp.2d at 24 (citing *Toyota*, 534 U.S. at 195; *see also McDonald v. Commonwealth of Pa.*, 62 F.3d 92, 96 (3d Cir. 1995); *Paegle v. Dep't of the Interior*, 813 F. Supp. 61, 64 (D.D.C. 1993)).  Although temporary conditions still require a case-by-case evaluation, a presumption exists that temporary impairments do not qualify as disabilities.  *Toyota*, 534 U.S. at 198.

Plaintiff alleges that on April 9, 2004, she "broke her toe [in a non-job related incident] and requested to park closer to the office until her toe healed."  Compl. at p. 4.  She avers that "Mr. Haskins denied her request for reasonable accommodations which created an extreme medical hardship upon Complainant."  *See id*.  Additionally, Plaintiff alleges that she "was given difficult assignments during the period of an established injury and was denied reasonable accommodations in accordance with the American with Disabilities Act."  *See id*. at 6.  However, Plaintiff's Complaint makes it clear that her broken toe was a minor, short-lived injury, and does not qualify as an impairment which substantially limited a major life activity.  *See id.* at 4

15

("requested medical accommodations . . . until her toe healed.")   *See Adams v.* Rice, 484 F.

Supp. 2d 15, 22 (D.D.C. 2007)( impairments which are purely temporary in nature are not

impairments that substantially limit a major life activity); *Paegle v. Dep't of the Interior*, 813

F.Supp. 61 (D.D.C. 1993) (where plaintiff presented to employer that injury was not permanent,

disabling condition, "plaintiff's temporary injury . . . d[id] not constitute a 'handicap' for

purposes of the Rehabilitation Act."); *Grimard v. Carlston*, 567 F.2d 1171, 1174 (1st Cir. 1978)

(fractured and dislocated ankle not a handicap).  *Cf. Bragdon v. Abbott,* 524 U.S. 624, 641 (1998)

("HIV infection is a physical impairment which substantially limits a major life activity");

*Moysis v. DTG Datanet*, 278 F.3d 819, 825 (8th Cir. 2002) (where plaintiff suffered brain injury,

jury could reasonably find that impairments were long-term and substantially limited "real work

opportunities."); *Otting v. J.C. Penney Co*., 223 F.3d 704, 710 (8th Cir. 2000) (considering record

as a whole, plaintiff's epilepsy substantially limited one or more major life activities.)

Accordingly, Plaintiff has failed to state a claim under the Rehabilitation Act and such claim

should be dismissed.

### 2.  Plaintiff's Claim of Discrimination Under Title VII.

A.  Adverse Employment Action

In order to prevail in an employment discrimination suit, a plaintiff must show, as a

threshold matter, that she suffered an adverse employment action.  In Plaintiff's formal

complaint, she alleged that she was discriminated against on the basis of race (Caucasian), color

(Caucasian), and sex (female), when:

a.  A letter of reprimand was placed her in personnel file on June 16, 2004;

b. She was reassigned, beginning July19, 2004, from the West Wing mailroom to the

16

mailroom at 1800 G Street and her work hours were changed from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:-00 p.m.; and

c. She was issued a three-day suspension for insolent behavior on July 15, 2004, toward her supervisors.

*See* Exhibit R.  Only the third of these assertions possibly makes out an adverse employment action.

"An 'adverse employment action' . . . is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006).  *See Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997)(In determining whether a particular employment action constitutes an adverse action, the trier of fact should focus on "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating."); *Crady v. Liberty Nat'l and Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) ("a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience") (cited with approval in *Farce v. Tanoue*, 131 F. Supp. 2d 36, 40 (D.D.C. 2001).  "Not everything that makes an employee unhappy is an actionable adverse action. . . ."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).  "'[P]urely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions."  *Nichols*, 424 F. Supp. 2d at 136.  An "employment decision does not rise to the level of an actionable adverse action unless there is a tangible change in the duties or working conditions constituting a *material* employment disadvantage."  *Stewart v. Evans*, 275 F.3d 1126, 1134-35 (D.C. Cir. 2002)(emphasis added) (citing *Walker v. WMATA*, 102 F. Supp. 2d 24, 29 (D.D.C.2000)) .

### i) Letter of Reprimand

Plaintiff's receipt of a letter of reprimand, did not constitute an adverse action. Her letter of reprimand did not result in a diminution in pay, benefits or responsibility. It did not constitute a materially adverse change in the terms and conditions of her employment. In fact, there is no material consequence to an individual's work status in receiving a Letter of Reprimand. It is simply the employer's means to officially inform an employee that her conduct or performance, at a certain time, was unacceptable to the employer. *See Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999) (There is a "thick body of precedent . . . refutes the notion that formal criticism . . . [is] necessarily [an] adverse action.") While the receipt of the Letter of Reprimand may have upset plaintiff, it simply did not have a materially adverse impact on her employment for purposes of Title VII. To find otherwise would have the deleterious effect of "deterring employers from documenting performance difficulties, for fear that they would be sued for doing so." *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998). Therefore, Plaintiff cannot claim that an adverse employment action took place when she was issued the letter of reprimand.

### ii) Reassignment to the 1800 G Street, N.W., Mailroom

Plaintiff's reassignment to the mailroom at 1800 G Street, N.W., and the alteration of her work hours, also do not constitute adverse actions. While Plaintiff would have preferred not to have been assigned to a different mailroom, this reassignment had no material effect on the terms and conditions of her employment. *See Holcomb*, 433 F.3d at 902 ("Not everything that makes an employee unhappy is an actionable adverse action . . . .") It did not result in significantly different responsibilities for Plaintiff, or cause a significant change in benefits. *See Broderick*, 437 F.3d at 1233. In fact, Plaintiff kept the same position upon reassignment. *See* Exhibit F at p.

18

2 ("We reassigned [Plaintiff] to the same position in a different mailroom."); Exhibit M at p. 3.

Moreover, the reassignment was part of an ongoing series of personnel reassignments with OA's

Mail Messenger Operations.  *See* Exhibit F; Exhibit A at p. 3.  Other mailroom employees that

had been reassigned included an Hispanic male, three African American males and an Asian

American/Pacific Islander male.  *See* Exhibit F.  Because a "purely subjective injur[y], such as

dissatisfaction with a reassignment" does not constitute an adverse action, *Nichols*, 424 F. Supp.

2d at 136, Plaintiff's change of work site to 1800 G Street, N.W., with the attendant change in

work hours, clearly did not constitute an adverse action.

### iii) Three-Day Suspension

 Suspension without pay in some cases may amount to an adverse employment action, *see*

*Dickerson v. SecTek*, 238 F. Supp. 2d 66, 80 & n.11 (D.D.C. 2002), even where, as here, the

suspension is a mere three days, does not alter the employee's employment status, and has no

significant, long-term negative effects.

Nevertheless, Plaintiff's claim of Title VII discrimination must be dismissed because

Defendants clearly had legitimate, nondiscriminatory reasons for taking such action.

### B.  Defendants' Legitimate, Non-Discriminatory Reasons Defeat Plaintiff's Claims.

Assuming *arguendo* that Plaintiff suffered an adverse employment action, neither

Plaintiff's allegations nor the evidence in the record can rebut Defendants' legitimate,

nondiscriminatory reasons for those actions.  Because Plaintiff cannot overcome Defendants'

legitimate, nondiscriminatory reasons, the Court need not even ask whether Plaintiff can

establish a *prima facie* case - - which she cannot.  *See Brady v. Office of the Sergeant at Arms,*

*United States House of Representatives*, 520 F.3d 490 (D.C. Cir. 2008).  Under *Brady*, the

existence *vel non* of a *prima facie* case is not the central question at this point in the analysis:

"Where an employee has suffered an adverse employment action[15] and an employer has asserted

a legitimate, non-discriminatory reason for the decision, the district court need not - - *and should*

*not* - - decide whether the plaintiff actually made out a prima facie case under *McDonnell*

*Douglas*." *Id*. at 494.[16]  Instead, the Court should ask whether the employee can produce

"sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory

reason was not the actual reason and that the employer intentionally discriminated against the

employee on the basis of race, color, religion, sex, or national origin." *Id*.  Because Plaintiff's

allegations - - and the evidence in the record - - - cannot support such a shoring, the Court should

dismiss Plaintiff's claims.

　　　With respect to Defendants' legitimate, non-discriminatory reasons for these actions,

Plaintiff was issued the letter of reprimand because, although she volunteered to work on June

---

[15]Despite the *Brady* Court's admonition that District Courts need not decide whether a plaintiff makes out a *prima facie* case, it clearly held that a plaintiff still must establish that she suffered an adverse employment action.

[16]However, "because the strength of the *prima facie* case is still relevant to the central question of whether Plaintiff [could] demonstrate that a reasonable jury could conclude from all the evidence that [she was discriminated against,]" *Pardo-Kronemann v. Jackson*, 2008 WL 836153, at *5 (D.D.C. March 31, 2008), it may be noted that in order for a white plaintiff to establish a *prima facie* case of discrimination, she must show "background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993) (quoting *Parker v. Baltimore & Ohio R.R.*, 652 F. 2d 1012, 1017 (D.C. Cir. 1981)).  "this requirement is not designed to disadvantage the white plaintiff" but "merely substitutes for the minority plaintiff's burden to show that he is a member of a racial minority."  *Id*.  *See Checka v. Rite Aid of Washington, D.C., Inc.*, 2008 WL 647540, at *3 (D.D.C. March 11, 2008); *Hairsine v. James*, 517 F. Supp. 2d 301, 307 (D.D.C. 2007).

11, 2004, she failed to report for work, and failed to complete a Request for Leave or Approved

Absence Form in violation of applicable procedures.  Exhibit M at pp. 2-3.  Therefore, the letter

of reprimand was issued as a result of Plaintiff's violation of applicable procedures, and

Defendants clearly had legitimate, non-discriminatory reasons for issuing the letter of reprimand.

Plaintiff was reassigned as part of an ongoing series of personnel reassignments designed

"to make the operations more effective and efficient and to provide customers with the best

possible customer service."  Exhibit C at p. 2; Exhibit M at p. 3; Exhibit F at p. 2.  Plaintiff as

well as six other employees were reassigned or relocated during the same period.  *See* Exhibit F

at p. 3.  Plaintiff was reassigned to

> the same position in a different, larger mailroom to provide her with opportunities
> to (1) cross-train with other employees in different mailrooms, thereby helping the
> organization increase its customer service; (2) learn different skills, which could
> help her enhance future career opportunities and would add value to the entire
> organization; and, (3) lead a larger mailroom, given that [Plaintiff indicated that]
> she wanted to be a supervisor in the future.

Exhibit M at p. 3.  Therefore, Defendants had legitimate, non-discriminatory reasons for

Plaintiff's reassignment.

Plaintiff's challenge to her three-day suspension fares no better, because that decision,

too, rested on legitimate reasons.  Plaintiff was issued the three-day suspension not because of

discrimination but because she reacted poorly when she was informed of the reassignment.

Specifically, she said that she did not wish to comply, and  "stormed out of" the mailroom.  *See*

Exhibit Z (Report of Investigation) at p. 12.  She returned and thrust her access badge close to her

supervisor's face.  *Id*.  Moreover, Plaintiff attempted to contact several Senior White House Staff

Members to ask them to intervene on her behalf.  Exhibit F at p. 3.  *See* Exhibit P (Affidavit of

Susie Shannon, Director, Human Resources Management Division) at p. 2.[17]  Again, Plaintiff's

suspension was as a result of her own behavior, and Defendants had legitimate, non-

discriminatory reasons for taking that action.

Therefore, it is clear that Defendants had legitimate, non-discriminatory reasons for each

of its decisions.  Moreover, Plaintiff cannot show that these reasons were "not the actual reason[s

for Defendants' actions] and that [Defendants] intentionally discriminated against [her] on the

basis of race, color [or gender] . . . ."  *Brady*, 520 F.3d at slip op. 7 (citing *St. Mary's Honor*

*Society v. Hicks*, 509 U.S. 502, 514-15 (1993); *United States Postal Serv. Bd. of Governors v.*

*Aiken*, 460 U.S. 711, 714-16 (1983)).  Plaintiff offers nothing beyond her own allegations to

refute Defendants' legitimate, non-discriminatory reasons for its decisions.  "'As courts are not

free to second-guess an employer's business judgment,' a plaintiff's mere speculations are

'insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its

decisions] . . . ."  *Brown v. Brody,* 199 F.3d 446, 458-59 (D.C. Cir. 1999) (citing *Branson v.*

*Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).  Therefore, Plaintiff's claim of

discrimination must fail.

### 3.  Plaintiff's Claim of Retaliation Under Title VII.

#### A.  Plaintiff Has Failed to State a Claim of Retaliation Under Title VII.

To succeed on a retaliation claim under Title VII, a plaintiff must prove that she engaged

in protected activity and that her protected activity resulted in adverse employment action.  *Wiley*

*v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  Plaintiff has failed to state a claim retaliation

---

[17]Having been the subject of a letter of reprimand less than one month earlier, Plaintiff's
behavior warranted a more serious sanction under OA's progressive discipline policy.  *See*
Exhibit H.

under Title VII because she has not alleged that she engaged in protected activity.  Plaintiff

alleges that "from the time [she] reported the March 24, 2004 incident [involving the box] to the

Equal Employment Opportunity director on April 6, 2004 and . . . beyond, [she] experienced a

documented **career first** litany of extreme harassment and hostile working conditions [based

upon her race, color, and gender]."[18]  Compl. at p. 6.  According to the Complaint, Plaintiff

complained of the alleged security violation and disrespectful treatment to the EEO Director.

However, complaining to the EEO Director regarding a purported security violation and being

"disrespected" do not rise to the level of activities protected under Title VII.  *See Broderick,* 437

F.3d at 1232 (not every complaint garners its author protection under Title VII).

> Title VII provides that:
>
> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees . . . *because he has opposed any practice made an*
> *unlawful employment practice by this subchapter*, or because he made a charge,
> testified, assisted, or participated in any manner in a investigation, proceeding,
> or hearing *under this subchapter*.

42 U.S.C. § 2000e-3(a) (emphasis added).  Neither the reporting of a purported security violation

nor the reporting of disrespectful treatment are protected activities under the language of this

statute.  Accordingly,  Plaintiff's claim that she was retaliated against after these reports should

be dismissed.  *See Brodetski v. Duffey*, 141 F. Supp. 2d 35, 44 (D.D.C. 2001) ("courts cannot be

wheeled into action for every workplace slight, even one that was possibly based on protected

---

[18] Plaintiff claimed that after reporting the purported security violation concerning a box
that had not been processed according to radiation procedures, she was disrespected by a female
subordinate because Plaintiff "was the only white female working in the mailroom."  Compl. at
pp. 3-4.  Additionally, Plaintiff alleges that she "e-mailed [her African American supervisor]
reiterating her concerns [about the box] and was subsequently told by [him,] 'when I see a red
bull, you see a red bull.'"  *Id*.

23

conduct") (citations omitted) .

Moreover, in order to support a claim of retaliation, a plaintiff must demonstrate the employer's challenged action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."[19]  *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (citing *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir.2005)).  Assuming *arguendo* that the reporting of an alleged security violation and disrespectful treatment are protected activities under Title VII, Plaintiff has not alleged that Defendants' actions dissuaded her, or would have dissuaded a reasonable person, from making a charge of discrimination. Indeed, while Plaintiff received the letter of reprimand on June 16, 2004, on that date, she also went to the EEO office and filed an informal complaint of discrimination.  *See* Exhibit E. Further, although Plaintiff was told that she was being reassigned on July 15, 2004 and was issued a Notice of Decision on Suspension on August 13, 2004, on August 13, 2004, she filed a formal complaint of discrimination.  *See* Exhibit I.  Clearly, Plaintiff was not dissuaded from engaging in subsequent EEO activity when Defendants' took these actions against her.

At all events, Plaintiff cannot establish that, after making these reports, she was the subject of retaliation because Defendants had legitimate, non-discriminatory reasons for issuing the letter of reprimand, reassigning Plaintiff and suspending her for three days.  *See supra* at 19-22.

---

[19]"[B]ecause the strength of the *prima facie* case is still relevant to the central question of whether [Plaintiff could] demonstrate that a reasonable jury could conclude from all the evidence that [the issuance of the letter of reprimand and] reassignment w[ere] retaliatory," *Pardo-Kronemann*, 2008 WL 836153, at *5, it is again worth noting that the letter or reprimand and reassignment were not adverse employment actions.  *See supra* at 16-19.

B.  Defendants' Legitimate, Nondiscriminatory Reasons Defeat Plaintiff's Claims.

Even if the Court determines that Plaintiff engaged in protected activity and that she suffered adverse employment action, she still cannot prevail because she cannot establish a causal connection between the protected activity and the adverse action.  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007 (citing *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).  *See Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2406 (2006); *Mitchell v. Baldridge*, 759 F. 2d 80, 86 (D.C. Cir. 1985).  *See Broderick*, 437 F.3d at 1233 (While "'being aggrieved is necessary to state a claim for retaliation, . . . it is not sufficient to demonstrate that a particular employment action was adverse.'") (citing *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)).

Assuming *arguendo* that Plaintiff could claim that the letter of reprimand was an adverse action, she cannot show that there was a causal link between the issuance of the letter of reprimand and her alleged protected activity.  Plaintiff was issued the letter of reprimand as a result of her own failure to submit a leave form contrary to agency procedures. There is nothing to suggest that the issuance of the letter had any connection to Plaintiff's race or gender.  In addition, assuming *arguendo* that the reassignment was an adverse action, there was no causal link between this action and any protected activity.  Plaintiff's reassignment was not connected to her race or gender.  Rather, it was a part of an ongoing series of reassignments designed "to make the operations more effective and efficient and to provide customers with the best possible customer service." Exhibit C at p. 2.  Finally, Plaintiff was suspended when she reacted poorly upon being informed that she was being reassigned.  The suspension was a legitimate response to

25

Plaintiff's behavior. Plaintiff cannot demonstrate that there was a causal link between the suspension and any protected activity.

### 4. Plaintiff's Claim of Hostile Work Environment.

#### A. Plaintiff Has Waived This Claim.

As indicated *supra*, on June 16, 2004, Plaintiff filed an informal administrative complaint of discrimination in which she alleged that she was discriminated against on the basis of race, color, sex, and reprisal for participation in protected EEO activity. *See* Exhibit E. On August 13, 2004, Plaintiff filed a formal administrative complaint of discrimination which she then amended on September 24, 2004. *See* Exhibits I, K. On each occasion, however, Plaintiff failed to allege that she was subjected to a hostile work environment.

In the instant Complaint, for the first time, Plaintiff has alleged a claim of hostile work environment. However, because exhaustion of administrative remedies is a prerequisite to bringing a claim in federal court, Plaintiff's hostile work environment claim must be dismissed. *See Bryant*, 288 F.3d at 132 ("the EEO charge defines the scope of the plaintiff's right to institute civil suit") (internal quotations and citations omitted).

#### B. Even If Properly Presented, Plaintiff's Claim of Hostile Work Environment Fails.

Assuming *arguendo* that Plaintiff properly had raised the claim of a hostile work environment, Plaintiff, nevertheless, has failed to state the claim upon which relief can be granted. To determine whether a reasonable person would find an environment hostile or abusive, the Supreme Court outlined a totality of the circumstances test in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). The *Harris* Court stated that whether the environment is "hostile" or

"abusive" can only be determined by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Id.* at 23. Plaintiff must meet this standard in order to establish a hostile work environment claim because, as the Supreme Court noted, "Title VII does not provide a cause of action for 'ordinary tribulations of the workplace.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

To establish a *prima facie* case of hostile work environment, plaintiff must demonstrate that: (1) she was a member of a protected class; (2) she was subjected to harassment; (3) the harassment complained of was based upon her race or gender; (4) the charged discrimination had the effect of unreasonably interfering with the Plaintiff's work performance and creating an intimidating, hostile, or offensive working environment; and (5) the existence of *respondeat superior* liability. *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2002); *see also Lester*, 290 F. Supp.2d at 22; *Elam v. Bd. of Trustees of Univ. of District of Columbia*, 530 F. Supp. 2d 4, 21 (D.D.C. 2007); *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 162-63 (D.D.C. 2007); *Jones v. Billington*, 12 F. Supp.2d 1, 11 (D.D.C.1997). Moreover, the District of Columbia Circuit has determined that:

> [a] workplace environment becomes hostile for the purposes of Title VII only when offensive conduct "permeate[s] [the workplace] with 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create[s] an abusive working environment.'"

*Barbour v. Browner*, 181 F.3d 1342, 1347-1348 (D.C. Cir. 1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *Elam*, 530 F. Supp.2d at 22. Moreover, "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Barbour*,

181 F.3d at 1347.  Rather, the conduct must be severe and pervasive enough to create an

objectively hostile or abusive environment.

Plaintiff claims that, after she reported to the EEO Director that a box purportedly had

entered the White House without being processed according to security procedures and she

allegedly had been treated with disrespect for complaining about the purported incident, she

experienced a

> litany of extreme harassment and hostile working conditions which included:
> heavy workloads in work assignments, change of work location, change in
> parking location, loss of computer privileges, loss of high level security clearance,
> change of work hours, being prevented from returning to the Old Executive Office
> Building to gather personal belongings, placed under surveillance by United
> States Secret Service (USSS) . . . .

Compl. at p. 4.

Reviewing each of Plaintiff's claims of "harassment and hostile working conditions[,]"

Plaintiff first claims that she suffered heavy workloads in work assignments.  However, Plaintiff

offers no factual support for this claim.  Plaintiff next claims that she experienced a change of

work location.  But, that was not a form of harassment.  Rather, Plaintiff's reassignment was

> part of an ongoing series of personnel reassignments in [OA's] Mail Messenger
> Operations which were intended to make [the] operations more effective and
> efficient, and to provide [the] customers with the best possible customer service. .
> . [A]ll the reassignments . . . [were] routine management actions.

See Exhibit C at p. 2.  The change in parking location and work hours about which Plaintiff

complains occurred because of her reassignment.  The change in Plaintiff's parking location was

necessitated by her change in work location.  Her parking space was changed from a space "on

the Avenue" to one "on the Ellipse."  See Exhibit I at p. 4; Exhibit F at p. 3 (reassignment "to a

new mailroom in a different building . . . required a change to [Plaintiff's] security access level

28

and parking"). Additionally, Plaintiff was not prevented from returning to the Old Executive Office Building to gather personal belongings. Rather, she "took sick leave the day after her reassignment and was unable to pack things herself. Therefore, the OA Security Office's Deputy Director packed [Plaintiff's] things and locked them in a secure area until she returned to work." Exhibit F at p. 4.

The allegations that remain include Plaintiff's claim of loss of high level security clearance, loss of computer privileges, and being "placed under surveillance" by United States Secret Service ("USSS"). However, these claims do not establish that Plaintiff was harassed.

The change in Plaintiff's security clearance was a direct result of her reassignment from the White House to a different building. *See id.* at 3 (Plaintiff's reassignment "to a new mailroom in a different building . . . required a change to her security access level . . .").[20] Plaintiff complains that she lost her computer privileges. However, Plaintiff's "computer privileges were not taken away. Her *e-mail* privileges were [only] *temporarily* suspended after her reassignment because[, after she learned she was being] reassign[ed, she] attempted to contact several senior White House staff members to ask them to intervene on her behalf and possibly override the decision to reassign her." *Id*. at 4 (emphasis added). Plaintiff's actions were viewed as inappropriate. The temporary suspension of the use of e-mail was not harassment. Rather, it was a direct result of, and a proper employer response to, Plaintiff's own actions.

Finally, Plaintiff complains that she was harassed when she was "placed under

---

[20]Claims including security clearances are not actionable under Title VII. *See, e.g. Bennett v. Chertoff*, 425 F.3d 999 (D.C. Cir. 2005).

surveillance by the USSS." Compl. at p. 4. However, Plaintiff was watched by the United States Secret Service while on the job site because she

> had a security badge that gave her access to the White House . . . and she appeared [to be] upset [on July 15, 2005, after learning of her reassignment. So, Mr. Miller] asked the Security Service to ensure that [Plaintiff] did not return to the White House.

*Id*. at 3. Therefore, this did not constitute harassment or create a hostile work environment either. Rather, it was precipitated by Plaintiff's own behavior, which suggested she might pose a security risk to the President. Moreover, it did not create an intimidating or offensive work environment. *See Davis*, 275 F.3d at 1122-22.

Assuming, *arguendo*, that these actions somehow amounted to harassment, there is nothing to establish that any of the actions about which Plaintiff complained were based upon her race or gender. *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (All of the "personnel decisions . . . lack a linkage of correlation to the claimed ground[s] of discrimination."). It is clear that Plaintiff was not forced to suffer any "discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the [her] employment and create an abusive working environment." *Oncale*, 523 U.S. at 81. Plaintiff can point to no derogatory remarks, intimidation, ridicule or insult based upon race.[21] Likewise, Plaintiff can point to no derogatory remarks, intimidation, ridicule or insult based upon gender. Therefore, looking at the totality of the circumstances, Plaintiff has established no evidence to suggest that she was subjected to an intimidating, hostile or offensive work environment. Moreover, even if there were such evidence, it is clear that Defendants had legitimate, non-discriminatory reasons

---

[21] The only derogatory remark based upon race or national origin is alleged to have been made by Plaintiff. Exhibit D at pp. 1-2.

for each of its actions.  *See supra* at 19-22.  Hence, Plaintiff has failed to state a claim of hostile work environment.

## V.  CONCLUSION

For the foregoing reasons, George W. Bush, President of the United States, should be dismissed as a party to this action.  Plaintiff's claims pursuant to the Rehabilitation Act should be dismissed because Plaintiff failed to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  Plaintiff's claims of discrimination based upon race and gender, and her claims that she was subjected to retaliation and a hostile work environment, also must be dismissed for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  In the alternative, summary judgment should be granted on these claims because no genuine issue of material fact exists, and Defendants are entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(b).

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/
MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-6531
Marian.L.Borum@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on this 14th day of May, 2008, the foregoing, and the attached Order, were

sent via First Class Mail, postage prepaid, to:

Laura C. Jones
29872 1 Lincoln Road
Mechanicsville, MD 20659


_____
        /s/
        MARIAN L. BORUM
        Assistant United States Attorney

33

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ——————————————— ) | |
| **LAURA C. JONES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 07-2164 (RWR)** |
| ) | |
| **GEORGE W. BUSH, PRESIDENT OF** ) | |
| **THE UNITED STATES, AND ALAN R.** ) | |
| **SWENDIMAN, DIRECTOR, EXECUTIVE** ) | |
| **OFFICE OF THE PRESIDENT,** ) | |
| ) | |
| **Defendants.** ) | |
| ——————————————— ) | |

## <u>ORDER</u>

Upon consideration of Defendants' Motion to Dismiss or, in the Alternative, for

Summary Judgment, Plaintiff's Opposition, and the entire record herein, it is this _____ day

of _____, 2008,

ORDERED that Defendants' Motion to Dismiss be and is hereby GRANTED; and it is

FURTHER ORDERED that the above-captioned action be and is hereby DISMISSED

with prejudice.

_____
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | |
| **LAURA C. JONES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 07-2164 (RWR)** |
| ) | |
| **GEORGE W. BUSH, PRESIDENT OF** ) | |
| **THE UNITED STATES, AND ALAN R.** ) | |
| **SWENDIMAN, DIRECTOR, EXECUTIVE** ) | |
| **OFFICE OF THE PRESIDENT,** ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————— ) | |

**ORDER**

Upon consideration of Defendants' Motion to Dismiss, or in the Alternative, for

Summary Judgment, Plaintiff's Opposition, and the entire record herein, it is this _____ day

of _____, 2008,

ORDERED that Defendants' Motion for Summary Judgment be and is hereby

GRANTED.

_____
United States District Judge

Copies to:
Marian L. Borum
Assistant United States Attorney
555 Fourth Street, N.W.
Civil Division
Washington, DC  20530

Laura C. Jones
29872 1 Lincoln Road
Mechanicsville, MD 20659

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit A

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

Laura C. Jones,
Complainant,

v.

Larrilyn Bertocchio,
Director,
Executive Office of the President,
Office of Administration,
Agency.

Appeal No. 0120064394[1]

Hearing No. 100-A5-0382X

Agency No. OA-04-01

DECISION

On June 22, 2006, complainant filed an appeal from the agency's May 23, 2006 final order concerning her equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.* The appeal is deemed timely and is accepted pursuant to 29 C.F.R. § 1614.405(a). For the following reasons, the Commission AFFIRMS the agency's final order.

At the time of events giving rise to this complaint, complainant worked as Lead Mail Assistant, Grade 8/4, at the White House in Washington, D.C. On June 16, 2004, complainant contacted an EEO Counselor and filed a formal EEO complaint on July 30, 2004, which was amended on September 24, 2004, alleging that she was discriminated against on the bases of race/color (Caucasian), sex (female), and in reprisal for prior protected EEO activity (arising under Title VII) as to the following actions:

   (1)   Placement of a Letter of Reprimand (LOR) into her personnel file on June 16, 2004;

---

[1] Due to a new data system, your case has been re-designated with the above referenced appeal number.

2                                             0120064394

(2)    Her reassignment beginning July 19, 2004, from the West Wing mailroom to
the mailroom at 1800 G Street, and a change in her work hours from 10:30 a.m.
- 7:00 p.m. to 9.30 a.m. - 6:00 p.m.; and

(3)    Her three-day suspension for insolent behavior on July 15, 2004 toward her
supervisors.

At the conclusion of the investigation, complainant was provided with a copy of the report of
investigation and notice of her right to request a hearing before an EEOC Administrative Judge
(AJ). Complainant timely requested a hearing. The AJ assigned to the case granted the
agency's October 7, 2005 Motion for a decision without a hearing and issued a decision
without a hearing on April 26, 2006. The agency subsequently issued a final order adopting
the AJ's finding that complainant failed to prove that she was subjected to discrimination as
alleged.

On January 27, 2006, the AJ issued a "Determination of Claims Before the Commission." In
such document, the AJ denied complainant's motion to amend the complaint to add three
additional issues, and found that the only claims before him were claims (1)-(3), as listed
above. The AJ addressed complainant's argument that her removal from the agency, should be
accepted as an issue in this case. The AJ found that on June 1, 2005, complainant was issued a
Notice of Proposed Removal, which became effective on July 8, 2005. The AJ found that
complainant alleged that she contacted the EEOC's National Call Center (NCC) in June 2005,
and pursuant to instructions that she was given, she faxed the NCC copies of her removal
documents. The AJ noted that although complainant alleged that someone at the NCC told her
that her documents would be forwarded to the Washington Field Office, the AJ never received
the documents. The AJ noted that complainant was aware of the contact information of the
Washington Field Office, and should have sent the removal notices, as part of a motion to
amend, to that office directly. The AJ concluded that complainant never actually moved to
amend her complaint. The AJ further noted that complainant filed an appeal of her removal
with the Merit Systems Protection Board (MSPB) on August 8, 2005. The AJ asserted that
removal actions are appealable to the MSPB, not the Commission, and that at best,
complainant had a "mixed case" complaint, which would not entitle her to a Commission
hearing.

In addition, the AJ addressed complainant's two "newest claims" noting that in a letter dated
November 28, 2005, complainant notified her agency's EEO Director of two new claims.[2]
The AJ noted that although complainant sent a copy of that letter to the Commission, she did
not move to amend her complaint or consolidate her newest claims. In this instance, we find

---

[2]    One claim apparently concerned "deposition harassment" and the other concerned a
challenge to her unemployment compensation claim.

that the AJ did not abuse his discretion by addressing only the three (3) issues which complainant initially raised in her formal complaint, as these were the sole issues that were properly before the AJ.[3]

In his decision on the merits, dated April 26, 2006 the AJ found that the agency articulated a legitimate, nondiscriminatory reason for the June 16, 2004 Letter of Reprimand (LOR); namely, complainant did not report for work on June 11, 2004, even though she had volunteered to work that day. Additionally, the Manager, Mail/Messenger Operations (M1) asserted that complainant stated that she was "the last one around," which M1 took to mean that she was the last Caucasian working in her unit; and that she stated that "no spic is going to make [her] leave." The AJ noted that according to complainant, she never used the word "spic," and that the reference to "last one around" was the fact that most of her co-workers had already left for the day.

As to issue (2), the AJ found that the agency articulated a legitimate, nondiscriminatory reason; namely, both the Deputy Director, Office of Administration, and M1, acknowledged that complainant was assigned to a different work location, but she was not reassigned in the sense that her job and pay remained the same. They said she was moved in order to help make operations more effective and efficient. They also said that this relocation would enable complainant to cross-train with other employees, learn other skills, and lead a larger mailroom, which would improve her qualifications when seeking a supervisory position in the future. The AJ noted that altogether, there were six employees reassigned or relocated, one white Hispanic, three African American, one Asian, and one Caucasian. The AJ further found that contrary to complainant's claim, she was not denied the opportunity to pack her personal things before she left the West Wing, rather, she was out sick before her transfer.

As to issue (3), the AJ again found that the agency articulated legitimate, nondiscriminatory reasons for its action; namely, in August 2004, Complainant was suspended for three days. The Notice of Proposed Suspension, issued July 27, 2004, was issued because complainant "engaged in insolent conduct toward supervisors." In particular, complainant was accused of responding "with considerable hostility" to M1 when he told her she would be reassigned to the 1800 G Street mailroom. M1 stated that complainant said she did not wish to comply, and left the room. She returned moments later and thrust her access badge close to M1's face. Complainant submitted a written reply, in which she apologized for her behavior, and claimed she was being punished for reporting a possible security violation in the mail room. The AJ

---

[3] **Error! Main Document Only.** We note that Administrative Judges have broad discretion in the conduct of hearings. *See* 29 C.F.R. § 1614.109(e); Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO- MD-110) at 7-8 to 7-14 (revised November 9, 1999); *Bennett v. Department of the Navy*, EEOC Request No. 05980746 (September 19, 2000).

4                                    0120064394

noted that complainant did not deny the events as described, she only tried to excuse them. Consequently, the proposed suspension was imposed.

The AJ then found that complainant has not shown that the agency's explanations for the suspension, the reprimand or reassignment, were pretext for discrimination or retaliation. The AJ further noted that complainant had not proffered evidence from which he could conclude that there are any genuine issues of material fact necessitating a hearing. The AJ then found that the agency was therefore entitled to a decision without a hearing, in its favor.

In her appeal, complainant contends that the AJ incorrectly found that complainant's removal was never before the Commission. Complainant contends that she contacted the NCC in Kansas City and that the NCC forwarded the complaint to the Commission's Washington Field Office, thereby officially placing the claims before the Commission. On appeal, complainant does not specifically address issues (1)-(3), nor explain why a hearing ought to have been conducted concerning such claims. The agency requests that we affirm the final order.

As an initial matter we note that, as this is an appeal from a FAD issued without a hearing, pursuant to 29 C.F.R. § 1614.110(b), the agency's decision is subject to *de novo* review by the Commission. 29 C.F.R. § 1614.405(a). We must first determine whether it was appropriate for the AJ to have issued a decision without a hearing on this record. The Commission's regulations allow an AJ to issue a decision without a hearing when he or she finds that there is no genuine issue of material fact. 29 C.F.R. § 1614.109(g). This regulation is patterned after the summary judgment procedure set forth in Rule 56 of the Federal Rules of Civil Procedure. The U.S. Supreme Court has held that summary judgment is appropriate where a court determines that, given the substantive legal and evidentiary standards that apply to the case, there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In ruling on a motion for summary judgment, a court's function is not to weigh the evidence but rather to determine whether there are genuine issues for trial. *Id.* at 249. The evidence of the non-moving party must be believed at the summary judgment stage and all justifiable inferences must be drawn in the non-moving party's favor. *Id.* at 255. An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 105 (1st Cir. 1988). A fact is "material" if it has the potential to affect the outcome of the case. Here, we find that it was proper for the AJ to issue a decision without a hearing.

To prevail in a disparate treatment claim such as this, complainant must satisfy the three-part evidentiary scheme fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Complainant must initially establish a *prima facie* case by demonstrating that he or she was subjected to an adverse employment action under circumstances that would support an inference of discrimination. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 576 (1978). Proof of a *prima facie* case will vary depending on the facts of the particular case. *McDonnell Douglas* 411 U.S. at 804 n. 14. The burden then shifts to the agency to articulate

5

a legitimate, nondiscriminatory reason for its actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To ultimately prevail, complainant must prove, by a preponderance of the evidence, that the agency's explanation is pretextual. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519 (1993).

Assuming complainant established a *prima facie* case of discrimination on the alleged bases, she has not shown by a preponderance of the evidence that the agency's articulated reasons are pretext for discrimination. We note that even assuming complainant did not use the term "Spic" as she contends, she still has not presented evidence that she was intentionally falsely accused of using this term (and subsequently issued an LOR) because of her membership in a protected group. In fact, complainant speculates that her manager had a non-discriminatory reason for issuing the LOR as well as for ordering her July 19, 2004 reassignment; namely, it was in retaliation for her reporting of a security breach. *See* Report of Investigation, Complainant's Affidavit, at 3. This statement concerning management's motivation seriously undermines complainant's contentions that the actions were taken for discriminatory reasons.

After a careful review of the record, the Commission finds that the AJ's decision without a hearing was appropriate, as no genuine issue of material fact is in dispute. *See Perry v. Department of Defense*, EEOC Appeal No. 01A24206 (July 11, 2003). Therefore, we AFFIRM the agency's final order.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. *See* 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the

6                                      0120064394

absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. *See* 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c)

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

You have the right to file a civil action in an appropriate United States District Court within **ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, filing a civil action will terminate the administrative processing of your complaint.

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*

Carlton M. Hadden, Director
Office of Federal Operations

JAN 3 0 2007

Date

# <u>LAURA C. JONES</u>
## <u>v.</u>
# <u>GEORGE BUSH, President of the United States, et al.</u>

## Civil Action No. 07-2164 (RWR)

## Exhibit B

| 2. Reason for Submission | | 3. Service | | 4. Employing Office Location | 5. Duty Stat. | | 6. OPM Certification No. |
|---|---|---|---|---|---|---|---|

**2. Reason for Submission**
- [X] Redescription
- [ ] New
- [X] Hdqtrs.
- [ ] Field
- [ ] Reestablishment
- [ ] Other

Explanation *(Show any positions replaced)*

**4. Employing Office Location:** WASHINGTON, DC

**5. Duty Stat.:** WASHINGTON, DC

**7. Fair Labor Standards Act**
- [ ] Exempt
- [X] Nonexempt

**8. Financial Statements Required**
- [ ] Executive Personnel Financial Disclosure
- [ ] Employment and Financial Interests

**9. Subject to IA Action**
- [X] Yes
- [ ] No

**10. Position Status**
- [X] Competitive
- [ ] Excepted *(Specify in Remarks)*
- [ ] SES (Gen.)
- [ ] SES (CR)

**11. Position Is:**
- [ ] Supervisory
- [ ] Managerial
- [X] Neither

**12. Sensitivity**
- [ ] 1—Non-Sensitive
- [ ] 3—Critical Sensitive
- [X] 2—Noncritical Sensitive
- [ ] 4—Special Sensitive

**13. Competitive Level Code**

**14. Agency Use**

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | LEAD MAIL ASSISTANT | GS | 0305 | 08 | | 9/23/98 |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

**16. Organizational Title of Position *(if different from official title)***
LEAD MAIL TECHNICIAN

**17. Name of Employee *(if vacant, specify)***

**18. Department, Agency, or Establishment**
EXECUTIVE OFFICE OF THE PRESIDENT

**a. First Subdivision**
OFFICE OF ADMINISTRATION

**b. Second Subdivision**
GENERAL SERVICE DIVISION

**c. Third Subdivision**
MAIL/MESSENGER BRANCH

**d. Fourth Subdivision**

**e. Fifth Subdivision**

**Signature of Employee *(optional)***

**19. Employee Review—**This is an accurate description of the major duties and responsibilites of my position.

Supervisory Certification. I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

**a. Typed Name and Title of Immediate Supervisor**
KENNETH HEMBREE, MANAGER
MAIL AND MESSENGER OPERATIONS

Signature                     Date 9/24/98

**b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)***
JOSEPH K. BRYAN, DEPUTY DIRECTOR
OFFICE OF ADMINISTRATION

Signature                     Date

**21. Classification/Job Grading Certification.** I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

Typed Name and Title of Official Taking Action
MARY COUTTS BECK, ASSOCIATE DIRECTOR FOR
HUMAN RESOURCES MANAGEMENT

Signature   Mary Coutts Beck    Date 10/14/98

**22. Position Classification Standards Used in Classifying/Grading Position**
US OPM PCS for Mail and File Series, GS-305, dated January 1979; Leader Grade Evaluation Guide, dated 1998.

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

**24. Remarks**

Target grade and full performance level is GS-08.

**25. Description of Major Duties and Responsibilities *(See Attached)***

EX. 29 (1-7)

**Major Duties**

Performs mail and administrative functions to deliver and meter mail, to solicit and forward feedback from customers, to offer suggestions to improve work processes, to assist and educate customers, and to plan and record daily work activities. There are five EOP mail centers which sort and deliver interoffice mail, U.S. Postal mail, express mail, and courier deliveries.

Serves as a working leader. Demonstrates proper work methods and trains employees in what is to be done, and how it is to be done; and works along with them demonstrating proper procedures and the work objectives expected. Corrects deficiencies; and provides information to supervisor on status and progress of work, overall operations and problems.

Participates in improving work processes. Regularly reports feedback from customers to supervisor via e-mail, and checks electronic mail account at least once daily. Operates and utilizes EOP on-line directory. Uses word processing for written communications. Summarizes monthly feedback from distinct client groups (post office, FedEx, staff, RDS/supply, carriers, et cetera). Documents work procedures and advises supervisor on posting work procedures. Conducts process improvement session among mail staff. Monitors labels used, and returns invalid addresses to clients; notifies clients of the need to change label listings by identifying specific corrections. Convenes process improvement teams which include both mailroom and non-mailroom staff; schedules meetings, identifies obstacles, and facilitates team progress. Reviews, develops, and validates business requirements analyses for mailroom projects. Works to develop systems which capture meaningful performance measures which enable mailroom staff to measure their effectiveness.

3.    Plans and reports daily work schedule. Completes and submits daily work summary. Submits personal leave plans in advance to supervisor, records and summarizes staff leave plans. Prepares monthly performance statistics. Coordinates mail runs and ensures floor coverage. Performs and records weekly audits of mail sorting accuracy for assigned floors. Tabulates and posts summaries of ongoing mail sorting accuracy, and identifies areas for sorting focus. In temporary absence of supervisor, manages and prioritizes mailroom operations. Makes weekly report of team process improvement status.

4.    Processes recurring workload. Sorts (on basis of addressee name) incoming air express, UPS, postal/interoffice mail, and transfers between mailrooms. As assigned, makes floor deliveries/pickups for approximately 150 stops in NEOB, 300 in OEOB, and 100 in White House; other stops made to Winder Building, Treasury, Jackson Place townhouses, or 750 17th Street. Meters outgoing postal mail, charging the most economical appropriate postage to the agency listed on the stationery letterhead (absent specific other directions from agency administrative staff). Performs mass mailings (stuffs, labels, and meters). Distributes memorandums to EOP staff and operates inserter and labeling machine. Labels/delivers newspapers and makes room change corrections to newspaper label database. Returns

EX. 29 (2-7)

inappropriately addressed personal mail to customers. Notifies mailroom supervisor of continuing incoming misdirected mail (e.g., newspapers) and identifies misdirected mail trends. Identifies and reroutes misdirected mail; tracks misdirected mail that's not picked up. Notifies other mailrooms of late deliveries. Determines mail delivery priorities, and ensures there are no backlogs of undelivered mail. Alerts supervisor in writing of new or changed EOP office procedures. Prints reports from mail metering system. Verifies that mailroom staff adhere to mailroom policies and procedures.

5. <u>Educates customers</u>. Explains postage, UPS operation, express mail policies to customers. Explains all mail delivery schedules and expectations. Explains red tag delivery procedures, policies, criteria, and customer expectations for external/internal red tags. Explains East Wing/West Wing delivery procedures. Identifies offices which plan to move and notifies supervisor in writing of proposed move. Advises EOP staff on the need to notify mailroom of pending room reassignments. Solicits and posts memos from EOP staff advising of room changes. Communicates close-out information to moving or relocating offices. Relates to customers the procedure used to acquire messenger envelopes and office supplies. Reviews signage in mailroom customer service areas to ensure that critical mailroom policies are explained to walk-in customers. Surveys EOP staff where mailroom procedures are not followed; works with EOP staff to resolve misunderstandings.

6. <u>Handles special delivery items</u>. Delivers red tag packages *(urgent delivery items)* within EOP complex and solicits signature for each delivery; when unable to secure signature, makes appropriate written notation on delivery manifest. Delivers Presidential gifts to White House gift unit. ~~(Processes floral deliveries, and contacts clients via telephone for pickup)~~ Delivers UPS boxes and bulk parcels to the designated location. Deliveries are not made to other offices or to other floors; however, clients may direct mail staff to place boxes in the reception area within 20 feet of the designated delivery spot. Identifies destination of misaddressed packages. Notifies clients of status of "missing package" searches. Receives registered, insured and certified mail from the U.S. Postal Service. Verifies each item and maintains the necessary documentation for program accountability and control. Operates red tag database *monitors*. Identifies and reports special delivery exceptions to supervisor.

7. <u>Fiscal responsibility</u>. Sorts mail by agency and meters mail. Forwards supply receipts and documentation through supervisor to Associate Director for General Services. Separates mail for Capitol Hill so that it is not metered, but rather is delivered on daily courier deliveries. Prints express mail backup *for* and forwards to appropriate agency contacts. Identifies exceptions to normal mailing policies, and verifies to ensure correctness. Understands and explains approximate newspaper costs and billing process. Recommends to supervisor alternatives to minimize mailing costs. Prepares *monthly* mail cost reports. Monitors equipment supplies (labels, tape, postage/UPS meter, strapping tape, cartridges for fax/copier/printer). Coordinates with ~~procurement staff~~ *supervisor* on projects to acquire mailroom equipment or systems. *for supervisor*

8.  <u>Other services.</u> Forwards misdirected calls (e.g., trash pickup) to appropriate entity. Answers staff inquiries; researches the requested information and provides staff member with information. Escorts service technicians. Delivers copier paper to White House. Acquires supplies from stores for EOP staff after-hours -- and maintains records for supply staff. Reports White House copier repairs; replaces toner/developer in copiers. Monitors level of copier paper and processes reorders. Prepares summaries of commonly requested information and posts for staff referral. Delivers fax supply orders from supply stores; communicates to supply staff inquiries from customers regarding supply order status.

Performs other duties as assigned.

## FACTOR 1.  KNOWLEDGE REQUIRED BY THE POSITION

1.  Superior knowledge of and competence in the application of postal regulations, rates and related requirements. Demonstrated skill in operating postal metering system located in 1704 FST NEOB mailroom, charging postage to the appropriate agency in accordance with OA cost policies. Understanding of and ability to explain express mail policies for both domestic and international mail.

2.  Demonstrated experience in mail operations and recognized capability required for the leadership of colleagues.

3.  In-depth knowledge of the organizational structure and functions of the EOP and of its components, and analytical ability sufficient to route any type of material on any of a wide variety of different topics by subject-matter content and by address. ~~An understanding of and the ability to explain the naming conventions used by Procurement Branch in order to identify items sent in response to purchase orders.~~

4.  Demonstrated skill in operating mailroom equipment, including strapping machines, faxes, copiers, labeling equipment.

5.  Demonstrated skill in operating personal computers, i.e., electronic mail (including on-line EOP staff directory), word processing, and mailroom labeling/red tag systems.

6.  Mastery of different sort schemes when rotated to meet staffing requirements either in the East Wing, West Wing, NEOB SB-221, NEOB G-1, of OEOB mailroom. 1800 G sr or 1704 G sr

7.  Evidence of superior analytical ability sufficient to review and conduct projects related to the mail operation and provide recommendations to the supervisor. Ability to develop and validate procurement requirements for proposed mailroom acquisitions.

8.  Experience facilitating work process improvement teams, and leading a team through the analysis phase to the development of recommendations, to the presentation of the findings.

Ex. 29 (4-7)

## FACTOR 2.   SUPERVISORY CONTROLS

The supervisor makes assignments by defining objectives, priorities, and deadlines and assists the employee with unusual situations that do not have clear precedents. The employee handles deviations and problems in work assignments in accordance with instructions, policies, previous training, or accepted practices.

Completed work is usually evaluated for technical soundness, appropriateness, and conformity to policy and requirements.

## FACTOR 3.   GUIDELINES

Guidelines include documented procedures and postal regulations. Since different agencies handle different types of mail in different ways, the employee must identify the specific guidance applicable to the different types of mail. In cases where different guidelines exist, employee must exercise judgment in selecting the most appropriate guidelines. Areas of uncertainty or overlap without written guidelines are analyzed by the incumbent, who forwards written analysis of the results and recommendations to improve work processes and document mailroom procedures.

INITIATIVE TO TAKE ACTION TO IMPROVE MAILROOM OPERATIONS

## FACTOR 4.   COMPLEXITY

Since EOP mail staff serve more than a dozen separate agencies served by five mailrooms in four buildings, the incumbent must demonstrate an in-depth knowledge of staff relationships and the EOP's organizational structure; must be able to perform the services provided in each EOP mail room; and, must be able to explain the services to customers both in-person and on the telephone. This position involves the full range of mail functions and procedures and superior analytical ability sufficient to review and conduct projects related to the mail operation and provide recommendations to the supervisor.

Moreover, the potential for rapid and unexpected changes in priority requires flexibility in completing assignments. EOP mail staff must also be able to identify high-priority mail (e.g., red tags, air express) from low-priority mail (e.g., bulk rate unsolicited mail). The incumbent advises the mail supervisors and mail manager on projects of special interest to the integrity and efficiency of work processes.

EX. 29 (5-7)

## FACTOR 5.   SCOPE AND EFFECT

The incumbent deals with a variety of changing circumstances, problems, and unexpected situations in the sorting, processing, and handling of mail. Senior mail employees are responsible for showing leadership among the mail staff in formulating improvements to the integrity and efficiency of work processes.

EOP staff are dependent upon the prompt distribution of mail and printed documents to other government agencies, as well as to the general public and the private sector. The work of the senior mail staff in improving the efficiency of the mail service (as well as in delivering the mail) directly impacts the effectiveness of the individual agencies.

The incumbent regularly reports feedback from customers; initiates process improvement sessions among mail staff; and recommends changes.

## FACTOR 6.   PERSONAL CONTACTS

Contacts are with all levels of EOP staff who seek mail services. Such contacts vary widely in rank, and engage in a wide variety of functions and types of work. Mail staff also deal frequently with staff from other mailrooms (in both the EOP and other government agencies), the remote delivery site, the White House Correspondence Section, delivery services (including the Postal Service and express mail services), and couriers. On special projects, the incumbent works closely with staff from IST, procurement, and other EOP operational functions.

## FACTOR 7.   PURPOSE OF CONTACTS

The purpose for the contacts may vary from obtaining information about the routing of mail, delivering a document, or answering staff inquiries on proper mailroom procedures. The incumbent asks questions to clarify delivery instructions, to ascertain priorities, and to identify customer needs -- and to communicate those priorities and needs to other mail staff. By analyzing customer's questions and using their observations about the routing of mail, senior mail staff identify areas where it appears mail customers are uncertain of the proper mailing procedures; they then make contact with those customers to educate and assist them. The incumbent also advises EOP staff on proper mailroom procedures, delivery expectations, and provides updates on the status of ongoing deliveries. The incumbent also regularly inquires with routine mail customers about the quality of the mail services, and summarizes this feedback in writing. Senior mail staff convene working groups of mail staff to discuss work processes and brainstorm potential improvements; record and summarize the discussions; and, use the input generated from these sessions to analyze the impact of proposed mail processes. On special projects, the incumbent works with IST to identify and verify the soundness of mailroom automation alternatives, with procurement to define the requirements, and with other EOP components to ensure the soundness of operational recommendations.

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit C

AFFIDAVIT of
Jon Laurich

I, Jon Laurich, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination by Laura C. Jones, against the Office of Administration, Executive Office of the President, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge, and which discloses all of my first hand knowledge having a bearing on the merits of the complaint.

My series and grade are _GS 0301/15, title Deputy Chief Operating Officer
agency/office/division/branch, EOP/Office of Administration, Chief Operating Officer.
located in Washington, DC , and telephone number
My race is Caucasian, color White, sex male, and I
have not been involved in prior EEO activity.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and the Executive Office of the President policy. Any employee who is accused of discrimination, or other acts of impropriety, may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record. In addition, the Complainant and appropriate management officials involved in the EEO complaint process will receive the entire investigative file.

The complaint of discrimination, filed by Ms. Laura C. Jones (Complainant), is accepted by the Agency based on race (Caucasian), color (White), sex (Female), and reprisal for prior protected activity on April 9, 2004. The issues, as accepted, state that Ms. Jones alleges she was discriminated against when a letter of reprimand was placed in her personnel file on June 16, 2004, when she was reassigned, beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street, when her work hours were changed from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m., and, when she was issued a three-day suspension for insolent behavior on July 15, 2004, toward her supervisors.

Please respond to the following questions:

1.      Please articulate why you decided to sustain the charge of insolent behavior against the Complainant in your "Decision of Notice on Proposed Suspension to the Complainant."---I thought the incident that precipitated the suspension was sufficiently serious and I was not presented any

Initials: JSL

compelling evidence or reasons that caused me to change my mind. Accordingly, I sustained the charge.

2.      Were you aware that the Complainant volunteered to come to work on the day of mourning for President Reagan?---No, not at that time.

3.      The Complainant has stated that Mr. Haskins told her she would work the early shift on the day of mourning and she then stated that she could not come in.  Were you aware that the Complainant stated she could not come in on this day?---No.

4.      Did Mr. Haskins discuss with you the issue of Mr. Dewitt Ramsey's statement, to the EEO Counselor, in regard to the Complainant working on the day of mourning for President Reagan?--No, not that I recall.  If so, what was stated?---N/A.

5.      Were leave slips required from employees who did not come to work on the day of mourning for President Reagan?---Generally, no.  However, Ms. Jones volunteered to work that day and was scheduled to work that day.  Therefore, she should have notified her Supervisor of her intent to take leave and explained why.

6.      Were you involved in the decision to reassign the Complainant?  If so, what was your involvement and why was she reassigned?---Yes, I was involved.  I was the acting General Services Division Chief (GSD) at the time and the decision to reassign Ms. Jones and other employees to new mailrooms was a joint decision between myself and the Deputy Chief of GSD, Mr. Ken Miller.  The departure of the long-time previous Chief of GSD provided us the opportunity to reassign some staff in order to provide them cross-training opportunities as well as to learn different skills.  Additionally, it provided management the opportunity to place staff with the requisite skill sets into the requisite positions.  In the specific case of Laura, the reassignment to a new mailroom would give her the opportunity to acquire more responsibility as well as work towards becoming a supervisor in the future.  I had been told Laura had repeatedly expressed to her supervisors this is what she wanted: more responsibility and to become a supervisor.  Ms. Jones' reassignment was part of an ongoing series of personnel reassignments in the EOP/OA Mail Messenger Operations which were intended to make our operations more effective and efficient, and to provide our customers with the best possible customer service.  Finally, I considered all the reassignments, including the reassignment of Laura, to be routine management actions.

Initials: JSC

Page _2_ of _4_

2

7. During the Complainant's oral response to your decision of notice to suspend the Complainant, was there any heated discussion?---No. I recall Ms. Jones being emotional a few times, shedding a few tears, but nothing more.

Did you yell at the Complainant and tell her to "shut up" because she allegedly interrupted you?---Absolutely not. Again, absolutely not. But I certainly may have told her to please let me finish speaking and then she could speak for as long as she wanted to speak.

Did you state that you had thrown people out for less?---Absolutely not.

8. Were you aware that the Complainant's computer privileges had been taken away from her? If so, why were they taken away?---Yes as I was involved in that decision. Ms. Jones computer privileges were not taken away from her. Rather, her e-mail privileges were temporarily suspended after her reassignment because Ms. Jones had attempted to contact several senior White House staff to ask them to intervene on her behalf. These senior officials had no involvement in the decision to reassign her to a new mailroom. Her actions were inexcusable.

9. Were you aware of the Complainant's race, color, sex, and whether or not she had participated in prior EEO activity?---No. If so, did this awareness have any impact on any decisions you made in her regard?---No.

If you have anything further you would like to contribute to this investigation, please so state.--- Nothing more to add.

I have read the above statement consisting of __4__ pages. I declare under the penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Initials: JSL

_____

Affiant=s Signature

17 Dez 2004

Date

Signed before me at _Alexandria VA_.
(city and state), on this the _17th_ day of _December_

20 _04_

Signature of Investigator/Notary

# LAURA C. JONES
## v.
# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit D



**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF ADMINISTRATION**
WASHINGTON, D.C. 20503

June 16, 2004

MEMORANDUM FOR:     LAURA C. JONES-WHELCHEL
                    LEAD MAIL ASSISTANT

FROM:               KENNETH HASKINS
                    BRANCH CHIEF, MAIL/MESSENGER OPERATIONS

SUBJECT:            Letter of Reprimand

This letter constitutes an official written reprimand in accordance with Office of Administration (OA) Directive, Disciplinary Guidelines, PMD.30-0 dated July 26, 1991. This action is based upon your failure to follow established leave procedures and offensive language.

### Charge: Failure to Follow Established Leave Procedures

On Wednesday, June 9, 2004, you volunteered to work on Friday, June 11, 2004, which had been designated as a National Day of Mourning by President George W. Bush as the result of the death of President Ronald W. Reagan. On that same date I informed you that you had been placed on the work schedule for Friday, June 11, 2004. You were notified to report for your regular scheduled tour of duty which is 10:30 a.m. to 7:00 p.m.

Prior to your departure from the work site on June 9, 2004, you submitted a leave request which did not specify the type of leave requested for Thursday, June 10, 2004. You did not submit any request for Friday, June 11, 2004. On Friday, June 11, 2004, you did not report for duty as assigned nor did you telephone the office to request leave for the day.

Employees requesting the use of leave are required to either submit a Request for Leave or Approved Absence prior to taking leave, if possible. If an employee becomes incapacitated for duty due to illness, or experiences an emergency that requires them to be absent from duty, they are required to notify their supervisor or management official as soon as practical on the day of the illness or emergency situation.

Offense 1 of OA Directive, Disciplinary Guidelines, PMD.30-0, provides for a reprimand to 5-day suspension for a first offense of failure to follow established leave procedures.

### Charge: Offensive Language

On Wednesday, June 9, 2004, you had a conversation with me over the telephone regarding several issues. During the discussion you informed me that on or about Monday, June 7, 2004, you were in Room 52, Eisenhower Executive Office Building (EEOB), when Daniel Moncada

1

# <u>LAURA C. JONES</u>
## <u>v.</u>
# <u>GEORGE BUSH, President of the United States, et al.</u>

## Civil Action No. 07-2164 (RWR)

## Exhibit E

# INFORMATION FOR INFORMAL COMPLAINT

1. Name of aggrieved:                    Laura Jones

2. Work address of aggrieved:            West Wing Mail Room

3. Work telephone(s) of aggrieved:

4. Home address of aggrieved:

5. Home telephone(s) of aggrieved:

6. EEO counselor name:                   Shalini Madan Benson

7. EEO counselor telephone(s):           x57837

8. Date of aggrieved's first contact with EEO counselor:  6/16/04

9. Date of aggrieved's first meeting with EEO counselor:  6/16/04

10. Aggrieved's position title/series/grade:  Lead Mail Assistant, Grade 8, step 4.

11. Issues aggrieved brought to the EEO counselor (with dates):  On June 16th, Laura Jones
spoke with Linda Sites and myself about a Letter of Reprimand she received from her second-
level supervisor, Kenneth Haskins that day.  The letter charges Ms. Jones with a failure to follow
established leave procedures, and use of offensive language.  Ms. Jones has stated that the
charges brought against her were false.  On July 15, Ms. Jones was
informed that her hours would be changed (from 10:30-7 to 9:30-6)
and that beginning Monday, July 19th she should report for work
to the mailroom at 1800 G Street. On July 20th, Laura was told that
her picture was distributed at meetings with Secret Service recently, and
that they were told to deny her access to the White House Complex.

12. Type of discrimination alleged ("X" as appropriate):

    ___Age (give date of birth)

    _X_Color (identify color)   Caucasian

    ___Disability (identify specific disability or disabilities)

    ___National origin (identify country of origin or ethnic group)

    ___Religion (identify religion)

    _X_Race (identify racial group)  *Caucasian*

    _X_Sex (identify gender)   Female

    _X_Reprisal for participation in protected EEO activity  (specify the activity with dates)

       EEO Complaint raised April 9.

13. Does the aggrieved give permission for the EEO counselor to use the aggrieved's name during the counselor's inquiry ("waives anonymity")? If so, the aggrieved should sign below and date the signature.

*Laura C Jones*             *June 21, 2004*

Signature of the aggrieved               Date

14. If the matters being complained about occurred more than 45 days prior to contacting an EEO counselor, what was the reason for the delay?  NA

15. Has the aggrieved presented the matters being complained about through a grievance or any other official system? If so, explain and provide dates.  NA

16. What remedy or remedies is the aggrieved seeking? Laura Jones would like the Letter of Reprimand removed from her file and written responses to her emails within 24 hours. *She would also like to return to her previous work schedule of 10:30 - 7pm in the west wing Mailroom. Ms*

17. Does the aggrieved have a representative at this time? _____ (If so, provide *Jones wo* also like name, mailing address, and telephone numbers.) *apology in uriting f Ren Mille,*

    Name: _____

    Mailing address: _____

                    _____

Telephone: _____

The information I have provided to the counselor and that is included on this form is true.

_____          6-21-04
Signature of aggrieved                    Date

_____          6-21-04
Signature of EEO counselor                Date

DATE: July 1, 2004

SUBJECT:     AGREEMENT TO POSTPONE THE FINAL INTERVIEW AND TO EXTEND THE
COUNSELING PERIOD FOR UP TO AN ADDITIONAL 60 DAYS

In accordance with § 1614.105 (e) of the Equal Employment Opportunity Commission (EEOC)

Regulations (29 CFR Part 1614), the undersigned agrees to postpone the final interview on the

matter(s) upon which EEO counseling began on June 16, 2004. It is agreed that counseling may

extend for a period of 30 days from the date of this agreement.  If counseling is completed prior

to the end of the period stated above, and matters (s) remains unresolved, a "Notice of the Right

To File a Discrimination Complaint" will be provided.

_____          _____
Signature of Counselee                                              Date

# LAURA C. JONES
## v.
# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit F

## AFFIDAVIT

I, Kenneth Miller, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination by Laura C. Jones, against the Office of Administration, Executive Office of the President, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge, and which discloses all of my first hand knowledge having a bearing on the merits of the complaint.

My series and grade are **GS-14-301**, title **Deputy Director**, agency/office/division/branch, **Executive Office of the President (EOP), Office of Administration (OA), General Services Division**, located in **Washington DC** (city and state), and telephone number **(202) 395-7651**.
My race is **Caucasian**, color white, sex male, and I have been involved in prior EEO activity.

This statement is provided under oath (or affirmation), under penalty of perjury; and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and the Executive Office of the President policy. Any employee who is accused of discrimination, or other acts of impropriety, may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record. In addition, the Complainant and appropriate management officials involved in the EEO complaint process will receive the entire investigative file.

The complaint of discrimination, filed by Ms. Laura C. Jones, is accepted by the Agency based on race (Caucasian), color (White), sex (Female), and reprisal for prior protected activity on April 9, 2004. The issues, as accepted, state that Ms. Jones alleges she was discriminated against when a letter of reprimand was placed in her personnel file on June 16, 2004, when she was reassigned, beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street, when her work hours were changed from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m., and, when she was issued a three-day suspension for insolent behavior on July 15, 2004, toward her supervisors.

Please respond to the following questions, by issue.

ISSUE 1:    A letter of reprimand was placed in the Complainant's personnel file on June 16, 2004, by Mr. Kenneth Haskins.

1.    Please state any information you have in regard to the letter of reprimand that was issued to the Complainant. **I knew that Kenneth Haskins gave the Complainant a letter of reprimand because she committed misconduct.**

2.    Did you provide any input to the letter of reprimand?  **No.**  If so, what information did you provide?  **N/A.**

3.    Did Mr. Haskins consult with you about this issue?  **Yes.**  If so, what information did you provide.  **I directed him to work with the OA Human Resources Management Division on the issue.**

ISSUE 2:    The Complainant was reassigned beginning July 19, 2004, from the West Wing Mailroom to the mailroom at 1800 G Street and her work hours were changed from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m.

It has been stated that on July 15, 2004, you told the Complainant she would be starting a new job on July 19th at the 1800 G Street Mailroom.

1.    Why was the Complainant assigned a new job?  **Mr. Haskins and I did not reassign the Complainant to a new position. We reassigned the Complainant to the same position in a different mailroom.**  What reasons were given to the Complainant for her "reassignment?"  **The Complainant's reassignment was part of an ongoing series of personnel reassignments in the EOP/OA Mail Messenger Operations which were intended make our operations more effective and efficient, and to provide our customers with the best possible service. We explained to the Complainant that we were reassigning her to the same position in a different, larger mailroom to provide the Complainant with opportunities to: (1) cross-train with other employees, ensuring continuity of operations in the event that the Complainant or one of her co-workers was on leave; (2) learn different, career-enhancing skills, which in turn add value to the entire organization; and, (3) lead a larger mailroom, given that the Complainant had indicated her desire to qualify for a supervisory position in the future, and one of OA's core values is to encourage its employees to seek and take responsibility.**

2.    What was the reason the Complainant was reassigned with only four days notice?  **The OA Humand Resources Management Division had advised us that additional advance notice was not required because we were only reassigning the Complainant to a different mailroom, not a new position or duty station.**

3.    Who was responsible for initiating the Complainant's reassignment?  **Mr. Kenneth Haskins.**

Page 2 of 6

2

Initials: KKm

EX·5 (26)

Who made the final decision in regard to the Complainant's reassignment? **I did.**

4.    Was part of the reason the Complainant was reassigned due to the allegation that she had expressed a desire to be a supervisor? **Yes.** If so, what was the other part of the reason for the reassignment of the Complainant?  **See my response to Issue 2, Question 1 above.**

5.    How many employees in the mailroom have been reassigned? **Six.** Please state the number by race, color, and sex. **One Hispanic, Caucasian, male; three African American, black or brown, males; one Asian (Filipino) female; and, one Caucasian, white, female.** What were the reasons for reassignment of the other employees? **The reason for all of the reassignments is set forth in my response to Issue 2, Question 1 above.**

6.    On July 15, 2004, did you ask the Complainant if she would mind if you walked her to her car so that her parking permit could be switched? **Yes, I suggested I walk her to her car to get her parking permit since she had been instructed to go home and, besides, I was concerned because she was very emotional at the time.** If so, why did the Complainant need to have her parking permit switched? **We reassigned the Complainant to a new mailroom in a different building, which required a change to her security access level and parking.**

7.    Did the Complainant ask you if everything was okay when the parking permit switch had been completed? **No.** And, did you state that you were waiting for her to leave? **No.**

8.    Did you inform the Secret Service to watch the Complainant and make sure she left? **Yes. At the time, the Complainant had a security badge that gave her access to the White House. She was parked on the East Exective Avenue, which gave her immediate access back into the White House, and she appeared upset. After she got into her car, she remained sitting in her car and did not drive out of the parking area. Additionally, earlier that day, the Complainant had inappropriately attempted to contact several senior White House staff members to ask them to intervene on her behalf, and possibly override the decision to reassign her. Therefore, I asked the Secret Service to ensure that the Complainant did not return to the White House.**

9.    Was Mr. Haskins aware that you had escorted the Complainant to her car to "make sure she left?" **I did not escort the Complainant to her car "to make sure she left." Mr. Haskins was aware that I walked with the Complainant to her car to exchange parking permits.**

10.    What was the reason you felt that the Complainant had to be escorted to her car? **I walked with the Complainant to her car to exchange parking permits.** Is this standard procedure for employees that are being reassigned? **There is no standard procedure for such a unique circumstance.**

11.    Did you have the Complainant's picture distributed among the Secret Service and preclude her from entering the complex? **No.** If so, why? **N/A.** If not, who was responsible for distributing the Complainant's picture and precluding her from entering the complex? **I did not participate in any such decision.**

12.    Why were the Complainant's computer privileges taken away from her? **The Complainant's computer privileges were not taken away. Her e-mail privileges were temporarily suspended after her reassignment because the Complainant had attempted to contact several senior White House staff members to ask them to intervene on her behalf, and possibly override the decision to reassign her. Her actions were intolerable.**

13.    Did you ever state that the Complainant was being reassigned for "cross training?" **Yes.** If so, was this explained to the Complainant? **Yes.** What other employees were reassigned for "cross training?" **Dan Moncada, Antonio Rivers, Tye Grey, Bobby Strickland, and Anita Garcia.**

14.    Why was the Complainant not allowed to pack her things when she was reassigned? **This simply is not true. She was allowed to pack her things, but she took sick leave the day after her reassignment to the new mailroom and was unavailable to pack things herself. Therefore, the OA Security Office's Deputy Director packed her things and locked them in a secure area until she returned to work.** Is this standard procedure when a person is reassigned? **Again, we do not have a standard procedure for every unique circumstance that comes up.**

ISSUE 3:    The Complainant was issued a three-day suspension for insolent behavior on July 15, 2004, toward her supervisors.

1.    Why did you issue a proposed suspension to the Complainant? **See my letter dated July 27, 2004.** Upon what did you base this decision? **My reasons are stated clearly in my letter.**

2.    Did you state to the EEO Counselor, when she asked if you would consider removing the letter of reprimand from the Complainant's personnel file (because Mr. Ramsey believed he had overheard

E: 5 (4-6)

Ms. Jones tell Mr. Haskins she would not be at work on June 11, 2004), that you would need some time to think about this? If so, what impact did this information have on your decision not to remove the letter of reprimand? **I think this question was intended for Mr. Haskins.**

3.    Who provided you information in regard to the proposed suspension? **I personally witnessed the Complainant's misconduct.**

BACKGROUND QUESTIONS:

1.    Are you aware of the Complainant's race? **Yes.**

2.    Are you aware of the Complainant's color? **Yes.**

3.    Are you aware of the Complainant's sex? **Yes.**

4.    Are you aware of any protected activity on the part of the Complainant? *Yes UKm*  What "protected" activity? If so, when did you become aware of this activity? ~~N/A~~ *4/04 UKm*

5.    Did your awareness of any of these bases on the part of the Complainant for this complaint have any impact on any decision you made involving the aforementioned issues? **N/A.**

If you have anything further you would like to contribute to this investigation, please so state.

_(signature)_
Affiant=s Signature

_Nov 15, 2004_
Date

Signed before me at _Washington, DC_.

Page _5_ of _6_

5

Initials: _UKm_

_Ex. 5 (5·6)_

(city and state), on this the _15th_ day of _November_

20_04_.

_Paul A. Eaton_
Signature of Investigator/Notary

EX. 5 (6-6)

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit G



**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF ADMINISTRATION**
WASHINGTON, D.C. 20503

July 27, 2004

MEMORANDUM FOR MS. LAURA C. JONES-WHELCHEL
LEAD MAIL ASSISTANT

FROM:          KENNETH L. MILLER
               DEPUTY DIRECTOR, GENERAL SERVICES DIVISION

SUBJECT:       Notice of Proposed Suspension

You are hereby notified that I propose to suspend you, without pay, from your position of Lead
Mail Assistant, GS-5/4, for a period of three days. The suspension, if approved, would take
effect not earlier than ten days from your receipt of this proposal. I am proposing that you be
suspended for three days because I believe you engaged in insolent conduct toward supervisors.

On July 15, 2004, you met with your second-line supervisor, Mr. Kenneth Haskins, Branch
Chief, Mail/Messenger Operations, and me regarding your reassignment from the West Wing
mailroom to the 1800 G Street mailroom, two blocks away. Mr. Haskins explained to you the
reasons behind management's determination to reassign you and other Mail/Messenger
Operations employees to different locations. Among the many reasons cited to you included: the
necessity to provide cross-training to you and other employees to ensure continuity of operations
in the event you or others are absent; new and better opportunities for you to learn different,
career-enhancing skills; and the beneficial challenge of supervising a larger operation and
serving new customers. We notified you that your reassignment would become effective on
Monday, July 19, 2004.

You responded to the news of your pending reassignment with considerable hostility. You
indicated that you did not wish to comply, and stood to leave the room. At this point, I expressly
directed you to report to your new work location at 9:30 am, on Monday, July 19, 2004, and
asked if you understood. You declined to reply. Instead, you stormed from the room, and
returned only moments later at which time you thrust your access badge within centimeters of
Mr Haskins face and asked if he planned to take your badge also. Mr. Haskins did not respond
to your overly aggressive, insolent conduct, but instead told you that you would receive whatever
access badge you needed to perform your duties. You then left the room a second time. Given
your unpredictable emotional condition, the Chief Operating Officer, Dr. Sandra Evans, placed
you on administrative leave with pay for the remainder of the day and directed you to go home
and attempt to calm yourself.

By ignoring my direct question to you, storming out of the meeting with Mr. Haskins and me,
and thrusting your access badge within centimeters of Mr. Haskins's face, I believe you
committed insolent conduct toward supervisors. Such behavior is disrespectful, disruptive, and
intolerable. As an employee of the Executive Office of the President, you are expected to
conduct yourself in a professional manner that reflects positively on both yourself and the Office

*EX. 25 (1-3)*

of Administration (OA) at all times.

I am proposing that you be suspended for three days because of the circumstances and gravity of your misconduct, and for the efficiency of the Federal service. I also considered the aggravating factor that you received a reprimand for misconduct only one month prior to your most recent offense. On June 15, 2004, you received a reprimand for failing to follow established leave procedures and for using offensive language in the workplace. At that time, you received express notice that any further instances of misconduct may result in more severe disciplinary action.

You may reply to this Notice of Proposed Suspension orally, in writing, or both. You must address your written reply, including any affidavits or other supporting evidence, to Mr. Jon S. Laurich, Deputy Chief Operating Officer, OA, 1800 G Street, 10th Floor, Washington, DC 20503. If you wish to make an oral reply you must contact Mr. Laurich at (202) 395-4541, to arrange for your presentation. You will be allowed a reasonable amount of official time to prepare your reply. You must contact your immediate supervisor to request official time.

You may review the material I relied upon to support the charges against you. To make suitable arrangements, you must contact Mr. Robert McWhirter, Human Resources Specialist, at (202) 395-1140.

Any reply you wish to submit, whether written or oral, must be completed and delivered to Mr. Laurich within 7 calendar days of your receipt of this notice. You may request a reasonable extension, provided you submit the request in writing to Mr. Laurich and establish good cause.

You are entitled to representation by an attorney or another individual of your choice at your own expense. If you choose to be represented, you must send written notice immediately to Mr. McWhirter setting forth the identity, address, and telephone number of your representative. If your representative is an OA employee, he or she may receive a reasonable amount of official time to assist you with the preparation of your reply. Your representative must contact his or her supervisor to request such official time.

If you believe that the proposed action is unwarranted or excessive for any reason, including medical circumstances, you should state your reasons in your reply.

Additionally, you are reminded that you may seek assistance from the Employee Assistance Program (EAP) if you believe you are experiencing personal problems that are impacting your work performance or conduct. You may contact the nationwide counseling referral service provided by The Sand Creek Group, LTD at (800) 243-5744, or www.sandcreekeap.com. EAP contacts are confidential and provided without charge to you.

Should you have any questions regarding policies and procedures associated with this matter, please contact Mr. McWhirter.

You may expect a written final decision from Mr. Laurich regarding this Notice of Proposed Suspension shortly after you submit a reply or, in the event you elect not to submit a reply, when

the ten day reply period expires.

Receipt Acknowledgement:

_____

Ms. Laura C. Jones-Whelchel

# LAURA C. JONES
## v.
# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit H



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF ADMINISTRATION
WASHINGTON, D.C. 20503

August 13, 2004

MEMORANDUM FOR LAURA C. JONES-WHELCHEL
LEAD MAIL ASSISTANT

FROM                JON S. LAURICH
                    DEPUTY CHIEF OPERATING OFFICER

SUBJECT             <u>Notice of Decision on Proposed Suspension</u>

I am writing to advise you of my decision concerning the Notice of Proposed Suspension issued to you on July 27, 2004. I have considered your written and oral replies of August 5, 2004. After careful review of the entire record in this matter, I have decided to sustain the charge of insolent behavior toward supervisors.

I have determined that your suspension is fully warranted and will promote the efficiency of the service based on the sustained charge and all relevant aggravating and mitigating factors, otherwise referred to as the "Douglas Factors." Your unacceptable conduct toward your supervisors is a most serious matter, and severely erodes your supervisor's confidence in your ability to perform the requirements of your position satisfactorily. Despite repeated counseling and receiving a reprimand for misconduct only one month prior to this most recent offense, you engaged in misconduct again by committing insolent conduct toward your supervisors. Such conduct will not be tolerated. As a Lead Mail Assistant in the Office of Administration (OA), you are required to provide professional, courteous and timely service to all components within the Executive Office of the President (EOP). Your conduct and performance directly affect the reputation of the OA, as well as the entire EOP.

Consistent with the preceding discussion, it is my decision to suspend you from your position of Lead Mail Assistant, series 305, grade 8 with OA for a period of 3 days, effective August 19, 2004, August 24, 2004, and August 25, 2004.

You have the right to file an administrative grievance of this decision under the Office of Administration's grievance procedures. If you decide to file a grievance, you must do so within 20 days of your receipt of this notice. Your grievance must be filed with the Agency Grievance Coordinator, Mr. Robert McWhirter, Human Resources Specialist (Employee Relations). You may contact Mr. McWhirter at (202) 395-1140. Further information on the grievance process and your grievance rights is attached to this notice.

If you believe this action is being taken for any unlawfully discriminatory reason, you have the right to file an Equal Employment Opportunity (EEO) complaint. Your EEO complaint must be filed with the Director, EEO Division, Ms. Linda Sites. You may contact Ms. Sites

1

*EX.27 (1-2)*

at her office in the New Executive Office Building, 725 17th Street, N.W., Room 2200, Washington D.C. 20503, or by telephone at (202) 395-7704. To file an EEO complaint concerning this matter, you must contact Ms. Sites within 45 days of your receipt of this notice.

Please note that the OA grievance system does not apply to a decision that is subject to final administration review by the Equal Employment Opportunity Commission. Consequently, you may either grieve this decision under the Office of Administration's grievance procedures or file an EEO complaint. You must choose one option; you may not choose both.

If you have any questions regarding your procedural rights, you may contact Mr. McWhirter at (202) 395-1140.

Please sign, date, and return the accompanying copy of this memorandum as acknowledgement of receipt of the original and attachments.


Attachments:  OA Directive PMD.29-0
              Acknowledgement copy memorandum

Ex. 27/2-2,

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit I

# FORMAL COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT

## PRIVACY ACT STATEMENT (6 USC 552a)

| | |
|---|---|
| Authority: | Public Law 92-261 |
| Principle Purpose: | Formal filing of allegation of discrimination because of race, color, religion, sex, handicap, age, national origin or reprisal. |
| Routine Uses: | This form and the information on this may be used: (a) as a data source for complaint information for production of summary descriptive statistics and analytical studies of complaints processing and resolution efforts and may also be used to respond to general requests for information under the Freedom of Information Act, (b) to respond to requests from legitimate outside individuals or agencies (e.g. Members of Congress, The White House, and the Equal Employment Opportunity Commission (EEOC) regarding the status of the complaint or appeal, and (c) to adjudicate complaint or appeal. |
| Disclosure: | Voluntary, however, failure to complete all appropriate portions of this form may lead to rejection of complaint on the basis of inadequate data on which to determine if complaint is acceptable. |

**1. NAME OF COMPLAINANT** *(Last, First, Middle Initial)*
Jones, Laura C.

**2. AGENCY DOCKET/COMPLAINT NO.:**

**3a. HOME TELEPHONE NO.**
(>

**3b. WORK TELEPHONE NO.**
(202 - 395 1700

**4. ADDRESS** *(Include City, State, and Zip Code)*

**5. DO YOU HAVE A REPRESENTATIVE?**
[ ] a. Yes *(Complete 6)*    [X] b. No

**6. IF YES, PROVIDE NAME, ADDRESS, AND TELEPHONE NUMBER OF REPRESENTATIVE** *(Include City, State, and Zip Code)*

**7. NAME OF AGENCY AND ADDRESS IN WHICH YOUR COMPLAINT AROSE** *(Include City, State, and Zip Code)*
Executive Office of the President
Office of Administration
725 17th St. NW.
Washington, D.C. 20503

**1. NAME OF AGENCY ORGANIZATION IN WHICH COMPLAINT AROSE**
Office of Administration

**9. DATE OF THE MOST RECENT ACT OF ALLEGED DISCRIMINATION**
July 15, 2004

**10. ARE YOU A FEDERAL EMPLOYEE OR APPLICANT?**
[X] a. Employee
[ ] b. Applicant for Employment

**11. REASON YOU BELIEVE YOU WERE DISCRIMINATED AGAINST** *(CHECK BELOW)*

| | | | |
|---|---|---|---|
| [✓] | **a. RACE** *(State your Race)* | Caucasian | **e. HANDICAP** [ ] PHYSICAL  [ ] MENTAL |
| [✓] | **b. COLOR** *(State your Color)* | Same As Above | **f. SEX** [ ] MALE  [X] FEMALE |
| | **c. RELIGION** *(State your Religion)* | | **g. AGE** *(Specify Age)* |
| | **d. NATIONAL ORIGIN** *(State your National Origin)* | [✓] | **h. REPRISAL** |

**12. I HAVE DISCUSSED MY COMPLAINT WITH AN EEO COUNSELOR** *(See Reverse)*
[X] a. Yes *(Complete 12c)*    [ ] b. No

**12c. IF YES, NAME AND TELEPHONE NUMBER OF COUNSELOR**
Shalini Benson  202 395 7837

**13. DATE OF RECEIPT OF NOTICE OF FINAL INTERVIEW**
July 30, 2004

**14. EXPLAIN BRIEFLY HOW YOU WERE DISCRIMINATED AGAINST** *(That is, treated differently from other employees or applicants, because of your race, color, religion, sex, national origin, age, mental or phsical handicap or reprisal.) (If your complaint involves more than one allegation of discrimination, list and number each such allegation separately and furnish specific, factual information in support of each.) (Use additional sheets, if necessary.)*

Allegation No. 1:

See attached

EEOC FORM — (MONTH/YEAR)

Page 1

First of all I was told last August 18th, 2003 by a Vander Williams a driver that was with us for years that our new boss Ken Haskins was going to make some changes and said it in a way that was awfully threatening.

March 24, 2004 Shane Chambers, Assistant to the Chief of Staff, came into the West Wing mailroom with a huge unopened box. He was asking me what the protocol was for packages coming into the White House that had not yet been x-rayed or irradiated. I explained the protocol. I explained we would be putting the president and his staff at risk and ourselves if we were to let it slide and not follow protocol. As I was explaining, Barbara Swann a mail clerk in the West Wing (WW) mailroom put her hand in my face and told me to turn around and go back to what I was doing and that she would go ahead and deliver them for him. Restituto Francisco the WW/ East Wing (EW) mailroom supervisor was there the entire time yet said nothing and kept his back to me. Shane Chambers went ahead and opened the box to see if the items were of any importance. I looked into the box and there were 20-40 small packages in the box. The items were addressed to the President, Vice President, and the entire staff. As Barbara and I believe, Rusty delivered these items to the staff, at that time I documented the event. It had been stressed a million time by Ken Haskins our Branch Chief to General Services Division (GSD) to never accept outside mail but this time he said that he was expecting a package. I asked then how come I wasn't made aware of it at the time to save heartache. Days later he said that he was thinking about another package. Later on it happened again by the same person. During a meeting later on with the East Wing, West Wing and USTR Staff it was brought up again and stressed again that we are not to do this.

April 15th, 2004 I went to EEOC. I was starting to feel pressure from my supervisor Rusty. He started adding more work for me in the evenings. He would sort mail in the 52 mailroom which gave me an extra mail run in the evening. He would start leaving mail in the WW mailroom to air out because Helen the Lead Clerk in the East Wing said that the mail irritated her throat and her Dr. suggested that she stay away from it. Mr. Francisco already knew that I had to carry an Epipen for my throat closing up on me from the unaired mail; which we had been told had already been aired out. I was accused by Mr. Haskins of leaving bulk mail in the WW mailroom; which I have never done. He said that he came in early twice and found it there. Later during the meeting that he had with all of us, he stated he meant that he saw it somewhere else. For a week and a half I tried to get him to explain to me what he had seen so that I could find out who might have done it. He was aware of that fact that it bothered me. I overheard Mr. Haskins tell Dan Moncada, the supervisor in the Old Executive Office Building that I needed to be humbled. He also asked me when I had time to document things in front of several people in the Post Office line. I was embarrassed. I would call him on his office phone to ask him something and prior to asking him I would ask if we were on speakerphone, as he had done that in the past. He would ask me why I wanted to know. I could never get a straight answer from him. I would send e-mails, concerning work and my duties, and never get replies. Part of what I had requested from EEOC was to have him respond within a 24 hour period to my mail, he agreed to this.

2

Page 2

June 3rd, 2004 Barbara Swann picked up mail from the outside, as she had done on at least one previous occasion, and attempted to have it delivered without x-ray/ irradiation. Unaware of this breach in protocol at this time I delivered the mail to Dan Bartlett's office. Upon delivery of the mail I found a note from Barbara indicating that it had come through lower press.

Also on June 3rd, 2004 Barbara informed me that Rusty had a meeting with them that I had not been invited to. I never found out what the meeting had concerned. I did notice Helen and Barbara working harder and making more appearances in the WW mailroom. Barbara stopped watching game shows on TV and taking less naps.

June 4th, 2004 Mr. Haskins had a meeting with the East Wing and West Wing employees along with USTR mailroom. He informed us that Rusty was going on vacation and that Barbara was to be working in the East Wing from 2:00 pm until 5:30 pm. In April when I had broken my toe, Mr. Haskins had put me to work in the 52 mailroom for three weeks. He said it was for light duty work; however I was required to work very hard. Barbara was given Tony Rivers, another mail clerk, to work with her in the East Wing and West Wing for those three weeks. When I returned to the West Wing Barbara went on a two week vacation and I had no help at all in the West Wing or East Wing after 2:00 pm. I was extremely exhausted from all of this. The West Wing has never been operated solo because of the importants of it being the West Wing. When Barbara returned, the tension between us increased at a faster rate. Mr. Haskins informed me that these were personal issues and referred to them as "Cat Fights". There were two standards here and I have e-mail backing this. Rusty told me to work it out myself, so I tried to talk to Barbara to no avail. Later on I asked for him to mediate, he declined saying work it out.

A lot of what I am writing to you here on paper are problems that arose after the mail incident. The supervisor Rusty and Ken Haskins failed to return my e-mails and I was left alone.

June 9th, 2004 I arrived at work to find that almost everyone was granted leave for President Reagan's funeral. Tony and Helen were sent home and I was extremely busy. I could not find Barbara Swann so I had to call the supervisor and have him look for her. Towards the end of the day I went to drop off mail in 52 and there were two large heavy boxes. Mr. Haskins and Dan Moncada were in Mr. Haskins' office watching TV, Susanne Gonzalez mail clerk was sitting on the floor arranging blank labels and Dewitt Ramsey our driver was on the computer in the front office. I told Dan that I could not lift the heavy boxes alone and he asked me why. I replied that it was because they were heavy and that I was physically exhausted. Earlier that morning I had volunteered, even though I was not essential personnel, to come in and work on the day of morning that the President had granted the Federal Government. Later on I found out that the person (who for several years was the essential person for our section) was not coming in to work that day. I had to tell Mr. Haskins then that I could only work my own schedule that day. He repeatedly said that I had already said that I was coming in. I planned to come in, but to work my normal scheduled hours. It was definitely a misunderstanding. Dewitt Ramsey

Page 3

had overheard the conversation. He was my witness who later on related what he had heard to my EEOC counselors. I had worn down from work on this day so much that I told Mr. Haskins with Dan, Susan and Ramsey present that the following day I was going to have to take off because I was obviously not feeling well. I had given Dan Moncada a leave slip earlier that day. I believe that it was misplaced. I also did not come into work on that Friday, which was President Reagan's funeral; because I had told Mr. Haskins that I could not work Helen's hours. Unfortunately he had already told his superiors in a meeting that morning that he had back up.

June 16th, 2004 I was written up for being Absent With Out Leave (AOWL) and I was also written up for calling or using a foul word. This was two write ups now. I was called into Mr. Haskins' office with Bob McWhirter, a personnel specialist, as a witness. I asked if I could have my own witness when I realized that the meeting was not going to be a good one and Mr. McWhirter informed me that that was what he was there for. I could have had my own witness but was not told this. On this day I set up an appointment with the EEOC counselor Shalini Benson and the EEOC Director Linda Sites.

As per my original complaint to EEOC on April 15th, Mr. Haskins was to finally put into effect a new label system for the White House Staff and other organizations within the EOP complex. For eight years I was in charge of all subscriptions for the Staff, magazine and newspaper. During the first meeting Mr. Haskins finally agreed to a password that only he and I would have to get into this program. In the past others, many others would have the password and dishonestly change the billing around. This was on April 15th and Mr. Haskins failed to comply until the day before my second visit to the EEOC about reprisal.

Rusty Francisco's mother passed away and he was in the Philippines for about a month. All appeared to have quieted down.

July 15th, 2004 3:00 pm I was called over to a meeting in Room 52 with Ken Haskins and Ken Miller. They told me that I would be starting a new job on the 19th of July, at 1800 G Street mailroom. My hours would also change. I would be coming in earlier. I wanted to know why and was informed that I had no choice. I asked if they could give me time to get ready and I was told no. Mr. Miller asked me if I understood and I kept quiet. I was shocked and unprepared. I felt as though I was being punished. I had walked out rather quickly as I was about to start crying. I chose to walk out before I started crying as it would only have served to embarrass myself. I returned to the office and asked them if they were also taking my pass away. Mr. Haskins said that he did not know. I had not known of anyone from any other mailroom who had been moved as quickly without notice unless they had done something terribly wrong. I walked back to the WW mailroom and called personnel. I asked to speak to Suzy Shannon, Director of

Page 4

the Human Resources Division, and was told that she was on vacation. I then asked to speak to Jon Laurich, Director of Personnel and was informed that he was out. I asked if I could be transferred to Tim Campen's office; he is the Director of the Office of Administration. I was advised by whomever I was speaking to that I should not even attempt to speak with him. I chose at this time to walk over to his office.

When I walked into his office I asked Bridgett Sheedy if I could make an appointment. Standing in the middle of the waiting area was, Mr. Haskins, Mr. Miller, and Sandy Evens. Sandy faced me, waving me off with her hands, telling me that on Monday morning my hours would change and I would start my new job. She told me to go on out of the office because it wasn't all about me. She said as a matter of fact I was too upset to be at work and that I should go home at that time. That stunned me because it appeared to me that she was attempting to convince me that I was more upset than I was. I left the office and went outside to try and understand some of what had just happened. Standing there I saw Tony Rivers, the mail clerk, escorting Mr. Miller to the West Wing. I put out my cigarette and continued thinking that Mr. Miller was looking for me. I followed him into Colleen Litkenhause's office to get Tony or myself a new parking permit for another location. I asked Colleen if Linda was around and I was told that she was upstairs. Linda Gambatesa is the Director of Oval Office Operations. I asked Linda if I could speak with her and realizing that the President was in with her I backed out. She said that we could speak later. I went back to my office to get ready to go home. Mr. Miller and Tony came down to the mailroom. They asked if I minded that they walked me out so that they could switch parking permits with me as Tony would be replacing me in the West Wing. Tony would therefore need my permit, which I have had for many years. We walked out through the back of the White House. On the way out I said hello to a few people that I know and then proceeded out to my car. We walked through the gates and down to the Avenue, where I had parked my car. We switched permits and I got into my car and turned the air on to let the inside cool off. I looked into the rearview mirror and noticed that Mr. Miller and Tony were still standing by my car. I asked Mr. Miller if everything was OK and he said that he was waiting for me to leave. I felt as though I was just slapped in the face. I got out of my car and informed Mr. Miller that I was embarrassed by this and asked him why it was necessary. He walked over to the Secret Service whom I have known for years and told them to watch and make sure that I left. I called my sister in Florida and then got back into my car where I proceeded to cry, uncomfortable with the situation. I do not believe anyone saw me crying. At that point I left. Friday, the following day, I had class which had to be canceled. Before that Friday though I called Mr. Haskins and he said that he was unaware that I had been escorted out. I then called Bridgett Sheedy to see if Tim Campen the OA Director could please call me at home. She said that she did not see why he would not be able to. He failed to call me back and I had a feeling that he most likely would not.


All of the Office of Administration employees were told by the Chief of Staff Andy Card that if we ever needed a minute of his time we could set up an appointment. This was three years ago in the Briefing Room. At the time I kind of laughed it off.

Page 5

July 16th, 2004 Saturday morning. I picked up the phone and the White House Operator left a message with Deputy Chief of Staff Harriett Miers for me. She returned my call right away. I quickly and briefly told her what had happened and how I felt humiliated in front of co-workers and the US Secret Service. She said she would get back to me and never did. I told her how for my 15 years with the Federal Government I have always had excellent performance appraisals, medals, awards, never a write up, etc., and that something was not right. A couple of hours later Suzy Shannon called me from her vacation, saying that she had gotten permission to do so by Linda Sites, EEOC Director. She warned me not to make another phone call and said that people feared that their jobs were in jeopardy because of me. We talked for a long time. She left her number and warned me that not only was my West Wing pass taken away but my old Executive Office Building pass would be as well.

July 19th, 2004 As I was returning to work on Monday morning I was pulled over by the Secret Service and told to wait. Other Secret Service pulled up in their trucks while I waited. I was told that my picture was distributed among them during their meetings and that I was not to be allowed onto the complex. I was trying to park on the ellipse, which was my newly designated parking spot. Mark Frownfelter from the EOP Security had to walk to get me and escort me from the ellipse. He apologized for everything that they were doing to me. He offered to have me to use him as a reference on any job application as he had known me for 10 years and therefore knew my character quite well. When I told him that it started with the security breach in the West Wing mailroom he put his head down and said "I wished that you hadn't told me this". He also said that OA was behind my problems on the ellipse.

July 19th, 2004 same day. I was given a new badge to go with my new parking permit. My computer privileges were taken away for several weeks. My co-workers treated me as though I had done something terrible. I even got a phone call at home asking me if it was true that I had been fired. July 19th Monday morning I had been asked by several people if it was true that I had been escorted out of the White House.

July 20th, 2004 Tuesday. This is the second time that the US Secret Service would not allow me to enter the ellipse. The informed me that my picture was circulating around the complex again. I waited by my car until I finally gained permission. Things were taking a toll on me. I was asked again today if it were true that I had been put into a straight jacket and escorted out. I found that to be funny at the time and laughed with him but when I got off of the phone I felt humiliated again. I stayed out of work on July 21st, July 22nd, and July 23rd. I went to the Dr. I had a note from him to stay out the entire next week. After speaking with my family it was thought best that I hold up my head and return to work, which I did.

6

Page 6

July 26th, 2004 The US Secret Service stopped me again and hopefully for the last time. A USSS friend who has known me for over 10 years told me that the other agents that know me well told the newer ones to back off. That made me feel so much better. This was maybe August 2nd that he told me this.

July 30th, 2004 Mr. Ken Miller presented me with a letter of a three day suspension.

I appealed this to Jon Laurich the Director of Personnel with Marsha Fulham (newly employed), Director of the General Services Division, on August 5th at 4:00 pm until 5:15 pm. He said that he would consider it. I also mentioned to him that I had a witness on June 9th that had heard me explain to Mr. Haskins that I could not come in and work Helen's hours on June 11th, 2004. Even with this witness Mr. Haskins said that the letter would remain in my file.

I believe that by keeping it in my file it somehow supported Ken Miller's reasoning for suspending me for 3 days without pay. I believe that he was behind Haskins' not removing it as without it his letter would not have as much validity.

My ten years working for the Executive Office of the President has been impeccable. My reputation has been spotless and I have always brought a good attitude to work. These last few months I have been humiliated, embarrassed, condemned, laughed at, and put out for show. I take tremendous pride and honor in my job and I have always done it well. I have been called a scapegoat by family, friends and co-workers. I was told that this was an example of what could be, if I did not somehow comply. Mr. Haskins told us that if he saw a red cow, we would see a red cow. I and a co-worker of mine were told that when the last General Services Division Director Kenneth Hembree left, there were going to be repercussions.

August 2nd or 3rd, 2004 I had a meeting last week with Suzy Shannon in personnel about transferring out. As we talked about things she said that my leave record had a lot to do with my transfer to another office. This was the first time that I had ever had my leave brought up. I had my leave records pulled. I have documentation for everything and as far as I know or can see there is no problem. I also asked her why my computer privileges had been revoked. She replied that they were concerned that I would e-mail the wrong person. She also said that she could get access to my e-mails and documents if she had to.

All of a sudden they started saying that I had been moved for cross training. Out of the 5 mailrooms around the White House complex, I was the only person that was moved. They placed a mail clerk to help Barbara in the West Wing mailroom. They also moved

Page 7

Bobby Strickland from where I am now working (he was the Lead Mail Assistant) to Old Executive Office Building (OEOB).

Page 8

Tim Campen-

Sandy Evans-

Jon Laurich-

Suzy Shannon-

Marsha Fulhum-

Ken Miller-

Ken Haskins-

Restituto Francisco-

Jun Deleyos-

Dan Moncada-

Myself-

Barbara Swann-

Page 9

Room 52 mailroom where they already have a Lead Mail Assistant they placed another Lead Mail Assistant. I am only one of two maybe three people who have cross trained for the Room 52 mailroom and knows already how the operation moves. From the mail, to the dispatching, to handling all of the newspapers and billing for the entire staff. I was in my position as Lead Mail Assistant in the West Wing for maybe three years. Other Lead Mail Assistants and Mail Clerks have been in there positions for ten to twenty years. I don't mind being transferred for cross training but I was not even allowed to go back to my own desk to pack my own things. They had security do it which made another scene in front of my co-workers. The whole thing makes it look as though I had done something wrong.

I am one of two Caucasians working in the mailroom. The other is male.

LAW OFFICES

# FARBER TAYLOR, LLC

ONE CENTRAL PLAZA

SUITE 805

11300 ROCKVILLE PIKE

ROCKVILLE, MARYLAND 20852

———

www.farbertaylor.com

———

(301) 881-6800

———

FACSIMILE

(301) 770-3927

MINDY G. FARBER**
R. DOUGLAS TAYLOR JR *^○
JAMES E. RUBIN**
MARY E. HENRY**
GWENLYNN W. D'SOUZA**

* MARYLAND BAR
+ D.C. BAR
○ VIRGINIA BAR

September 24, 2004

**BY FACSIMILE (202)395-3613 AND REGULAR MAIL**

Linda Sites
Director, Equal Employment Opportunity
Office of Administration
Executive office of the President
725 17th Street, N.W
Room 2200
Washington, D.C. 20503

Re:    **Discrimination Complaint of Laura C. Jones**
        **Complaint No.: OA-04-01**

Dear Ms. Sites:

Laura C. Jones, a long-term federal employee and lead mail assistant in the Office of Administration, Executive Office of the President ("the agency"), Washington, D.C., has retained this employment and labor law firm to represent her in her discrimination complaint.

On behalf of Ms. Jones, we wish to amend the above complaint to add an additional claim of discrimination on the basis of reprisal, race, color, and sex for the three day suspension issued on August 13, 2004 by Jon S. Laurich, Deputy Chief Operating Officer. Mr. Laurich suspended Ms. Jones for supposed insolent behavior. A copy of this decision is attached.

Sincerely,

Mindy G. Farber

enclosure
cc:    Laura C. Jones

**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF ADMINISTRATION**
WASHINGTON, D.C. 20503

August 27, 2004

Laura C. Jones

Dear Ms. Jones:

This notice acknowledges receipt of the discrimination complaint you filed by facsimile August 13, 2004, against the Office of Administration (OA), Executive Office of the President, under the provisions of Title 29 Code of Federal Regulations (CFR), Part 1614. Your formal complaint of discrimination is considered filed on August 13, 2004, and has been assigned complaint number OA-04-01.

In your complaint of discrimination, you claimed that the OA discriminated against you because of your race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, in the following actions:

    a. Placement of a letter of reprimand into your personnel file on June 16, 2004;

    b. Your reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in your work hours from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:00 p.m.

Your formal complaint attached a narrative statement that included the claims stated above, but your narrative also included additional information, which I have determined to be background information for your complaint. You attached to your complaint the letter of reprimand addressed in your complaint, but you also attached a notice of proposed suspension, which was not discussed in your narrative statement and contains only limited information regarding the circumstances surrounding your receipt of notice of your reassignment. I am considering this attached notice of suspension as background information for the issue of your reassignment.

If you believe that your claims and/or bases have not been correctly stated, please notify me, in writing, within 10 calendar days of receipt of this letter. State the claim(s) and basis/bases of discrimination that you believe to be correct. If I have not heard from you within the specified time frame, I will assume that the claim(s) and bases of discrimination are correct as stated, and decisions for acceptance and/or dismissal will be based upon the information provided and as cited above.

The agency will process your complaint in accordance with 29 CFR § 1614.106. The Director of Equal Employment Opportunity, Office of Administration (OA), Executive Office of the President (EOP), will determine whether your formal complaint of discrimination should be accepted for further processing.

2

If your complaint is accepted for further processing, OA, in accordance with 29 CFR § 1614.108, will conduct an impartial and appropriate investigation of the complaint within 180 days of the filing of the complaint unless the parties agree in writing to extend the time period. You have the right to amend your complaint of discrimination prior to the conclusion of the investigation. If you amend the complaint, OA has to complete the investigation within the earlier period ending 180 days after the last amendment to the complaint or 360 days after the filing of the original complaint.

Following the conclusion of the investigation, you will receive a copy of the report of investigation. After receiving this report of investigation, or any time after 180 days from the date of the first filed complaint, you will have the option of requesting a hearing by an administrative judge from the Equal Employment Opportunity Commission (EEOC) or a final decision by the OA. Using the EEOC's Request for Hearing Form, you may request a hearing by personal delivery or by mail sent to the address below.

> Equal Employment Opportunity Commission
> 1400 L Street, NW, Suite 200
> Washington, D.C. 20005

As an alternative to mailing your request, you may send your request for a hearing to the EEOC by facsimile at (202) 275-6834 or (202) 275-0025. At the same time that you file your request for a hearing with the EEOC, you must send a copy of the hearing request to the address below or by facsimile at (202) 395-3613.

> Director, Equal Employment Opportunity
> Office of Administration
> Executive Office of the President
> 725 17th Street, NW, Room 2200
> Washington, DC 20503

The Director of Equal Employment Opportunity, OA, EOP, may dismiss your complaint of discrimination for failure to meet any one of the requirements specified in 29 CFR §1614.107. In case of a dismissal, the Director of Equal Employment Opportunity, OA, EOP, will state the reason(s) for the dismissal. You will have the right to appeal the dismissal of your complaint or OA's final action on the complaint.

If the Director of Equal Employment Opportunity, OA, EOP, partially dismisses your complaint, you cannot appeal this partial dismissal. You will be notified in writing of any partial dismissal including the rationale for that determination and notification that the dismissed portion of your complaint will not be investigated. If you request a hearing on the remainder of the complaint, an administrative judge will review the dismissal determination, but you cannot appeal the partial dismissal until the OA takes final action on the remainder of your complaint.

3

To avoid delays in postal mail, please forward all correspondence by facsimile at (202) 395-3613. Also, you may contact me at (202) 395-7704 or (TTY) (202)-395-0805 if you have questions regarding this letter or the processing of your complaint.

Sincerely,

Linda Sites
Director of Equal Employment Opportunity

Attachments:    Request for Hearing Form
                Notice of Appeal
                Counselor's Report

Appendix N  EEO-MD-110

## REQUEST FOR A HEARING FORM

**EEOC Hearings Unit**
_____ **District/Field Office**

_____

_____

_____

**Dear Sir/Madam:**

I am requesting the appointment of an Equal Employment Opportunity Commission Adminis-trative Judge pursuant to 29 C.F.R. § 1614.108(g). I hereby certify that either more than 180 days have passed from the date I filed my complaint or I have received a notice from the agency that I have thirty (30) days to elect a hearing or a final agency decision.

**My name:**          _____

**Agency**
**name &**            _____
**address**
                      _____

                      _____

**Agency No.:**       _____

In accordance with section 1614.108(g), I have sent a copy of this request for a hearing to the following person at the agency:

**Name:**             _____

**Address**           _____
(if different
from above)
                      _____

                      _____

Sincerely


[Name of Appellant]

15

# NOTICE OF APPEAL/PETITION
## TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

OFFICE OF FEDERAL OPERATIONS
P.O. Box 19848
Washington, DC 20036

**Complainant Information:** (Please Print or Type)

| | |
|---|---|
| Complainant's name (Last, First, M.I.): | |
| Home/mailing address: | |
| City, State, ZIP Code: | |
| Daytime Telephone # (with area code): | |
| E-mail address (if any): | |

**Attorney/Representative Information (if any):**

| | |
|---|---|
| Attorney name: | |
| Non-Attorney Representative name: | |
| Address: | |
| City, State, ZIP Code: | |
| Telephone number (if applicable): | |
| E-mail address (if any): | |

**General Information:**

| | |
|---|---|
| Name of the agency being charged with discrimination: | |
| Identify the Agency's complaint number: | |
| Location of the duty station or local facility in which the complaint arose: | |
| Has a **final action** been taken by the agency, an Arbitrator, FLRA, or MSPB on this complaint? | _____ Yes;  Date Received _____ (Remember to attach a copy) <br> _____ No <br> _____ This appeal alleges a breach of settlement agreement |
| Has a complaint been filed on this same matter with the EEOC, another agency, or through any other administrative or collective bargaining procedures? | _____ No <br> _____ Yes (Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate) |
| Has a civil action (lawsuit) been filed in connection with this complaint? | _____ No <br> _____ Yes (Attach a copy of the civil action filed) |

16

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit J

**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF ADMINISTRATION**
WASHINGTON, D.C. 20503

September 13, 2004

Laura C. Jones

Dear Ms. Jones:

This notice refers to the discrimination complaint you filed by facsimile August 13, 2004, against the Office of Administration (OA), Executive Office of the President (EOP), under the provisions of Title 29 Code of Federal Regulations (CFR), Part 1614. Your formal complaint of discrimination is considered filed on August 13, 2004, and has been assigned complaint number OA-04-01.

In your complaint of discrimination, you claimed that the OA discriminated against you because of your race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, in the following actions:

    a. Placement of a letter of reprimand into your personnel file on June 16, 2004;

    b. Your reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in your work hours from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:00 p.m.

Your formal complaint attached a narrative statement that included the claims stated above, but your narrative also included additional information, which I determined to be background information for your complaint. You attached to your complaint the letter of reprimand addressed in your complaint, but you also attached a notice of proposed suspension, which was not discussed in your narrative statement and contained only limited information regarding the circumstances surrounding your receipt of notice of your reassignment. I considered this attached notice of suspension as background information for the issue of your reassignment.

I informed you by notice dated August 27, 2004, which you received August 31, 2004, that if you believed that your claims and/or bases had not been correctly stated, you should notify me, in writing, within 10 calendar days of receipt of that notice. My notice told you that if I had not heard from you within the specified time frame, I would assume that the claim(s) and bases of discrimination were correct as stated, and decisions for acceptance and/or dismissal would be based upon the information provided and as cited above.

I have received no response from you within the ten-day period, and I am therefore issuing formal acceptance of your complaint and have specified the claims accepted for investigation as follows:

2

Due to her race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, the aggrieved was subjected to discrimination by the Office of Administration (OA), Executive Office of the President (EOP), in the following actions:

    a. Placement of a letter of reprimand into her personnel file on June 16, 2004;

    b. Her reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in her work hours from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:00 p.m.

The OA will process your complaint in accordance with the regulations at Title 29 Code of Federal Regulations (CFR), Section 1614.106, and will conduct an impartial and appropriate investigation of the complaint within 180 days of the filing of the amended complaint unless the parties agree in writing to extend the time period for not more than an additional 90 days. You will be notified when the investigation will begin, and you will receive a copy of the report of investigation when it has been completed.

You have the right to amend your complaint of discrimination prior to the conclusion of the investigation. When a complaint is amended, the Agency has to complete the investigation within the earlier period ending 180 days after the last amendment to the complaint or 360 days after the filing of the original complaint. Using the attached Request for Hearing Form, you may request a hearing by personal delivery or by mail addressed to:

        Equal Employment Opportunity Commission (EEOC)
        1400 L Street , NW, Suite 200
        Washington, D.C. 20005

As an additional alternative, you may fax your request to the EEOC at (202) 275-6834 or (202) 275-0025. At the same time that you file your request for a hearing with the EEOC, you must furnish a copy of the hearing request to:

        Director, Equal Employment Opportunity
        Executive Office of the President
        Office of Administration (OA)
        725 17th Street, NW, Room 2200
        Washington, DC 20503

Within 30 calendar days of your receipt of the report of investigation, you have the right to request a hearing before an administrative judge appointed by the EEOC, or you may choose a final agency decision on your complaint based upon the investigative record. If you elect the latter, the OA is required to issue a final agency decision within 60 calendar days of your request. If, within 30 calendar days following your receipt of the report of investigation, you have made no election of either a hearing or an agency final decision, the OA will issue a final agency decision.

3

You will have the right to appeal the OA's final decision or action on your complaint. You must submit this appeal to EEOC within 30 calendar days of receipt of the OA's final decision or action.

You will also have the right to file a civil action in Federal court on matters raised in your complaint at the following stages and conditions in the processing of your complaint:

a. Within 90 calendar days of receipt of the final action on your complaint if no appeal has been filed;

b. After 180 calendar days from the date of filing your complaint if an appeal has not been filed and final action has not been taken;

c. Within 90 calendar days of receipt of the EEOC's final decision on an appeal; or

d. After 180 calendar days from the date of filing an appeal with the EEOC if there has been no final decision by the EEOC.

If a civil action is filed under Title VII of the Civil Rights Act of 1964, as amended, and you do not have or are unable to obtain the services of a lawyer, you may request the court to appoint a lawyer to represent you. In such circumstances as the court may deem just, the court may appoint a lawyer and may authorize the commencement of the action without the payment of fees, costs, or security. Any such request must be made within the above referenced 90-day time limit for filing suit and in such form and manner as the court may require. Also, if you file a civil action, you must name the individual who is holding the position of Director, OA, EOP, by name as the defendant. The OA Director is Timothy A. Campen. Failure to name the head of the Agency may result in the loss of any judicial redress to which you may be entitled.

Throughout the complaint process, both you and the Agency may make reasonable attempts to resolve the complaint. If a resolution is reached, the terms of the agreement will be reduced to writing, and a copy will be provided to you. If at any time you desire to withdraw the complaint, you may do so, but withdrawal must be in writing and signed by you.

To avoid delays in postal mail, please furnish all correspondence to me using facsimile at (202) 395-3613. Also, you may contact me at (202) 395-7704 or (TTY) (202)-395-0805 if you have questions regarding this letter or the processing of your complaint.

Sincerely,

Linda Sites
Director of Equal Employment Opportunity

Attachments:  Request for Hearing Form
              Counselor's Report

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit K



**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF ADMINISTRATION**
WASHINGTON, D.C. 20503

October 5, 2004

Mary E. Henry, Esq.
Farber Taylor LLC
One Central Plaza
Rockville, MD 20852

Dear Ms. Henry:

This notice refers to your September 24, 2004, amendment to your client's discrimination complaint filed against the Office of Administration (OA), Executive Office of the President (EOP), under the provisions of Title 29 Code of Federal Regulations (CFR), Part 1614. Your client's formal discrimination complaint was considered filed on August 13, 2004, and was assigned complaint number OA-04-01. Following my August 27, 2004, notice of receipt (Attachment 1), and September 13, 2004, notice of acceptance of your client's complaint (Attachment 2), you submitted the aforementioned amendment by facsimile. Specifically, your facsimiled document notified me of your firm's representation of Laura C. Jones as of September 24, 2004, and that your client wished to amend her complaint "to add an additional claim of discrimination on the basis of reprisal, race, color, and sex for the three day suspension issued on August 13, 2004 by Jon S. Laurich, Deputy Chief Operating Officer."

In my August 27, 2004, notice of receipt of your client's complaint of discrimination, I stated that she had claimed that the OA discriminated against her because of her race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, in the following actions:

"a. Placement of a letter of reprimand into your personnel file on June 16, 2004;

b. Your reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in your work hours from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:00 p.m."

Additionally, my notice informed your client that her formal complaint attached a narrative statement that included the claims stated above, but that her narrative also included additional information, which I had determined to be background information for her complaint. She attached to her complaint the letter of reprimand she addressed in her complaint, but she also attached a notice of proposed suspension, which was not discussed in her narrative statement and contained only limited information regarding the circumstances surrounding her receipt of notice of her reassignment. My notice informed your client that I considered this attached notice of suspension as background information for the issue of her reassignment. My notice also informed your client that she needed to inform me of any disagreement she might have with my statements of the claims of discrimination that would be investigated by the agency. I received no response from your client within the ten-day period, and I subsequently issued a formal acceptance of her complaint September 13, 2004, in which I specified the claims accepted for investigation as follows:

*Att. 3 (4-4)*

.2

"Due to her race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, the aggrieved was subjected to discrimination by the Office of Administration (OA), Executive Office of the President (EOP), in the following actions:

    a.  Placement of a letter of reprimand into her personnel file on June 16, 2004;

    b.  Her reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in her work hours from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:00 p.m."

Based upon your request to amend your client's complaint of discrimination as of September 24, 2004, I have amended the claim of discrimination accepted for investigation as follows:

Due to her race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, the aggrieved was subjected to discrimination by the Office of Administration (OA), Executive Office of the President (EOP), in the following actions:

    a.  Placement of a letter of reprimand into her personnel file on June 16, 2004;

    b.  Her reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in her work hours from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:00 p.m.;

    c.  Her three-day suspension for insolent behavior on July 15, 2004, toward her supervisors.

The Agency will process your client's complaint in accordance with the regulations at Title 29 Code of Federal Regulations (CFR), Section 1614.106. The Office of Administration will conduct an impartial and appropriate investigation of the complaint within 180 days of the filing of the amended complaint unless the parties agree in writing to extend the time period for not more than an additional 90 days. You will be notified when the investigation will begin, and you will receive a copy of the report of investigation when it has been completed.

Your client has the right to amend her complaint of discrimination prior to the conclusion of the investigation. When a complaint is amended, the Agency has to complete the investigation within the earlier period ending 180 days after the last amendment to the complaint or 360 days after the filing of the original complaint. Using the attached Request for Hearing Form, your client may request a hearing by personal delivery or by mail addressed to:

                    Equal Employment Opportunity Commission (EEOC)
                    1400 L Street , NW, Suite 200
                    Washington, D.C. 20005

Ex. 2 (5-4)

3

As an additional alternative, you may fax your client's request to the EEOC at (202) 275-6834 or (202) 275-0025. At the same time that you file your client's request for a hearing with the EEOC, you must furnish a copy of the hearing request to:

> Director, Equal Employment Opportunity
> Executive Office of the President
> Office of Administration (OA)
> 725 17th Street, NW, Room 2200
> Washington, DC 20503

Within 30 calendar days of your receipt of the report of investigation, your client has the right to request a hearing before an administrative judge appointed by the EEOC, or she may choose a final agency decision on her complaint based upon the investigative record. If she elects the latter, the OA is required to issue a final agency decision within 60 calendar days of her request. If, within 30 calendar days following your receipt of the report of investigation, your client has made no election of either a hearing or an agency final decision, the OA will issue a final agency decision.

Your client will have the right to appeal the OA's final decision or action on her complaint. Your client must submit this appeal to EEOC within 30 calendar days of receipt of the OA's final decision or action.

Your client will also have the right to file a civil action in Federal court on matters raised in her complaint at the following stages and conditions in the processing of her complaint:

a. Within 90 calendar days of receipt of the final action on your client's complaint if no appeal has been filed;

b. After 180 calendar days from the date of filing your client's complaint if an appeal has not been filed and final action has not been taken;

c. Within 90 calendar days of receipt of the EEOC's final decision on an appeal; or

d. After 180 calendar days from the date of filing an appeal with the EEOC if there has been no final decision by the EEOC.

If a civil action is filed under Title VII of the Civil Rights Act of 1964, as amended, and your client does not have or is unable to obtain the services of a lawyer, your client may request the court to appoint a lawyer to represent her. In such circumstances as the court may deem just, the court may appoint a lawyer and may authorize the commencement of the action without the payment of fees, costs, or security. Any such request must be made within the above referenced 90-day time limit for filing suit and in such form and manner as the court may require. Also, if your client files a civil action, she must name the individual who is holding the position of Director, OA, EOP, by name as the defendant. The OA Director is Timothy A. Campen. Failure

*Ex 2 (6-7)*

·4

to name the head of the Agency may result in the loss of any judicial redress to which your client may be entitled.

Throughout the complaint process, both your client and the Agency may make reasonable attempts to resolve the complaint. If a resolution is reached, the terms of the agreement will be reduced to writing, and a copy will be provided to you. If at any time your client desires to withdraw the complaint, she may do so, but withdrawal must be in writing and signed by you.

To avoid delays in postal mail, please furnish all correspondence to me using facsimile at (202) 395-3613. Also, you may contact me at (202) 395-7704 or (TTY) (202)-395-0805 if you have questions regarding this letter or the processing of your client's complaint.

Sincerely,

Linda Sites
Director of Equal Employment Opportunity

Attachments: Notice of Acknowledgement (with attachments)
Notice of Acceptance (without attachments)

cc: Laura C. Jones,                                              (without attachments)

# LAURA C. JONES
## v.
# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit L

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION
WASHINGTON, D.C. 20503

June 1, 2005

MEMORANDUM FOR LAURA C. JONES
LEAD MAIL ASSISTANT

FROM:              MARCIA FULHAM
                   DIRECTOR, GENERAL SERVICES DIVISION

SUBJECT:           Notice of Proposed Removal

You are hereby notified that I propose to remove you from your position of Lead Mail
Assistant, GS-08, with the General Services Division, Office of Administration (OA),
Executive Office of the President (EOP), and from the Federal service, because you
engaged in disorderly and insolent conduct, and you failed to follow instructions. As
discussed below, this is your fourth misconduct incident in the last eleven months. This
proposed removal, if sustained, will take effect no earlier than 30 calendar days from the
date you receive this memorandum.

**Charges: Disorderly and Insolent Conduct; and Failure to Follow Instructions.**

On May 20, 2005, you engaged in disorderly and insolent conduct during a meeting with
a colleague, Mr. Danilo Ibanez, and your supervisor, Ms. Anita Cox-Harris. During the
course of routine office conversation, you remarked that you had not yet had lunch that
day because of your excessive workload. Your supervisor then reminded you that it is
your responsibility to notify her whenever you need extra help so that she can make
appropriate arrangements to assist you. In response, you became increasingly agitated
and belligerent, excessively loud, and began making demeaning remarks about other
colleagues not present, including accusing them of gross dereliction of duty. Mr. Ibanez
left the office momentarily to complete an assignment, and while he was gone, you also
began accusing him of gross dereliction of duty. Ms. Cox-Harris directed you to calm
down, lower your voice, and cease making such abusive and demeaning comments
concerning your colleagues. When Mr. Ibanez returned, Ms. Cox-Harris asked you to
come closer to her desk so that she and Mr. Ibanez might discuss with you the accusations
and concerns you raised. At this time you rolled your chair from behind your desk to a
position directly in front of your supervisor's desk, and adjacent to Mr. Ibanez's desk. In
your hand you were holding large metal scissors, approximately 8 ¼ inches in length. As
discussion commenced, once again you became increasingly agitated, belligerent, and
excessively loud. Ms. Cox-Harris then told you at least three separate times to lower your

voice, but you refused. Mr. Ibanez noticed that, in your agitation, you began gesticulating sharply with the scissors. He became very concerned that you might injure yourself or strike Ms. Cox-Harris, when suddenly you rose from your chair and slammed the scissors, points-down, into Ms. Cox-Harris's brand new desk. The scissors struck with such force that the desk received two deep gouge marks and one long scrape, approximately 4 ½ inches in length. The considerable force of the impact also apparently caused the scissors to fly out of your hand and shoot across Ms. Cox-Harris's desk. Your actions and attitude reflected such a severe loss of emotional and personal control that Mr. Ibanez leapt from his chair to restrain you, only he was too late to stop you from slamming the scissors into your supervisor's desk.

Immediately following this incident, Ms. Cox-Harris directed you to calm down, leave the office, and go home for the remainder of the day. Once again, you failed to follow directions by refusing to comply. You retrieved your sweater, jacket, and umbrella, and then proceeded to swing all three items violently, striking the mail sorting boxes along the wall with sufficient force to dislodge sorted mail, causing it to fall to the floor. Contrary to your supervisor's instructions, you returned to your desk and began typing. Your supervisor directed you to stop typing and leave immediately. Although you initially ignored her and continued to disobey her instructions for a while, eventually you gathered your belongings and departed the mailroom for home.

By engaging in abusive and demeaning remarks concerning your colleagues during work hours and at the workplace, making aggressive and excessively loud remarks, gesticulating sharply with 8 ¼ inch scissors and slamming them into your supervisor's desk, and swinging your belongings with sufficient violence that you knocked mail out of boxes permanently affixed to an office wall, you engaged in disorderly and insolent conduct. Additionally, by repeatedly refusing to comply with your supervisor's legitimate and proper demands to calm down, lower your voice, cease making abusive and demeaning comments concerning your colleagues, stop typing, and leave the office immediately following your disorderly and insolent conduct, you failed to follow instructions.

Your disorderly and insolent conduct has negatively affected the efficiency of the service because it caused severe disruption to your office, negatively affected your work relationship with a colleague, and undermined your supervisors' trust in your professionalism and judgment. Similarly, your failure to follow instructions has negatively affected the efficiency of the service because it has undermined your supervisors' trust in your ability to take instructions and to act professionally in the workplace.

2

As noted previously, this latest incident of misconduct is the fourth such incident in the span of only eleven months. On June 16, 2004, you received a letter of reprimand for using offensive language toward a colleague in the workplace. On August 13, 2004, you received a 3-day suspension for committing insolent behavior toward supervisors. Most recently, on January 13, 2005, you received a 10-day suspension for abusing and using insolent language towards your coworkers. Following each misconduct incident, you received notice that any further instances of misconduct may result in more severe disciplinary action, up to and including removal from Federal service. Despite repeated opportunities to correct your misconduct, improve your attitude toward your colleagues and supervisors, and prove that you can conduct yourself in the professional manner expected of all OA and EOP employees, you have continued to engage in inappropriate outbursts that demonstrate a lack of judgment and professionalism.

The most recent misconduct incident is a matter of tremendous concern to me because I believe it suggests that you may have the potential for engaging in violence in the workplace. As a result, you have been placed on Administrative Leave, with pay, until further notice.

In making this proposal, I considered the nature and seriousness of your actions, your potential for rehabilitation, and the possible effectiveness of a lesser or alternative penalty. As noted previously, your most recent misconduct is particularly egregious because it reflects a continuation of unacceptable aggressive behavior towards your supervisors and colleagues, and suggests that you may have the potential for engaging in violence in the workplace. Although you have been a Federal employee for more than 16 years, I am not convinced that you have rehabilitative potential at this time because you have received multiple opportunities in the past eleven months to correct your unacceptable behavior, all to no avail. As a Lead Mail Clerk, you are responsible for setting a positive example by demonstrating proper work methods and training other employees in what is to be done, yet by repeatedly engaging in misconduct you have set an entirely negative example. I considered lesser or alternative penalties, but given the nature of your actions, and your refusal to conform your behavior to acceptable standards despite repeated warnings and progressive discipline, I determined that such lesser or alternative penalties would not be appropriate in your case. Accordingly, I am proposing that you be removed from the Federal service.

Please be advised that you have the right to review the materials I relied upon to support the charges against you. Contact Mr. Robert McWhirter, Human Resources Specialist, at (202) 395-1140, to make suitable arrangements.

You may answer this Notice of Proposed Removal orally, in writing, or both, within 10

3

calendar days of your receipt of this notice. You must address your written answer, including any affidavits or other supporting evidence, to Mr. Jon S. Laurich, Deputy Chief Operating Officer, OA, via fax at (202) 395-5608. If you wish to make an oral answer you must contact Mr. Laurich at (202) 395-7679, to arrange for your presentation. You will be allowed a reasonable amount of official time to prepare your answer. You must contact your immediate supervisor to request official time.

Regardless of whether you elect to submit an answer to this Notice of Proposed Removal, Mr. Laurich will issue you a written decision, explaining the specific reasons for his decision, at the earliest possible date, but no earlier than 30 calendar days after your receipt of this proposal notice.

You are entitled to be represented by an attorney or other representative of your choice at your own expense. If you choose to be represented, you must fax a written notice immediately to Mr. McWhirter at (202) 395-5608, setting forth the identity, address, and telephone number of your representative. If your representative is an OA employee, he or she may receive a reasonable amount of official time to assist you with the preparation of your answer. Your representative must contact his or her supervisor to request such official time.

If you believe that the proposed action is unwarranted or excessive for any reason, including medical circumstances, you should state your reasons in your answer.

Additionally, you are reminded that you may seek assistance from the Employee Assistance Program (EAP) if you believe you are experiencing personal problems that are impacting your work performance or conduct. You may contact the nationwide counseling referral service provided by The Sand Creek Group, LTD at (800) 243-5744, or www.sandcreekeap.com. EAP contacts are confidential and provided without charge to you.

Should you have any questions regarding policies and procedures associated with this matter, please contact Mr. McWhirter, at (202) 395-1140.

4

Please sign the acknowledgement copy of this letter as evidence of your receipt of this letter and return it to Mr. McWhirter via fax at 202-395-5608.

Receipt Acknowledgement:

_____

Ms. Laura C. Jones

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit M

AFFIDAVIT

I, Kenneth Haskins, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination of Laura C. Jones, against the Office of Administration, Executive Office of the President, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge, and which discloses all of my first hand knowledge having a bearing on the merits of the complaint.

1   My series and grade are **GS-13**, title **Manager, Mail/Messenger Operations**
    agency/office/division/branch, **Executive Office of the President (EOP), Office of**
    **Administration (OA), General Service Division**, located in **Washington, DC** (city and state),
    and telephone number (

2   My race is **African American**, color **black**, sex **male**, and I **have** been involved in prior EEO
    activity.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and the Executive Office of the President policy. Any employee, who is accused of discrimination, or other acts of impropriety, may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record. In addition, the Complainant and appropriate management officials involved in the EEO complaint process will receive the entire investigative file.

The complaint of discrimination, filed by Ms. Laura C. Jones, is accepted by the Agency based on race (Caucasian), color (White), sex (Female), and reprisal for prior protected activity on April 9, 2004. The issues, as accepted, state that Ms. Jones alleges she was discriminated against when a letter of reprimand was placed in her personnel file on June 16, 2004, when she was reassigned, beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street, when her work hours were changed from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m., and when she was issued a three-day suspension for insolent behavior on July 15, 2004, toward her supervisors.

Please provide answers to the following questions in as much detail as possible.

ISSUE 1:     A letter of reprimand was placed in the Complainant's personnel file on June 16, 2004,

Initials: _____

by Mr. Kenneth Haskins.

1.    Did you issue a letter of reprimand to the Complainant for being AWOL? **I issued a Letter of Reprimand because the Claimant failed to follow established leave procedures and used offensive language.** Please explain the circumstances that precipitated you issuing this letter of reprimand to the Complainant for being AWOL? **The Complainant failed to comply with leave procedures because she volunteered and was scheduled to work on Friday, June 11, 2004, which President George W. Bush had designated as a National Day of Mourning as a result of President Ronald Reagan's death, she did not submit a leave request for Friday, June 11, 2004, and she failed to call in or report for duty that day.**

2.    Did you issue a letter of reprimand to the Complainant for using a foul word? **Yes.** What word was used that was considered foul? **The Complainant used the derogatory term "spic" in reference to two of her Spanish-speaking co-workers, stating that "no spic is going to make [her] leave."** What guidelines were followed when you issued the letter of reprimand to the Complainant for using a foul word? **I consulted the OA Human Resources Management Division and followed the process explained to me.**

3.    What did you state to the Complainant when she asked to have this letter of reprimand removed from her personnel file? **I stated that I would not remove the Letter of Reprimand.** What reasons did she give you to warrant this action on your part? **The question is backwards. I did not pull the Letter of Reprimand because she did not convince me that such action was warranted by the facts and circumstances.**

4.    In regard to the issue of the Complainant working on the day of mourning for the death of President Reagan, did she tell you she could work that day? **Yes, the Complainant volunteered to work Friday, June 11, 2004, so she could work on the publication labeling and billing processes while no one was around to interrupt her.** Did she tell you she could only work her schedule on that day? **Yes, the Complainant stated that she could not work Helen Studgeon's hours.** What was your response? **I explained that the Complainant did not have to work Ms. Studgeon's work hours as I needed overlapping evening coverage. I explained that she would be working her normal work hours, which were 10:30 a.m. to 7:00 p.m. I further explained that she might not have to stay longer than 4:00 p.m., depending on the workload.**

5.    Did the people who had, in the past, been considered essential personnel, come to work on the day of mourning for President Reagan? **I did not have to direct anyone on the essential personnel list to come in that day because Laura Jones and Antonio Rivers volunteered to work that day.**

6.    The Counselor's Report states that you told the Complainant you would grant her leave for Friday, June 11, 2004, but she would need to submit a leave form on Monday. **No, that is incorrect. In fact, the Counselor's Report correctly states that I told the Complainant that I "expected her to report for work on [Friday, June 11, 2004] at her regular schedule." See Counselor's Report at page 6, paragraph (f).** Your letter of reprimand, dated June 16, 2004, states that the Complainant did not submit any request for Friday, June 11, 2004. **That is correct.** Did the Complainant submit any type of leave request for June 11, either verbal or written? **No. As I stated to the EEO Counselor, the Complainant "did not call [my] office, home, or cell phone and . . . did not inform [me] . . . that she would be absent" on Friday, June 11, 2004.** If so, how was the request presented? **N/A.**

ISSUE 2:    The Complainant was reassigned beginning July 19, 2004, from the West Wing Mailroom to the mailroom at 1800 G Street and her work hours were changed from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m.

It has been stated that on July 15, 2004, you told the Complainant she would be starting a new job on July 19th at the 1800 G Street Mailroom.

1.    Why was the Complainant assigned a new job? **Mr. Ken Miller and I did not assign the Complainant a new job. We reassigned her to the same position in a different mailroom.** What reasons were given to the Complainant for her "reassignment?" **The Complainant's reassignment to a different mailroom was part of an ongoing series of personnel reassignments, which were intended to make the EOP/OA Mail Messenger Operations more effective and efficient, and to provide better service to our customers. Mr. Miller and I told the Complainant that we were reassigning her to the same position in a different, larger mailroom to provide her with opportunities to: (1) cross-train with other employees in different mailrooms, thereby helping the organization increase its customer service; (2) learn different skills, which could help her enhance future career opportunities and would add value to the entire organization; and, (3) lead a larger mailroom, given that the Complainant told Mr. Miller she wanted to be a supervisor in the future.**

Initials: _KWM_

2.    What was the reason the Complainant was reassigned with only four days notice?  **The Human Resources Management Division instructed me that no additional notice period was required because we were not changing the Complainant's position or duty station, just the mailroom to which she was assigned.  We wanted the Complainant to have the opportunity to train with the Lead Mail Clerk that she was replacing, before he was to take his previously-scheduled leave.  Therefore, we gave the Complainant four days notice that she was being reassigned to a new mailroom to train with the Lead Mail Clerk she was replacing in two weeks.**

3.    When other employees have been reassigned, what advance notice were they given?  **Other reassigned employees were given between two and ten days notice.**

4.    Did you state that John Laurich decided to reassign the Complainant and that the Complainant's letter of reprimand was part of the reason?  **No, I did not.  That portion of the EEO Counselor's report is incorrect.**  *See* Counselor's Report at page 6, paragraph (f).  If so, what were the other parts of the "reason for reassigning" the Complainant?  **Please refer to my answer to Issue 2, Question 1.**

5.    Were you aware that on July 15, the Complainant was escorted to her car to leave?  **Yes.  It is my understanding that Mr. Miller walked the Complainant to her car to exchange parking permits.**  Is this standard procedure for employees who are reassigned?  **Because the Complainant stated that she was not feeling well and would be on leave the next day, Mr. Miller walked her to her car to ensure a seamless exchange of the parking permits.**

6.    Why was the Complainant not allowed to pack her things when she was reassigned?  **The premise of the question is dead wrong.  She *could have* packed her own things, however, she was on sick leave the day after we notified her she was reassigned and was not at work to pack her things for herself.  Therefore, the OA Security Office's Deputy Director packed her things and locked them in a secure area until she returned to work.**  Is this standard procedure when a person is reassigned?  **There is no standard procedure for such an event.  We were dealing with very limited workspace, so, to make more room available to the employee who replaced the Complainant, EOP Security packed and secured the Complainant's belongings and had them delivered to her new mailroom when she returned to work.**

7.    Did you state that "management" said the Complainant was not to come back to the West Wing? **No. That portion of the EEO Counselor's report is incorrect.** *See* **Counselor's Report at page 6, paragraph (f).** And, was the decision not to let the Complainant come back to the West Wing Sandy Evans' decision? **N/A.**

8.    Did you have the Complainant's picture distributed among the Secret Service and preclude her from entering the White House complex? **No.** If so, why? **N/A.** If not, who was responsible for distributing the Complainant's picture and precluding her from entering the complex? **This question assumes as fact something that I do not know to be true.**

9.    Why were the Complainant's computer privileges taken away from her? **The Complainant's computer privileges were not taken away. Her e-mail privileges were temporarily suspend after her reassignment because the Complainant had attempted to contact several senior White House staff members to ask them to intervene on her behalf, and possibly override the decision to reassign her. These actions were completely inappropriate.**

10.    Did you ever make a statement that the Complainant was being reassigned for "cross training?" **Yes.** If so, what other employees have been reassigned for "cross training?" **Dan Moncada, Tony Rivers, Tye Gray, Bobby Strickland, and Anita Garcia.** What cross training was involved? **These employees were cross-trained by working in new mailrooms and performing different functions, depending on the mailrooms' location.**

ISSUE 3:    The Complainant was issued a three-day suspension for insolent behavior on July 15, 2004, toward her supervisors.

1.    Did you have any input to the proposed three-day suspension of the Complainant? **Yes.** If so, were you aware that the Complainant had a witness that she had stated she could not work "Helen's" hours on July 11, 2004? **This is irrelevant to the Complainant's insolent conduct toward her supervisors on July 15, 2004.**

2.    Did you state to the EEO Counselor, when she asked if you would consider removing the letter of reprimand from the Complainant's personnel file (because Mr. Ramsey believed he had overheard Ms. Jones tell Mr. Haskins she would not be at work on June 11, 2004), that you would need some time to think about this? **Yes.** If so, what impact did this information have on your decision to not remove the letter of reprimand? **I had an opportunity to think it through again and I stand by my**

decision to issue the letter of reprimand.  **For additional information, please see my answer to Issue 1, Question 3.**

3.     Please state, to the best of your knowledge, what precipitated the issuance of a notice of proposed suspension to the Complainant by Mr. Kenneth Miller.  **Mr. Miller proposed the Complainant's suspension based on the Complainant's insolent behavior on July 15, 2004 when Mr. Miller and I notified her that she would be reassigned to a new mailroom.** Is it true that the Complainant was told she had no choice about the reassignment?  **Yes.** And, when she asked if she could have time to get ready, she was told no?  **No, I did not tell the Complainant that she could not get ready.**

BACKGROUND QUESTIONS:

1.     Did you ever make a statement to the effect that outside mail should not be accepted by staff?  **Yes.  According to White House guidelines, no mail is allowed into the complex without being processed.**

2.     Did the Complainant bring up the issue of Ms. Swann and/or Mr. Francisco delivering outside mail?  **Yes.** If so, what was your response?  **I spoke with Mr. Francisco and had a meeting with his team.  I directed them not to accept any mail that had not been processed.** Was there a question of you stating that you had been expecting a package when the Complainant mentioned this alleged problem to you?  **Yes, I had been in communication with representatives of the Security Office because they were expecting some documents from outside the White House, which White House management had previously cleared.**

3.     Did you ever accuse the Complainant of leaving bulk mail in the West Wing Mailroom?  **No.** If so, what precipitated this accusation?  **N/A.** Did the Complainant ever talk to you about this alleged accusation?  **No.** If so, what was stated?  **N/A.**

4.     Did you ever state to Mr. Dan Moncada that the Complainant "needed to be humbled?"  **No.**

5.     How was communication between you and the Complainant handled?  **I communicated with her the same way that I communicate with other employees, orally and in writing.**

Did you respond to e-mail from her in a timely manner?  **Yes.**

What was the usual turn-around time for you to respond to the Complainant? **I usually respond to her by the next business day.**

Did you ever make an agreement to respond to the Complainant within a 24-hour period? Has this been adhered to? **I am her supervisor.  I communicate with her consistent with my own responsibilities and as time permits.**

6.     Did the Complainant ever come to you about tension between herself and Ms. Swann? **Yes.** If so, what advice did you provide? **I advised them to complete their work based on the schedule their supervisor had provided, and to notify management if they noticed anything that would impact their ability to complete their work as scheduled.  I further explained that I would not tolerate their personal attacks on one another in the work place.** Was this tension ever referred to as "cat fights?" **Not to my knowledge.** If so, by whom? **N/A.**

7.     What accommodation(s) did you provide the Complainant when she broke her toe? **I moved the Complainant to EEOB Room 52 to work at the customer service window, answer telephones, and complete her publication labeling and billing duties.  This accommodation minimized the amount of time she was on her feet and gave her the opportunity to elevate her foot, as her Physician prescribed.** Was the accommodation(s), if any, that was provided, in line with accommodations to other employees? **Yes.**

8.     Did you ever state to the Complainant that "if he saw a red cow, we would see a red cow?" **No.** If so, what was meant by this statement? **N/A.**

9.     Are you aware of the Complainant's race? **Yes.**

10.     Are you aware of the Complainant's color? **Yes.**

11.     Are you aware of the Complainant's sex? **Yes.**

YES, SEEING EEO 4/04

12.     Are you aware of any protected activity on the part of the Complainant? **I do not understand the question.  What "protected activity"?** If so, when did you become aware of this activity? **N/A.**

13.    Did your awareness of any of these bases on the part of the Complainant for this complaint have any impact on any decision you made involving the aforementioned issues?  **N/A.**

If you have anything further you would like to contribute to this investigation, please so state.

_____
Affiant=s Signature

_Nov  15, 2004_____
Date

Signed before me at _Washington DC____,
(City and state), on this the _15_ day of

_November_, 20 _04_

_____
Signature of Investigator/Notary

# <u>LAURA C. JONES</u>
## <u>v.</u>
# <u>GEORGE BUSH, President of the United States, et al.</u>

## Civil Action No. 07-2164 (RWR)

## Exhibit N

Names of Employees Reassigned for Cross Training in Last Two Years
[within Mail/Messenger Operations]

October 2003

- Dan Moncada from the NEOB Supervisor position to the EEOB Supervisor position
- Jun DeLeyos from EEOB Supervisor position to NEOB Supervisor position

July 2004

- Tony Rivers from the EEOB to the West Wing
- Bobby Strickland from Lead Mail Clerk position at 1800 G Street to Lead Mail Clerk position at the EEOB
- Laura Jones from Lead Mail Clerk position in the West Wing to Lead Mail Clerk position at 1800 G Street

August 2004

- Anita Garcia from 1800 G Street to the NEOB
- Tye Gray from the NEOB to 1800 G Street

EX. 35 (1-1)

# LAURA C. JONES
## v.
# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit O

DRAFT

Response to Proposed Suspension

August 5, 2004

First of all I would like to apologize for any boundaries that I may have crossed. Also I am sorry for some of my behavior which was being misconstrued as hostility. I walked out of this particular meeting with Mr. Haskins and Mr. Miller because again I had been embarrassed, humiliated and almost ashamed because of the turn of events that have been happening so quickly and unexpectedly in my life over the last two or three months. I walked out possibly twice because I wanted to cry and did not want to embarrass myself anymore than what I had to.

I was told right before Mr. Ken Hembree left that I would be experiencing some repercussions and it has happened right on time. A lot of these write-ups and relocations, etc. are an echo of my bringing to the attention to my bosses not long ago a security breach in the WW mailroom which was a huge box of unopened, not x-rayed or irradiated mail. At least 40 thick packets were taken out of this box and delivered to the President and staff. I tried to stop this but my co-worker put her hand in my face and told me to get back to work or whatever I care. My Supervisor kept his back turned hearing this whole conversation. This is on record with E.E.O. with a second complaint stating reprisal. I have been written up twice for the first time ever in my career with the Federal Government. I had a witness that spoke with my EEO counselor and Mr. Haskins still refused to have that letter removed and I believe that if he had removed it from my file Mr. Millers' threat of suspension wouldn't have looked so grand. I feel Mr. Haskins may have thought twice about this considering that I had a witness and to re-iterate everytime I wanted to being subpoenaed to it. My witness was not a close friend and would have no reason or benefit for lying for me.

When I was told on that day by Haskins and Miller that they would be relocating me I felt that this was another way of punishing me. I had no time to pack my belongings, say goodbye or even walk out of the WW mailroom with my head up. I got phone calls at home asking me why I was escorted out. Asking me why I was fired. I got a phone call at home from a co-worker telling me ( why I'm not sure ) that some of my co-workers were jumping up and down for joy ( I was real popular ) and so very glad that I had been fired. Tony Rivers was the cause of all of this. Mr. Miller had Tony walk to my car with me so that we could switch parking permits. They stood there until I left but before I did I asked Mr. Miller why he was doing this because he was embarrassing me. He got the USSS involved who have been friends of mine for years. They were hurt to see this and I got on the phone and cried to my sister all the way home. I live 50 miles away.

EX 26 (1-2)

When I tried to return to work several times (3 or 4) the USSS would not allow me to park on the ellipse even though I was given Tony's permit. The second time this happened they told me that my picture was passed around their meetings telling them to make sure that I don't go onto the property. Mark Frownfelter had to come and get me. He even new this was wrong and I did not even have to say anything to him. Every day was an embarrassment and humiliation and I was so ashamed for something that I did not do. The agents would always apologize because they knew this was wrong, Very wrong.

On a daily basis I hear from someone asking me if it was true that I was escorted. The Residence where I work part-time has asked me what happened. Everyone has their own story about what I did. My co-worker's even now assume that I am going to cause trouble or do something because my parking permit was taken away, access to the OEOB was taken away, my computer privileges were taken away and everybody I work with knows this.

I worked on the AREV/ Billing for the WHO and other agencies for a long time. We finally are getting a new program that I have been wanting for years but couldn't get before. It was taken away from me two weeks ago. Years ago I saved O.A. a large sum of money by cleaning up the way things were being done with the billing. Ask Chuck Sigman. That was my pride and joy. ~~was~~ taken away from me next I do not know. Quite a few people call me a scape goat and that has kind of stuck because those that have known me from the beginning know this is wrong.

It was an honor to have worked the places that I have and if I never go back which I am sure that I won't I still have a lot. I am sorry that I had to go out the way I did.

This is not cross training. This is reprisal. There are those in the EW/WW, NEOB etc. who have never had to be moved. Is this being prejudiced? It looks's it.

Thanks for taking time to read this but I could tell you even more. All I have ever done was my job. I have documentation for every day I have missed work, etc. I was told last week by Personnel that I had missed a lot of Mondays and Friday's. I got my record and I didn't see it. If it were a problem how come I was never told? I'm finished but I am being treated like a leopard by my co-workers. I only want to do my job.

Thanks Again, Laura

EX·26 (22)

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit P

AFFIDAVIT of
Susie N. Shannon

I, Susie Shannon, acknowledge that I am required by Federal regulations to cooperate fully with the investigator who has been assigned to conduct an investigation into the complaint of discrimination by Laura C. Jones, against the Office of Administration, Executive Office of the President, and that I must provide a statement for the investigative report which is true and complete to the best of my knowledge, and which discloses all of my first hand knowledge having a bearing on the merits of the complaint.

My series and grade are GS-201-15, title Director, Human Resources Management Division, agency/office/division/branch,Executive Office of the President/Office of Administration/Human Resources Management Division, located in Washington, D.C.(city and state), and telephone number
My race is Caucasian, color White, sex Female, and I have not been involved in prior EEO activity.

This statement is provided under oath (or affirmation), under penalty of perjury, and without a pledge of confidentiality, in accordance with the Equal Employment Opportunity Commission rules and regulations and the Executive Office of the President policy. Any employee who is accused of discrimination, or other acts of impropriety, may be shown relevant portions of this affidavit and be provided an opportunity to respond for the record. In addition, the Complainant and appropriate management officials involved in the EEO complaint process will receive the entire investigative file.

The complaint of discrimination, filed by Ms. Laura C. Jones (Complainant), is accepted by the Agency based on race (Caucasian), color (White), sex (Female), and reprisal for prior protected activity on April 9, 2004. The issues, as accepted, state that Ms. Jones alleges she was discriminated against when a letter of reprimand was placed in her personnel file on June 16, 2004, when she was reassigned, beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street, when her work hours were changed from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m., and, when she was issued a three-day suspension for insolent behavior on July 15, 2004, toward her supervisors.

Please respond to the following questions:

1.    Did you warn the Complainant not to make any more phone calls, after her telephone

Initials: _____

Page 1 of 4

Ex 17(13)

call to Harriett Miers. If so, why did you warn her not to make any more telephone calls? No, I did not warn Ms. Jones not to make any more phone calls. As the Director of Human Resources I recommended to Ms. Jones that it is in her best interest to raise any personnel issues or EEO issues through her chain of command supervisors and/or the EEO counselor. White House officials who are not responsible for these sorts of personnel matters, simply refer such calls and information back to OA management. In my opinion, it was inappropriate for Ms. Jones to go outside of her chain of command to ask senior White House officials to intervene on her behalf on her personnel issues

2.    Did you state to the Complainant that people feared their jobs were in jeopardy because of her? No. Who feared for their jobs and why? N/A.

3.    Did you ever state to the Complainant that her leave records had a lot to do with her transfer to another office? No. If so, please explain what part of her leave records had an impact on her reassignment? N/A.
I had no knowledge of Ms. Jones' transfer to a new mail room until she came to me regarding her transfer. She asked if management could just up and reassign her. I explained that management had the authority to transfer an employee to the same position in a new mailroom based on mission/workload. She indicated she did not understand why she was transferred and appeared to believe it was a punishment for something. I recommended that she discuss this with her supervisor and we went over some possibilities. I asked was she doing her job well? I asked her is she was present for work on time and was her leave usage a factor. I also asked her about her conduct and productivity at work – was there a change? We discussed these possibilities, however, I had no knowledge of management's decision to transfer Laura Jones until at the time of her visit.

4.    Did you tell the Complainant not to go to her office to retrieve her belongings when she was reassigned and escorted out of the building because her pass was being taken away and because she had called Mrs. Miers? No. Ms. Jones asked me if she could go back to her office to get her personal belongings after she was told of her reassignment. I directed her to ask her supervisors on how they wanted to handle that. To my knowledge, unless she had badge access into the building, she could not go back into the building. Who issued the order for the Complainant not to go to her office to retrieve her belongings? N/A.

Initials: _____

Ex. 17 (2-3)

5. Were you ever able to read the Complainant's e-mail? No. If so, how was this possible? N/A.

6. Were you aware of the Complainant's race, color, sex, and whether or not she had participated in prior EEO activity? I was aware of Ms. Jones's race, color and sex. If so, did this awareness have any impact on any decision you made in regard to the Complainant? No.

If you have anything further you would like to contribute to this investigation, please so state.

I have read the above statement consisting of ____ pages. I declare under the penalty of perjury that my statement is true, correct, and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_____
Affiant=s Signature
12/20/09
Date

Page 3 of 4

3

Initials: _____

Ex. 17 (33)

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit Q

U.S. Equal Employment Opportunity Commission
Washington Field Office

EEOC
WASHINGTON FIELD OFFICE

2005 OCT 13 P 2: 16

1801 L ST NW
WASHINGTON D.C. 20507

| | | |
|---|---|---|
| Laura C. Jones | ) | EEOC No. 100-2005-00382X |
|     Complainant, | ) | Agency No. OA-04-01 |
| | ) | |
|         v. | ) | |
| | ) | |
| John Straub, | ) | |
| Special Assistant to the President and | ) | |
|   Director, Office of Administration, | ) | |
| Executive Office of the President, | ) | |
|     Agency. [1] | ) | |
| | ) | Date: October 7, 2005 |

## MOTION FOR FINDINGS AND CONCLUSIONS WITHOUT A HEARING

COMES NOW THE AGENCY, through its counsel, and moves the Commission for

findings of facts and conclusions of law without a hearing (summary judgment), and a dismissal

of this case with prejudice. The Agency notes for the record that it still has not received any

responses to its July 20, 2005 First Set of Interrogatories & Document Requests and First Set of

Requests for Admissions, two months after sending these discovery requests to the Complainant.

The Agency, therefore, relies on the Complainant's Complaint[2] and her responses to her

August 30, 2005 deposition in bringing this motion. The Agency further reserves the right to

supplement this motion, and any subsequent filings, if and when it receives the Complainant's

required discovery.

    The Agency offers the following in support of its motion:

---

[1] The term "Agency" in pleadings submitted by the Office of Administration is used to be consistent with standard terminology used before the EEOC. It does not imply or reflect any position as to whether and when the Office of Administration is an "Agency" under Federal law.

[2] By "Complaint," the Agency is referring to the Report of Investigation.

1

I.    APPLICABLE LAW

A.    Summary Judgment Standard

In an administrative proceeding under Title VII, summary judgment is appropriate if, after adequate investigation, the Complainant fails to establish the essential elements of her case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Spangle v. Valley Forge Sewer Authority, 839 F.2d 171, 173 (3d Cir. 1988). The Agency may also introduce evidence of a legitimate nondiscriminatory reason for its actions and show that the Complainant can raise no genuine issue of fact regarding whether the proffered reason is a pretext for discrimination. Spangle, 839 F.2d at 173.

The evidence before the Commission clearly establishes both. The undisputed material facts demonstrate that the Complainant has not been the victim of race, color or gender discrimination or any act of reprisal by management officials and therefore has not established the essential elements of a valid case. Further, the evidence also clearly shows that the Agency took each of the actions described below for legitimate, nondiscriminatory reasons and the Complainant fails to establish that the Agency's reasons for these actions were pretexts for discrimination.

Title 29 C.F.R. § 1614.109(g)(1) permits findings of fact and conclusions of law without a hearing if some or all material facts are not in genuine dispute and there is no genuine issue as to credibility. The Supreme Court has held that summary judgment is appropriate where a court determines that, given the substantive legal and evidentiary standards that apply to the case, there exists no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Further, Federal Rules of Civil Procedure (FRCP) Rule 56(c) provides for summary judgment if the pleadings, together with the affidavits, show that there are no genuine issues as to

any material fact and the moving party is entitled to judgment as a matter of law. See Beard v. Whitley County REMC, 840 F.2d 405, 409-10 (7th Cir. 1988). Thus, under the applicable governing standard of the case, the mere existence of some alleged factual dispute will not, in and of itself, defeat an otherwise properly supported motion for summary judgment. Anderson, 477 U.S. at 247-248. The requirement is that there be no genuine issue of material fact. Id. A material fact is "...genuine...if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

      B.    Prima Facie Case of Discrimination & Reprisal

To establish a prima facie case of race, color, or gender discrimination , the Complainant must show that: (1) she was a member of a protected group (race, color and sex) and was treated differently than similarly situated individuals outside her protected group; (2) the Agency took an adverse employment action against her; and, (3) there was a causal connection between her protected class and the adverse employment action. See 42 U.S.C. § 2000e; see, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (stating requirements for prima facie case of racial discrimination); Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1512 (D.C. Cir. 1995) (stating requirements for prima facie case of sex discrimination).

To establish a prima facie case of reprisal, the Complainant must present facts showing that: (1) she engaged in protected activity; (2) she was subjected to adverse action by the Agency; and, (3) there existed a causal link between the adverse action and the protected activity. 42 U.S.C. § 2000(e); Jones v. Washington Metropolitan Area Transit Authority, 205 F.3d 428, 433 (D.C. Cir. 2000).

If the Complainant establishes a prima facie case of discrimination and/or reprisal, the burden shifts to the Agency to articulate a legitimate, nondiscriminatory reason for the

3

challenged action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981);

see, e.g., Holbrook v. Reno, 196 F.3d 255, 263 (D.C. Cir. 1999). If the Agency articulates such a

reason for the challenged action, the burden shifts back to the Complainant to show that the

reason articulated is a pretext for discrimination and/or reprisal. Burdine, 450 U.S. at 253. The

Complainant may succeed by showing that, more likely than not, a discriminatory reason

motivated the Agency, or indirectly by showing that the Agency's proffered reason is unworthy

of credence and that the complainant's explanation of discrimination is to be believed. St.

Mary's Honor Center v. Hicks, 509 U.S. 502, 514 (1993). Ultimately, the Complainant bears the

burden of showing that the Agency would not have taken the adverse employment action "but

for" the Complainant's protected group and/or protected activity. Id. at 515-16.

Accordingly, a summary judgment decision is appropriate when the undisputed facts

show that: (1) the complainant fails to establish a prima facie case of discrimination or reprisal,

or (2) the employing agency fails to articulate a legitimate, nondiscriminatory reason for its

actions, or (3) the complainant fails to establish the agency's stated reason was a pretext for

discrimination. See Burdine, 450 U.S. at 253 (describing the basic allocation of burdens and

order of proof in a Title VII case alleging discriminatory treatment).

II.     DISCUSSION

In her formal complaint of discrimination, the Complainant alleges that the Agency

discriminated against her based on her race, color, and gender and retaliated against her for a

prior Equal Employment Opportunity (EEO) complaint. Complaint at 1, Exhs. 1, 2. For the

purposes of this motion, the Agency admits that the Complainant is Caucasian, white, and

female, that these are protected classes, and that she engaged in protected EEO activity – an

April 9, 2004 meeting between the Complainant, her supervisors, her EEO counselor, and EEO

4

Director Linda Sites – prior to any of the alleged acts of Agency discrimination or retaliation. See Complainant's Dep. at 150-55. The Agency notes, however, the Complainant engaged in this EEO counseling supposedly because she wanted to work on her "communication skills" with her supervisors, but in reality, "[t]o cover my butt," raising questions about the appropriateness and sincerity of her initial EEO involvement. See Complainant's Dep. at 153-54. Additionally, the Complainant admits that there is no distinction between her claim of race and color discrimination; they are the same claim. Id. at 334. Therefore, the Agency will treat the Complainant's race and color claim as factually and legally indistinguishable.

By way of background, the Complainant began working for one of the mailrooms of the Agency's General Services Division in April 1995. For a number of years, the Complainant worked under Ken Hembree, then-Director of the General Services Division. By all accounts, the Complainant had a close working relationship with Mr. Hembree and benefited from several promotions under his supervision, including the Lead Mail Clerk position she held prior to her removal during 2005. In 2004, however, the Agency hired a new team of supervisors: (1) a new second-level supervisor, Branch Chief of Mail/Messenger Operations, Ken Haskins; (2) a new third-level supervisor, Deputy Director of General Services, Ken Miller; (3) a new third-level supervisor, Director of General Services, Marcia Fulham; and, (3) a new fourth-level supervisor, Deputy Chief Operating Officer, Jon Laurich, of the Chief Operating Officer's office. Several months after most of the new team of supervisors came on board, Mr. Hembree retired. The incidents described below occurred after Mr. Hembree's retirement.

A. Letter of Reprimand.

The Complainant contends that Mr. Haskins discriminated and retaliated against her by issuing a June 16, 2004 Letter of Reprimand (LOR). Complaint, Exhs. 1, 2, 4. The LOR

5

charged her with failing to follow established leave procedures when she did not come to work on the national day of mourning honoring former President Ronald Reagan after she volunteered to work that day, and for offensive language by her use of the term "spic." Complaint, Exh. 24.

The Complainant generally denies the LOR's charges, but admits some of its specifications. Complainant's Dep. at 211-12. She asserts that, although she did volunteer to work on the day of mourning, she later orally requested that day off because she "would never leave the West Wing, ever, ever without somebody there." Complainant's Dep. at 191-92, 198-200, 202-05. Although the Complainant had made a "commitment" by volunteering to work, she did not feel that she had to comply with established leave procedures by completing a leave slip to request that day off because it was a national holiday. Id. at 191, 200. The Complainant also denies the charge of offensive language. Complainant's Dep. at 169. She claims that Mr. Haskins completely fabricated the story that she said "no spic is going to make me leave" and she asserted that what she meant when she said she was the "last one around" was that she was the last person working that day, not something racially derogatory. Complainant's Dep. at 167-68, 170; Complaint, Exh. 24.

When asked what she thought Mr. Haskin's motivation might have been for issuing her a "false" LOR, the Complainant said she did not know. Id. at 173, 185. She said that she does not believe Mr. Haskins dislikes females, Complainant's Dep. at 170, or that he dislikes white women, Complainant's Dep. at 171. Instead, she speculates that the June 16, 2004 LOR came about as a result of her reporting to Mr. Haskins in March of 2004 that a box in the mailroom had not been irradiated, Complainant's Dep. at 136, 172 and 176, and to stop the Complainant from being promoted because Mr. Haskins, Mr. Miller, and Mr. Laurich disliked her, disliked her outspokenness, and wanted to show the Complainant that she was not perfect, Complainant's

6

Dep. at 171-73, 205-11, 213. The Complainant speculates that "[m]aybe [she] was a threat to [Mr. Haskins]" because she knew her job so well, though she admitted that she was not "headstrong" all the time and it was not obvious that Mr. Haskin's resented her giving her ideas. Id. at 179-80. According to the Complainant, Mr. Haskin simply had his own ideas and his own ways of doing things; "he didn't like being told anything." Id. at 178-80. The Complainant indicated a number of reasons why she believed she received the LOR, but most importantly, not one of her stated reasons suggested or even hinted that unlawful discrimination was behind management's decision to discipline her. Thus, despite repeated opportunities to advance her case, the Complainant failed to establish a prima facie case of prohibited discrimination or retaliation.

In stark contrast, the Agency met its burden of establishing that Mr. Haskins issued the Complainant a LOR for legitimate, nondiscriminatory reasons. The Complainant volunteered and was scheduled to work on June 11, 2004. However, she failed to report for duty that day, and, contrary to established leave procedures, she failed to complete a leave slip or submit a leave request, either in writing or orally, to ask for June 11, 2004 off, after she committed to work that day. Complaint, Exhs. 24, 23(a), 6, 14. Additionally, Mr. Haskins issued the LOR because the Complainant used offensive language, namely, the word "spic" in reference to her being the "last one around." Complaint, Exhs. 24, 6, 14; see also Complainant's Dep. at 166-68. Although the Complainant denies using the word "spic" and offered an elaborate explanation for her use of the phrase the "last one around," she provides no rational explanation for why Mr. Haskins – who the Complainant believes was helped in drafting the letter by Mr. Miller and Mr. Laurich – would make up the charges. Complainant's Dep. at 181-82, 213. The Complainant failed to submit any facts establishing that the reasons for the LOR were not legitimate and

7

nondiscriminatory, or were a pretext for discrimination. Instead, she offered only her own generalized testimony about her subjective, unsubstantiated belief that the LOR was issued due to discriminatory animus. Thus, as a matter of law, the Agency is entitled to summary judgment regarding the Complainant's claims as to the LOR.

B. Moving to a Different Mailroom in the White House Complex.

When Mr. Haskins, Mr. Miller, and Mr. Laurich came to the Agency, they each met with the Complainant about her goals in the organization. The Complainant told each of these supervisors that she wanted to be the first female supervisor in the West Wing. Complainant's Dep. at 108, 113, 116. The Complainant acknowledged that, to become a supervisor in the West Wing, she would likely have to start out working as a supervisor in another mailroom first. Id. at 107, 260.

Thereafter, in July 2004, Mr. Haskins and Mr. Miller met with the Complainant to tell her that they were reassigning her – without a reduction in grade or pay, or a change to her position title – from the West Wing mailroom to the 1800 G Street mailroom, approximately three blocks away. Id. at 269, 259-60. They explained that they were moving her to another mailroom in the White House complex to provide her and other employees with cross-training to ensure continuity of operations; to provide her with new and better opportunities to learn different, career-enhancing skills; and, to provide the Complainant with the beneficial challenge of supervising a larger operation and serving new customers. Complaint, Exh. 24; Complainant's Dep. at 224, 269-70. The Complainant had not previously worked at the 1800 G Street mailroom, which was a larger mailroom than the West Wing mailroom. Id. at 225, 260-61, 271. Additionally, the West Wing mailroom had a first-level supervisor who assigned the mail clerks their work, and the Complainant, who was a Lead Mail Clerk, led just one other mail clerk there.

8

Id. at 267. She exercised no supervisory authority over that clerk. In the 1800 G Street mailroom, on the other hand, the first-level supervisor had recently retired and that position remained unfilled for a number of months, giving the Complainant, as the Lead Mail Clerk and the most senior person in that mailroom, leadership opportunities to assign work to two other mail clerks. Id. at 261, 263, 265-67. Consistent with their desire to encourage cross-training throughout Mail/Messenger Operations, Mr. Haskins and Mr. Miller also moved six other employees between different mailrooms from October 2003 to August 2004. Complaint, Exh. 4 at 6, Exh. 35. As part of the Complainant's reassignment to the new mailroom three blocks away, Mr. Haskins and Mr. Miller also changed the Complainant's work schedule to begin one hour earlier and changed her parking space to a new location.

In her Complaint, the Complainant contended that these changes resulted from race and sex discrimination, and were in retaliation for her April 2004 EEO meeting regarding enhancing communication skills, Complaint, Exhs. 1, 2, 4, but she provided no factual support to establish this causal link. Instead, in her deposition, the Complainant made a third, unfounded assertion about the changes, when she stated that she believed Mr. Haskins and Mr. Miller moved her in July 2004 as "punishment" for her reporting, in March 2004, that a box was not properly irradiated when it came into the complex. Complainant's Dep. at 218-19. Additionally, the Complainant asserted that the decision to move her may have been because she requested a desk audit. Id. at 278. Neither of these allegations support the Complainant's claims of discrimination or retaliation. See 42 U.S.C.A. § 2000e-3(a). The closest the Complainant came to providing some support for her sex discrimination claim was her assertion that Mr. Miler made a comment about a news report that was on TV regarding on a woman colonel being demoted, allegedly stating that "that's what she gets for not keeping her mouth shut, because

9

that's what happens to people when they talk." Complainant's Dep. at 274-76. However, once again, the Complainant failed to show how this alleged stray-comment was related to any action that was taken against the Complainant. Id. at 275-78. The Complainant even admitted that she was not sure that Mr. Miller knew about the box incident. Complainant's Dep. at 277-78. Consequently, as a matter of law, the Complainant failed to establish her prima facie case.

Further, as discussed above, the evidence before the Commission clearly shows that the Agency reassigned the Complainant to the 1800 G Street facility for legitimate, nondiscriminatory reasons. In fact, as her supervisor explained to the Complainant, one of the reasons the Agency decided to move the Complainant was because the Agency was trying to help the Complainant gain career-enhancing skills, which might have helped her reach her expressed goal of becoming a supervisor. The Complainant provides nothing except her unsubstantiated, subjective belief in support of her claim that the Agency moved her to the 1800 G Street facility as a pretext for discrimination. Therefore, the Commission should grant the Agency's motion for summary judgment regarding the Complainant's assertions about being moved to a different mailroom.

C. Three-day Suspension.

The Complainant contends that the Agency discriminated and retaliated against her by suspending her for three days in July 2004 for insolent behavior toward her supervisors. Complaint, Exhs. 1, 2, 4 at 8, Exh. 25. Mr. Miller proposed the suspension and Mr. Laurich decided to implement the three-day suspension because the Complainant stormed out of the room as Mr. Miller and Mr. Haskins were telling her that she was being reassigned to 1800 G Street and, upon returning to the room, she thrust her West Wing access badge at Mr. Haskins, asking him if he was going to take it. Complaint, Exhs. 25, 5, 6, 9.

The Complainant admits that she left the room in the middle of the meeting between herself and her supervisors, Mr. Haskins and Mr. Miller, and that she thrust her badge at Mr. Haskin's and accused him of wanting to take it. But, she denies that she acted insolently toward her supervisors. Complaint, Exh. 4 at 8; Complainant's Dep. at 234. Nevertheless, in her response to the proposed suspension, she also states, "First of all I would like to apologize for any boundaries that I may have crossed. Also I am sorry for some of my behavior which was being misconstrued as hostility." Complaint, Exh. 26. She further apologized for "[w]hen I cried that day and walked out of Haskins' office. Because I know they didn't like that. And I was sorry that they mistued it [sic], they thought it to be hostility, when it was just me being upset." Complainant's Dep. at 303.

The Complainant explained in her deposition that she apologized, not because she felt she was insolent toward her supervisors that day, but because she was "sucking up big time" because she felt she may have stepped on certain political appointees' toes; "I was just covering for anything," she explained. Complainant's Dep. at 293, 300. Specifically, after storming out of the room and thrusting the access badge at Mr. Haskins, Complainant's Dep. at 234, the Complainant attempted to contact the following people to try to reverse the Agency's decision to move her from the West Wing mailroom to the 1800 G Street mailroom: (1) Mr. Hembree, who was then retired; (2) Mr. Laurich, the Complainant's fourth-level supervisor, who was out of his office; (3) Dr. Sandra Evans, the Agency's Chief Operating Officer, the Complainant's fifth-level supervisor, who placed the Complainant on administrative leave and directed her to go home and attempt to calm herself; (4) Mr. Timothy Campen, the then-Director of the Agency and Special Assistant to the President, the Complainant's seventh-level supervisor, who was unavailable to talk to her at that time; (5) Mr. Andrew H. Card, Jr., Assistant to the President and

11

Chief of Staff; (6) Ms. Harriet Miers, Deputy Assistant to the President and Deputy Chief of Staff; and, (7) Ms. Linda Gambatesa, Deputy Assistant to the President and Director of the Office of Oval Operations. Complaint, Exh. 25; Complainant's Dep. at 236-241, 249-50, 293-95. Obviously, these last three individuals are in the President's inner-most circle of advisors. Complainant's Dep. at 253-54, 293-95. In fact, when the Complainant went to talk to Ms. Gambatesa about her personnel situation, Ms. Gambatesa told the Complainant that she could not talk to her then because, "[t]he President is in here." Complainant's Dep. at 295. Thus, when the Complainant apologized to "just cover[] for everything," she was apologizing because she recognized that she behaved inappropriately by attempting to take her concerns about moving to a different mailroom to the very highest levels of the Executive Branch, rather than working through her immediate supervisory chain.

The Complainant once again failed to establish a prima facie case of discrimination or retaliation because she provided no any specific evidence establishing a causal connection between her race, sex, or her April 2004 EEO complaint and her three-day suspension. Further, as discussed above, by her own admission, the Complainant walked out of a meeting with her supervisors, thrust her badge at Mr. Haskins, and accused him of wanting to take it. In short, the Complainant agreed she engaged in the conduct for which she was suspended. Therefore, the undisputed evidence shows that the Agency established that it suspended her for legitimate, nondiscriminatory reasons, and the Complainant provided no evidence of pretext.

III.    CONCLUSION

The Complainant failed to carry her burden of proof or persuasion that the Agency's actions were a result of sex or race discrimination or because of her prior EEO activity. In her deposition, the Complainant acknowledged that the only reason she felt she was discriminated

12

against on the basis of her race is that "aside from Kevin, I was the only Caucasian in the whole operation." Complainant's Dep. at 331-32. Nevertheless, she admitted that Mr. Miller, Ms. Fulham, Mr. Laurich, Dr. Evans, and Mr. Campen – who are all in her supervisory chain – are white, and stated that she thought management's goal was that, regardless of race, "[Agency management] wanted more submissive [sic], whoever was going to be most submissive, they wanted." Complainant's Dep. at 332-34. By her own admission, then, her stated reasons for the Agency's actions have absolutely nothing to do with unlawful discrimination on the basis of gender or race, or reprisal.

Later, in her deposition, the Complainant explained that she felt she was discriminated against on the basis of her sex because "all my bosses were . . . ex-military . . . and they were men." Complainant's Dep. at 335. The Complainant subsequently revealed that her unlawful discrimination claim on the basis of her gender was deficient as a matter of both fact and law when she herself acknowledged that her fifth-level supervisor, Ms. Fulham, a retired Navy officer, is a woman and is in charge of the entire General Services Division, and that Ms. Fulham's boss and Chief Operating Officer, Dr. Evans, is also a woman. Complainant's Dep. at 335. The Complainant further admitted that, in her opinion, management was not trying to eliminate all females from the department, but rather, to eliminate people of any sex who were "going to stand up and speak up," that is, women and men who were "outspoken." Complainant's Dep. at 336-37.

The Complainant also failed to carry her burden of proof that any of the Agency's actions resulted from reprisal. She provided no specific evidence that her decision to go to the EEO office in April 2004 to enhance communications skills caused the Agency to take any action against her. Instead, in her deposition, the Complainant admitted that she believed the Agency

13

took action against her, not for her protected EEO activity, but rather because, in March 2004, she notified management that a box had come into the complex without being irradiated. Complainant's Dep. at 338. In her opinion, the June 16, 2004 LOR, the July 2004 decision to move her to a new mailroom, and the July 2004 three-day suspension all stem from the Spring 2004 "box incident." Id. Even if this unsubstantiated claim was true, which it is not, the claimed reprisal did not result from a protected activity. See 42 U.S.C. § 2000e-3(a).

In sum, the evidence shows that the Complainant simply does not like the new management team. In her view, all of her supervisors – from her first-level supervisor to her sixth-level supervisor – were liars:

> Q. ...[D]o you feel that Mr. Francisco [the Complainant's first-level supervisor, an Asian (Filipino) male] has ever lied to you?
> A. Oh, yeah. He plays dumb a lot. He's real good at that.
> Q. How about Dan Moncada [a second-level supervisor in a different mailroom, a Hispanic male]? Did he ever lie to you during the course –
> A. Oh, yeah, he's a snake. I'm sorry. I'm sorry. But he's a – yeah.
> Q. We've established –
> A. He lied and said I called him a spic, and I did not.
> Q. A number of items during the course of this afternoon, you've talked about that Mr. Haskins [the Complainant's second-level supervisor, a Black male] lied to you repeatedly?
> A. In those statements. Not to me maybe not to my face, but in the writeups, yes.
> Q. Mr. Miller [the Complainant's third-level supervisor, a White male] also lied repeatedly –
> A. In the writeups, yes.
> Q. And Mr. Laurich [the Complainant's fourth-level supervisor, a White male] lied repeatedly?
> A. Oh, definitely, definitely, definitely.
> Q. Marcia Fulham [the Complainant's fifth-level supervisor, a White female] lied?
> A. Oh she lied. She heard him tell me to shut up. She definitely lied. . . .
> Q. And Dr. Evans [the Complainant's sixth-level supervisor, a White female], in her statement, she lied?
> A. I can't remember what her – oh, yeah, she was – yeah, because her statement was different from everybody else's and even the investigator said, "Boy, she really exaggerated that, didn't she?"

14

Id. at 338-39.  These supervisors, of different sexes, races, supervisory levels, and backgrounds, were nevertheless all the same in the Complainant's eyes:  every last one of them was a liar.  Id. She admitted, "I know it sounds like I don't trust a lot of people," and she is absolutely right.  Id. at 115.  In her opinion, before the new supervisory team came on board – when Mr. Hembree was still in charge – "[i]t was perfect;" afterwards, "[i]t was a disgrace."  Id. at 118-19.  The Complainant believes all of this negativity would never have happened if Mr. Hembree was still in charge.  Id. at 341.

But, the law does not give employees the right to pick and choose their supervisor. Rather, it prohibits illegal discrimination and protects employees against reprisal for protected EEO activity.  Here, the Complainant failed to establish that the Agency illegally discriminated against her or took any action against her in reprisal for her prior EEO activity.  Consequently, as a matter of law, the Agency respectfully asks the Commission to grant the Agency's motion for summary judgment and dismiss this case with prejudice.

Respectfully submitted,

Rachael L. Leonard
Assistant General Counsel
Office of Administration
Executive Office of the President
1800 G. Street, NW
Washington, DC 20503
PHONE: (202) 395-1270
FAX: (202) 456-7921
DC Attorney Number: 464055

10/7/05
Date

15

## CERTIFICATE OF SERVICE

I certify that I have mailed or faxed a copy of the <u>Motion for Findings and Conclusions without a Hearing</u> to the other parties in this case at the following addresses on the date specified below:

Laura C. Jones
29872 Lincoln Road
Mechanicsville, MD 20659

Matthew Fogg
P.O. Box 30956
Washington, DC 20030-0956

Linda Sites
Director, Equal Employment Opportunity
Executive Office of the President
Sent via Fax: (202) 395-3613

_____          10/7/05
Rachael L. Leonard                        Date
Assistant General Counsel
Office of Administration
Executive Office of the President

16

# <u>LAURA C. JONES</u>
## <u>v.</u>
# <u>GEORGE BUSH, President of the United States, et al.</u>

## Civil Action No. 07-2164 (RWR)

# Exhibit R

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### WASHINGTON FIELD OFFICE
#### 1801 L STREET, N.W., SUITE 100
#### WASHINGTON, D.C. 20507

|  |  |
|---|---|
| Laura Jones,<br>    Complainant,<br><br>    v.<br><br>John Straub, Director, Office of Administration,<br>Executive Office of the President,<br>    Agency. | EEOC Case No. 100-2005-00382x<br><br>Agency Case No. OA-04-01<br><br>JAN 27 2006 |

## DETERMINATION OF CLAIMS BEFORE THE COMMISSION

Before me is the Complainant's *Motion to Amend Complaint & Enlarge Discovery Period to Incorporate "Proposed Removal" and "Removal" Claims*, dated December 14, 2005.

I.    Original Claims

Complainant filed her formal complaint on July 30, 2004, and amended it September 24, 2004. Report of Investigation ("ROI"), Tab 1. The Agency issued its first acceptance letter on September 13, 2004, and an amended acceptance on October 5, 2005. Claims accepted (there were no partial dismissals) and set forth in the amended letter were:

Whether the Agency discriminated against Complainant on the bases of her race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, in the following actions:

a.    Placement of a letter of reprimand into her personnel file on June 16, 2004;

b.    Her reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in her work hours from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m.

c.    Her three-day suspension for insolent behavior on July 15, 2004 toward her supervisors.

See ROI, Tab 2.

I. **Important Elements of the History of this Case.**

Feb. 14, 2005     Complainant advised that if she wants a hearing before the EEOC, she was to notify the EEOC office, and was provided a mailing address[1]

Feb. 25, 2005     EEOC receives a request for a hearing from Complainant.

Mar. 4, 2005     The Agency transmits the complaint file to EEOC

June 1, 2005     Proposed Removal of Complainant

June 30, 2005     Acknowledgment Order issued

July 8, 2005     Notice of Decision of removal

Aug. 8, 2005     Complainant appeals her removal to MSPB

Sept. 16, 2005     Agency reports that Complainant failed to respond to discovery

Oct. 7, 2005     Agency motion for summary judgment. Claims addressed were the letter of reprimand, reassignment, and three-day suspension

Nov. 28, 2005     Complainant asks agency to process a new complaint regarding deposition harassment and a challenge to her unemployment compensation claim

Nov-Dec, 2005     Complainant conducts discovery for her MSPB appeal

Dec. 14, 2005     Complainant files motion to amend to add removal action and for discovery

Dec. 23, 2005     Agency opposes motion to amend

Jan. 4, 2006     Complainant sends MSPB dismissal of her removal claim

III. **Complainant's Appeal to the Merit Systems Protection Board**

Complainant filed an appeal of her removal with the MSPB on August 8, 2005. In spite of Complainant's current insistence that her removal claim was raised with the Commission in June, 2005, Complainant raised exactly the same claim before the MSPB in August, and proceeded to conduct discovery and argue her case before the Board. If Complainant sincerely believed she had that same subject matter before the Commission, she acted improperly by filing the same claim before the Board. Removal actions are appealable to the Board, not the Commission; at best, Complainant had a mixed case complaint, which would not entitle her to a Commission hearing.

On December 15, 2005, Complainant argued before the MSPB that her appeal should be dismissed because of her pending claim before the Commission. The Board granted Complainant's request, and dismissed her appeal without prejudice, pending a ruling from the Commission.

IV. **Complainant's Motion to Add Removal Claim**

According to Complainant, she received a Notice of Proposed Removal on June 1, 2005. The Removal was effected as of July 8, 2005. Supposedly, Complainant contacted the EEOC

---

[1] While the actual mailing address given was the Washington Field Office's former street address, all mail is forwarded to the WFO's present address.

lational Call Center in June 2005, which advised her to send her notices through the Call Center. Complainant has provided some FAX cover sheets to prove she sent her documents, but I find the Call Center information inconclusive at best. Even if Complainant did FAX her removal notices to someone, they never got to this Administrative Judge. This was at a time when Complainant had a mailing address for this EEOC office. Complainant did not follow up on her supposed submission until she (through Counsel) called the Administrative Judge on December 5, 2005. In any event, Complainant does not even allege that what she submitted was an actual motion to amend or consolidate. All she says she sent were copies of the removal letters given to her by the Agency, apparently without any instruction or statement of her intentions.

Also problematic was that Complainant failed to copy the Agency when she supposedly served her removal papers on the Commission in June and July. Without a certificate of service, or other indication of serving the other party, pleadings before the Commission are not accepted. Consequently, Complainant's removal submissions, even if made, would not have been a valid filing.

V     Complainant's Request for Discovery

Even if I were to recognize the removal claims as among the claims before me, Complainant would not be granted additional discovery.

The Acknowledgment Order was not issued until June 30, 2005, which was after Complainant supposedly notified the Commission of her Notice of Proposed Removal claim. If Complainant believed the removal was part of her complaint, then she should have conducted discovery when it was authorized. Complainant's request for discovery at this time is untimely and duplicative, and is DENIED.

Complainant charges the Agency with certain discovery abuses. Complainant should have filed a motion to compel or a motion for a protective order at the time the alleged abuses occurred. Having failed to do so, Complainant waived her right to pursue them.

VI     Agency's Motion for Summary Judgment

The Agency moved for summary judgment on October 7, 2005. Complainant failed to oppose or respond to that motion in any way. The Agency moved for a decision on the three original claims, and did not raise the removal actions in its motion. Evidently this failed to raise any question by Complainant about claims on which the Agency might have moved for a decision, but did not, and would appear to be a lack of due diligence on her part not to follow up in some manner.

VII.     Complainant's Newest Claims

In a letter dated November 28, 2005, Complainant notified her Agency's EEO Director of two new claims. Although she sent a copy of that letter to the Commission, she did not move to amend her complaint or consolidate her newest claims.

3

¶11    Summary

The only claims before the Commission are the original three claims accepted by the Agency in 2004. Complainant's appeal of her removal is not before the Commission, and never has been. According to the MSPB's Initial Decision, Complainant is permitted to refile her appeal on those claims, in accordance with certain instructions set forth in that decision.

The Agency's motion for summary judgment will be addressed in a separate Decision.

IT IS SO ORDERED.

_____
Richard E. Schneider
Administrative Judge

To:

Mr. Matthew Fogg
FAX: 866-743-4522

Ms. Rachael Leonard
Executive Office of the President
FAX: 202-456-7921

4

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit S

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### WASHINGTON FIELD OFFICE
1801 L Street, N.W., Suite 100
Washington, D.C. 20507

|  |  |
|---|---|
| Laura Jones,<br>　　　Complainant,<br><br>　　　　　　v.<br><br>John Straub, Director, Office of Administration,<br>Executive Office of the President,<br>　　　Agency. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

EEOC Case No. 100-2005-00382x

Agency Case No. OA-04-01

APR 2 6 2006

## DECISION

This Decision is issued pursuant to 29 C.F.R. § 1614.109(g) (2004).  On June 30, 2005, the Commission issued an order explaining the legal standards for summary judgment.[1]  The record before me consists of the Report of Investigation (ROI), and the Agency's *unopposed*[2] Motion for Summary Judgment.

The issue is whether the agency discriminated against the Complainant based on her race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, in the following actions:

　　a.　　Placement of a letter of reprimand into her personnel file on June 16, 2004;

　　b.　　Her reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in her work hours from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m.

---

[1] The Commission's regulations are patterned after the procedures and guidelines for summary judgment set forth in the Federal Rules of Civil Procedure.  *Pedersen v. Reno, Attorney General*, EEOC Request No. 05943339 (Feb. 24, 1995).  Fed. R. Civ. P. 56 provides, "When a motion for summary judgment is made and supported as provided in this rule, . . . [t]he adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, *shall* be entered against the adverse party."

[2] The Agency's Motion was filed October 7, 2006.  In an Order dated January 27, 2006 (*Determination of Claims Before the Commission*) I noted that Complainant had "failed to oppose or respond to the [the Agency's] motion in any way."

c.    Her three-day suspension for insolent behavior on July 15, 2004 toward her supervisors.[3]

I find that the investigative record has been adequately developed, there are no genuine issues of material fact, and I have no need to make findings of fact or credibility. Both parties had the opportunity to engage in discovery. Complainant was given ample notice of the Agency's motion for summary judgment, the Agency provided a comprehensive statement of the allegedly undisputed facts, and Complaint had the opportunity to respond to the Agency's motion. *Petty, Jr. v. Department of Defense*, EEOC Appeal No. 01A24206 (July 11, 2003); *see also Murphy v. Department of the Army*, EEOC Appeal No. 01A04099 (July 11, 2003).

Complainant has satisfied the procedural prerequisites for a hearing, but the evidence does not warrant one. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). I find that the Complainant has not shown that there are any issues requiring a hearing and therefore issue summary judgment in favor of the Agency.

## FINDINGS AND ANALYSIS

Absent direct evidence of discrimination, the complainant in a Title VII case must carry the initial burden under the statute of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of discrimination, Complainant must establish that she is in a protected group, and was treated less favorably than other similarly situated employees outside her protected group. *Arias v. Dep't of Interior*, EEOC No. 01942264 (Feb. 22, 1995).

---

[3] While Complainant sought to include a claim for her removal, that claim was appealed to the Merit Systems Protection Board (Docket Number DC-0752-05-0689-I-1). See *Determination of Claims* order for a discussion of Complainant's request to include that claim in the instant case. Removal not being before me, this is not a mixed case.

However, in a disparate treatment case, whether Complainant has established a *prima facie* case loses its importance when the Agency, as in this case, responds to Complainant's charges by offering evidence of legitimate, nondiscriminatory reasons for its actions. *United States Postal Service Bd. of Gov. v. Aikens*, 460 U.S. 711, 717 (1983). Complainant then has to prove by a preponderance of the evidence that the proffered explanations are a pretext for unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

## A.    Background

Complainant worked in the White House mail room beginning in 1995. During those years, she worked directly for Ken Hembree, who was then Director of the General Services Division. Evidently they worked well together, and Complainant was promoted up to the level of Lead Mail Clerk. In 2004, the Agency hired a new team of supervisors, Ken Haskins, Ken Miller, Marcia Fulham, and Jon Laurice. Several months later, Hembree retired.

## B.    Letter of Reprimand

In June 2004 former President Reagan died, and June 11, 2004 was declared a National Day of Mourning. Complainant volunteered to work that day, and was to report to work at 10:30 a.m. ROI, Ex. 24. However, as she was leaving work on June 9, Complainant submitted a leave request for June 10. Apparently her leave request for June 10 was granted, but Complainant, without having requested leave for June 11, did not report for duty on the 11th. She never claimed her absence was due to any illness or emergency.

Complainant admits she volunteered to work on June 11. ROI, Ex. 4 at 1. Complainant explained that she did not submit a leave slip for June 11 because it was a holiday, and so she says she did not need to submit one. Complainant said she did not report to work on the 11th because she was told to arrive at 5:00 a.m. for an earlier shift, but she could not get in at that

hour.  Complainant says she told Haskins she could not arrive at the earlier time, but did not tell him she could arrive for her regular hours.[4]  ROI, Ex. 4 at 3.

Complainant did not report to work at all on the 11th.  She says she was not granted leave, and did not have to turn in a leave request, because it was a holiday.  But as Haskins explained, Complainant had already volunteered to work that day.  ROI, tab 6 at 2.

Also on June 9th, Complainant overheard a conversation from two other employees who were speaking in Spanish.  ROI, Ex. 4 at 3.  According to Haskins, Complainant stated that she was "the last one around," which Haskins took to mean the last Caucasian working in her unit; and that "no spic is going to make [her] leave."  According to Complainant, she never used the word "spic," and the reference to "last one around" was the fact that most of her co-workers had already left for the day.  ROI, Ex. 4 at 3.

As a result of these two incidents, Complainant was issued a Letter of Reprimand on June 16, 2004.  ROI, Ex. 24.  Haskins, who issued the letter, explained that a first offense of failure to follow established leave procedures called for a five-day suspension.  Haskins also criticized Complainant for use of defamatory language, and it would not be tolerated.  Disciplinary guidelines provided for a suspension of ten days for a first offense.  Nevertheless, Haskins only imposed a three-day suspension.  *Id.*

## C.    Reassignment and Change in Work Hours

As for Complainant's claim that she was reassigned to a remote mailroom in retaliation for her reporting what she believed was a security breach, the evidence does not support her claim.  First, retaliation for reporting a security breach does not state a claim under any EEO law.

---

[4] Haskins maintains Complainant was to work her normal hours, 10:30 a.m. to 7:00 p.m.  ROI, tab 6 at 2  However, this dispute is not material to the ultimate issue of discrimination.

More importantly, both Ken Miller, Deputy Director, Office of Administration, and Kenneth Haskins, Manager, Mail/Messenger Operations, acknowledged that Complainant was assigned to a different work location, but she was not reassigned in the sense that her job and pay remained the same. ROI, Ex. 5 at 2. They said she was moved in order to help make operations more effective and efficient. *Id.* They also said that this relocation would enable Complainant to cross-train with other employees, learn other skills, and lead a larger mailroom, which would improve her qualifications when seeking a supervisory position in the future. *Id.* Altogether, there were six employees reassigned or relocated, one white Hispanic, three African American, one Asian, one Caucasian. *Id.* at 3. Contrary to Complainant's claim, she was not denied the opportunity to pack her personal things before she left the West Wing, rather, she was out sick before her transfer.

**D.    Suspension**

In August 2004, Complainant was suspended for three days. The Notice of Proposed Suspension, issued July 27, 2004, was issued because Complainant "engaged in insolent conduct toward supervisors." ROI, tab 25. In particular, Complainant was accused of responding "with considerable hostility" to her supervisor, Haskins, when he told her she would be reassigned to the 1800 G Street mailroom. Haskins stated that Complainant said she did not wish to comply, and left the room. She returned moments later and thrust her access badge close to Haskins' face. *Id.*

Complainant submitted a written reply, ROI, tab 26, in which she apologized for her behavior, and claimed she was being punished for reporting a possible security violation in the mail room. Complainant did not deny the events as described, she only tried to excuse them. Consequently, the proposed suspension was imposed. ROI, tab 27.

Complainant has not shown that the Agency's explanations for the suspension, the reprimand or reassignment, were pretext for discrimination or retaliation.

The Complainant has not proffered evidence from which I could conclude that there are any genuine issues of material fact necessitating a hearing. The Agency is therefore entitled to summary judgment.

Richard E. Schneider
Administrative Judge

To:

Mr. Matthew Fogg
National Diversity & EEO Consultant
P.O. Box 30956
Washington, D.C. 20030

Ms. Rachael Leonard
Office of Administration·
Executive Office of the President
1800 G Street, N.W.
Washington, D.C. 20503

Ms. Linda Sites, Director
Equal Employment Office
Executive Office of the President
725 17th Street, N.W., Room 4013
Washington, D.C. 20503

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1801 L Street, N.W., Suite 100
Washington, D.C. 20507

|  |  |  |
|---|---|---|
| Laura Jones,<br>     Complainant, | ) ) ) | |
|  | ) | EEOC Case No. 100-2005-00382x |
|      v. | ) ) | Agency Case No. OA-04-01 |
| John Straub, Director, Office of Administration,<br>Executive Office of the President,<br>     Agency. | ) ) ) ) | APR ? ? 2006 |

## ORDER ENTERING JUDGMENT

For the reasons set forth in the enclosed Decision dated April 25, 2006, judgment in the above-captioned matter is hereby entered. A Notice To The Parties explaining their appeal rights is attached.

This office is also enclosing a copy of the hearing record for the agency.

It is so ORDERED.

For the Commission:

Richard E. Schneider
Administrative Judge

To:

Mr. Matthew Fogg
National Diversity & EEO Consultant
P.O. Box 30956
Washington, D.C.  20030

Ms. Rachael Leonard
Office of Administration
Executive Office of the President
1800 G Street, N.W.
Washington, D.C.  20503

Ms. Linda Sites, Director
Equal Employment Office
Executive Office of the President
725 17th Street, N.W., Room 4013
Washington, D.C.  20503

## NOTICE TO THE PARTIES

### *TO THE AGENCY:*

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403, and append a copy of your appeal to your final order. *See* EEOC Management Directive 110, November 9, 1999, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

### *TO THE COMPLAINANT:*

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a). From the time you receive the agency's final order, you will have thirty (30) days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

*WHERE TO FILE AN APPEAL:*

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

BY MAIL:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C. 20036

BY PERSONAL DELIVERY:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
1801 L Street, NW
Washington, D.C. 20507

BY FACSIMILE:

Number: (202) 663-7022

*Facsimile transmissions of more than ten (10) pages will not be accepted.*

## COMPLIANCE WITH AN AGENCY FINAL ACTION

Pursuant to 29 C.F.R. § 1614.504, an agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the agency. If the complainant believes that the agency has failed to comply with the terms of this decision, the complainant shall notify the agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The agency shall resolve the matter and respond to the complainant in writing. If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action. The complainant may file such an appeal 35 days after serving the agency with the allegations of non-compliance, but must file an appeal within 30 days of receiving the agency's determination. A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

# <u>LAURA C. JONES</u>
## <u>v.</u>
# <u>GEORGE BUSH, President of the United States, et al.</u>

## Civil Action No. 07-2164 (RWR)

## Exhibit T



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

Laura C. Jones,
Complainant,

v.

Alan R. Swendiman,
Director,
Office of Administration,
Executive Office of the President,
Agency.

Request No. 0520070338

Appeal No. 0120064394

Hearing No. 100-2005-00382X

Agency No. OA-04-01

DENIAL

Complainant timely requested reconsideration of the decision in *Laura C. Jones v. Office of Administration, Executive Office of the President,* EEOC Appeal No. 0120064394 (January 30, 2007). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. *See* 29 C.F.R. § 1614.405(b).

After reconsidering the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(b), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. 0120064394 remains the Commission's final decision. There is no further right of administrative appeal on the decision of the Commission on this request.

COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0900)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive

2                                    0520070338

this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations

AUG 6   2007

Date

3                                    0520070338

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Laura C. Jones
29872 Lincoln Road
Mechanicsville, MD  20659

Matthew Fogg
P.O. Box 30956
Washington, DC  20030-0956

Director, Equal Employment Opportunity
ATTN: Ms. Clara Patterson
P.O. Box 2360
Landover Hills, MD  20784-0360

Rachel Leonard
Associate General Counsel
Office of Administration
Executive Office of the President
725 17th Street, NW
Washington, DC 20503

_____AUG 6  2007_____
Date

_____
Equal Opportunity Assistant

# LAURA C. JONES

## v.

# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit U

OMB No. 3124-0009

# MERIT SYSTEMS PROTECTION BOARD
# APPEAL FORM (MSPB FORM 185)
## INSTRUCTIONS FOR COMPLETING YOUR APPEAL

**GENERAL:** This form is intended to help you provide the Board with the information we need to process your appeal. We need this information to help us determine whether the Board has jurisdiction over your appeal, whether it has been filed within the applicable time limit, and what claims you are raising. You do not have to use this form to file an appeal with the Board. However, if you do not, your appeal must still comply with the Board's regulations. See 5 C.F.R. Parts 1201, 1208 and 1209. The Board will expect you to become familiar with these regulations, which are available on the MSPB website—www.mspb.gov—and in MSPB offices, agency personnel offices, agency libraries, and most public libraries. The Board's website also contains an electronic version of this form, addresses and telephone numbers of the MSPB regional and field offices, and additional information that explains the Board's pr   es and procedures.

**PARTS TO COMPLETE:** You may use this form for any   llowing matters over which the Board has jurisdiction:

  An appeal of a Federal agency personnel action or decision that is appealable to the Board under a law, rule, or regulation;

  An appeal of an administrative decision or action by the Office of Personnel Management (OPM) or a Federal agency affecting your retirement rights or benefits;

  An Individual Right of Action (IRA) appeal under the Whistleblower Protection Act (WPA);

  An appeal under the Uniformed Services Employment and Reemployment Rights Act (USERRA); or

**WHERE TO FILE AN APPEAL:** You must file your appeal with the Board's regional or field office that is responsible for the geographic area where your duty station was located at the time the agency took the action or made the decision you are appealing. If you are appealing a retirement or suitability decision by the Office of Personnel Management (OPM), you must file your appeal with the Board's regional or field office that is responsible for the geographic area where you live. See **5 C.F.R. Part 1201, Appendix II, 5 C.F.R. 1201.4(d),** and **5 C.F.R. 1201.22(a).** If you have any questions, please contact the regional or field office with which you will file your appeal.

**WHEN TO FILE AN APPEAL:** Unless your appeal is covered by a law that sets a different filing time limit, you must file your appeal during the period that begins on the day after the effective date, if any, of the action or decision you are appealing. (You may not file your appeal before the effective date of the action or decision.) The filing period ends on the 30th calendar day after the effective date, or on the 30th calendar day after the date you received the agency's decision, whichever is later. If your appeal is late, it may be di͏  ͏ed as untimely.

T       ͏-day filing time limit may be extended if you and the a͏        mutually agree in writing to try to resolve your dispute through an alternative dispute resolution (ADR) process before you file an appeal. If you and the agency reach such an agreement, you have an additional 30 calendar days—for a total of **60 calendar days**—to file your appeal with the Board if you are unable to resolve the dispute through the ADR process. This extension of the time for filing does not apply to appeals that are subject to a filing time limit established by law, e.g., IRA and VEOA appeals. **See 5 C.F.R. 1201.22(b) and (c).**

If you are filing an IRA appeal, you must file it within 65 days of the date of the Office of Special Counsel (OSC) notice advising you that the Special Counsel will not seek corrective action, or within 60 days after the date you received the OSC notice, whichever is later. See **5 C.F.R. 1209.5.**

If you are filing a USERRA appeal, there is no time limit for filing. See **5 C.F.R. 1208.12.** If you file a USERRA complaint with the Department of Labor first, you must exhaust the procedures of the Department before you may file an appeal with the Board.

If you are filing a VEOA appeal, you must file it within 15 days of the date you received notice that the Department of Labor was unable to resolve the matter. See **5 C.F.R. 1208.22.** Note: Before filing with the Board, you must file a VEOA complaint with the Department of Labor, and the Department is allowed at least 60 days to try to resolve the matter.

In all of the above instances, the date of filing is the date your appeal is postmarked, the date of the facsimile transmission, the date it is delivered to a commercial overnight delivery service, or the date of receipt in the regional or field office if you personally deliver it.

**HOW TO FILE AN APPEAL:** You may file your appeal by mail, by facsimile, by commercial overnight delivery, or by personal delivery. See **5 C.F.R. 1201.22(d).** You must submit an original and one copy of both your appeal and all attachments. You may supplement your response to any question on a separate sheet of paper, but if you do, please put your name and address at the top of each additional page. All of your submissions must be legible and on 8 1/2" x 11" paper. Please submit only the attachments requested in this form. You will have an opportunity to submit other documentary evidence later in the proceeding.

*Privacy Act Statement:* This form requests personal information that is relevant and necessary to reach a decision in your appeal. The Merit Systems Protection Board collects this information in order to process appeals under its statutory and regulatory authority. Because your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Merit Systems Protection Board with all the information essential to reach a decision in your case could result in the rejection of your appeal.

You should know that the decisions of the Merit Systems Protection Board on appeals are final administrative decisions and, as such, are available to the public under the provisions of the Freedom of Information Act. Additionally, it is possible that information contained in your appeal file may be released as required by the Freedom of Information Act. Some information about your appeal will also be used in depersonalized form as a ʰase for program statistics.

ᶦlic Reporting Burden: The public reporting burden for this collection of information is estimated to vary 20 minutes to 4 hours, with an average of 60 minutes per response, including time for reviewing the form, �День̖rching existing data sources, gathering the data necessary, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of the collection of information, including suggestions for reducing this burden, to Office of Financial and Administrative Management, Merit Systems Protection Board, 1615 M Street, NW, Washington, DC 20419.

08/09/2005 14:12 FAX 703 756 7112    MSPB-WRO    ☒025
AUG-9-2005  09:16P FROM:                            TO:17037567112           P.4/13

---

## If you prefer to file your appeal electronically, please visit the MSPB website—www.mspb.gov—and follow the link to e-Appeal.

MSPB Form 185, Page 1 (07/03)
S.C.F.R. Parts 1201, 1208 and 1209

---

## PART 1—Appellant and Agency Information

Complete this part regardless of which type of appeal you are filing  Then proceed to Part 2 if you are appealing an agency personnel action or decision, to Part 3 if you are appealing an administrative decision or action affecting your retirement rights or benefits, or to Part 5 if you are filing an IRA appeal, USERRA appeal, or VEOA appeal

*Please type or print legibly.*

| | |
|---|---|
| 1  Name *(last, first, middle initial)*<br>Jon    ura C. | |

2       it address *(number and street, city, State, and Zip code)*
    — must notify the Board in writing of any change in your mailing address while your appeal is pending.

Address:

City, State, Zip code:

RECEIVED
2005 AUG -9

3  Telephone Numbers *(include area code)* and E-Mail Address
     You must notify the Board in writing of any change in your telephone number(s) or e-mail address while your appeal is pending.

Home:                    Work  (   )          FAX                       Other  (   )

E-mail Address: laurasmeadow4@aol.com

4. Name and address of the agency that took the action or made the decision you are appealing *(include bureau or division, street address, city, State and Zip code)*

Agency Name: Executive Office of President, Office of Administration

Bureau: ATTN: Rachel Leonard, Associate General Counsel for the Executive Office of the President

Address: 725 17th Street, Rm 4013

City, State, Zip code: Washington, DC, 20503

| 5  Your Federal employment status at the time of the action or decision you are appealing: | 6.  Type of appointment *(if applicable)*: |
|---|---|
| D    nanent      [ ] Temporary     [ ] Term<br>[ ]   onal        [ ] Applicant       [ ] Retired<br>[ . | [X ] Competitive       [ ] Excepted<br>[ ] Postal Service     [ ] SES<br>[ ] Other *(describe)*: |

---

7  Your position, title, grade, and duty station at the time of the action or decision you are appealing (if applicable):

Occupational Series:  0305            Position Title:  Lead Mail Clerk

Grade:    GS-8, Step 4              Duty Station: 1800 G Street NW
                                                    Washington, DC 20503

| 8. Are you entitled to veterans' preference? See 5 U.S.C. 2108. |
|---|
| [] Yes              [] No |

9  Length of Government service (if applicable): 16-1/2 years as of February 26, 1989 until July 8, 2005 (effective termination date)

10. Were you serving a probationary or trial period at the time of the action or decision you are appealing?

[] Yes            [X] No

MSPB Form 185, Page 3 (07/03)
5 C.F.R. Parts 1201, 1208 and 1209

---

## PART 1—Appellant and Agency Information (continued)

**IG:** You may have a right to a hearing before an administrative judge. If you choose to have a hearing, the Board will notify en and where it is to be held. If you do not want a hearing, the Board will make its decision on the basis of the submissions of the parties.

11  Do you want a hearing?    [X] Yes          [] No

12. I certify that all of the statements made in this form and any attachments are true, complete, and correct to the best of my knowledge and belief.

Signature of Appellant or Representative:                    Date:

*Laura C Jones*                                          *Aug 8, 2005*

## PART 2—Agency Personnel Action or Decision (non-retirement)

Complete this part if you are appealing an agency personnel action or decision (other than a decision or action affecting your retirement rights or benefits) that is appealable to the Board under a law, rule, or regulation  See 5 C.F.R. 1201.3 (a) for a list of appealable personnel actions and decisions  If the personnel action or decision is appealable to the Board, you should have received a final decision letter from the agency that informs you of your right to file an appeal with the Board

---

13. Check the box that best describes the agency personnel action or decision you are appealing  (If you are appealing more than one action or decision, check each box that applies.) Attach a copy of the proposal letter and decision letter (if any). If an SF-50 or its equivalent was issued and is available, attach it now; however, DO NOT delay filing your appeal because you do not have an SF-50. You may submit the SF-50 when it becomes available.

[X] Removal                [] Reduction in grade or pay          [X] Suspension for more than 14 days (14

Day and 30 day suspensions which were merely used to enhance penalties)

[ ] Separation, demotion, or furlough for more than 30 days by reduction in force (RIF)

[ ] Furlough of 30 days or less                                    [ ] Termination during probationary period

[ ] Failure to restore/reemploy/reinstate or improper restoration/reemployment/reinstatement

[X] Negative suitability determination    (Supervisory Position)        [ ] Denial of within-grade increase

[ ] Other action, describe:

| 14. Date you received the agency's proposal letter (if any) (month, day, year) (Attach a copy): June1, 2005 | 15. Date you received the agency's final decision letter (if any) (month, day, year) (Attach a copy): July 14, 2005 (received by my former representative) | 16. Effective date (if any) of the agency action or decision (month, day, year): July 8, 2005 |
|---|---|---|

17  Prior to filing this appeal, did you and the agency mutually agree in writing to try to resolve the matter through an alternative dispute resolution (ADR) process?

[ ] Yes (Attach a copy of the agreement)                    [X] No

MSPB Form 185, Page 4 (07/03)
5 C.F.R. Parts 1201, 1208 and 1209

## PART 2—Agency Personnel Action or Decision (non-retirement) (continued)

18. Explain briefly why you think the agency was wrong in taking this action or making this decision

### BACKGROUND FACTS

Complainant has worked in federal service for almost seventeen (17) years. Approximately March 2004, Complainant made an informal complaint about the way a mall package was improperly handled by Office of Administration Executive Office staff which handling was in violation of directives instituted in light of the September 2001 attacks and anthrax scares. Soon after, having had a superior employment history for over 16 years, Complainant began to suffer contrived attempts by managment involved in the previous mail mismanagement incident to sabotage her stellar employment history. The initial attempt to sabotage Complainant's stellar employment record begain with alleged retaliation against Complainant for the filing of EEO complaints. Further, Complainant was improperly suspended for not coming to work on a day that is determined to be a federal holiday due to the observance of former president Ronald Regan's funeral. Further, Complainant was suspended for ten (10) days ( effective February 7, 2005) and placed on administrative leave for approximately thirty (30) days (effective approximately May 25, 2005) for conduct not rising to a level warranting a suspension wherein no progressive forms of discipline were used. Each of these disciplinary indicents were used to enhance the penalies of the charges in the removal action at issue. Jon Laurich, the original deciding official, in this matter left the Agency. A new deciding official, Anthony Scarfidi, was appointed and appears to have a background outside of the scope of Complainant's line of management. The decision to remove is suspect since the new deciding offical supposedly familiarized himself with Complainant's extensive seventeen (17) year employment history in less than three (3) days before making a decision to remove.

### DISCUSSION AS TO WHY THE AGENCY WAS WRONG IN DECIDING TO REMOVE COMPLAINANT

The decision to terminate was based on two charges; 1) Insubordination and 2) Failure to follow instructions  Both of these charges were ~d with language of other charges in a confusing manner. Two affidavits were provided by the Agency, however, the affidavits do not rt the charges maintained by the Agency  For example, one of the affidavits was proffered by Complainant's supervisor, Anita Cox-
~ ~s and a second affidavit was proffered by a co-worker supervised by Complainant.

~. . irst issue is the charge of  "insubordination" is unsupported by the evidence. With regard to employment law,  "insubordination" is a

08/09/2005 14:12 FAX 703 756 7112          MSPB-WRO                                    ☐028

AUG-9-2005  09:18P FROM:                                         TO:17037567112        P.7/13

discrete charge for misconduct defined as intentionally contemptuous behavior. The allegations made in both Affidavits mischaracterize an innocent act of the handling of office supplies by the Complainant. Complainant strongly opposes the Agency's position contending the Agency has contrived a conduct situation in which to attempt to show cause to support a removal action against Complainant. The Agency has further attempted to enhance penalties to boost it's position to remove by providing unjustified statements to demean Complainant's credibility. For example, the Agency has indicated in a "parenthetical" fashion, Complainant is a threat to others and the preservation of government property. However, the Agency's comments are contrary to the comments of a licensed Psychologist who, after evaluating Complainant, has indicated Complainant is not a threat and has no propensity for violent behavior. See Exhibit A.

The second issue is the charge of "failure to follow instructions" is unsupported by the evidence. Complainant received no instructions from the supervisor in which she failed to follow any instructions leading up to the proposed removal and ultimate decision to remove. In the context of the mischaracterized situation described in the affidavits, Complainant did not receive any instructions from the supervisor. Hence, it was impossible for her to fail to follow any instruction making the charge preposterous. The co-worker supervised by Complainant further gave no instructions for which Complainant failed to follow. For the sake of arguement, even if the non-supervisory co-worker is seen to have given any instruction to Complainant, the non-supervisory co-worker does not qualify as the type of personnel of which Complaint is subject to directives. Hence, a charge of failure to follow instructions is an improper charge with respect to the professional relationship between Complainant and the non-supervisory co-worker

### CONCLUSION

In summary, in consideration of the "contrived" nature of the disciplinary actions since Complainant vocalized complaints about mail mismanagement incidents, the lack of credibility in supervisory allegations, including making unjustified remarks about Complaintaint being a threat, and all other suspect disciplinary actions, complainant requests the suspect removal action is vacated and remanded to the Agency for remdial action in favor of Complainant.

19  What action would you like the Board to take in this case (i.e., what remedy are you asking for)? Complainant requests to be reinstated at a different division and/or agency Agency away from current management chain and their associates. Complainant would like to be put back into the same position she was in before the termination. Complainant would like back pay, attorney's fees, legal costs, medical costs that have arisen from the emotional reactions that lead up to the termination including past, present, and future compensation for medical costs, restored leave and benefits, damages, pain and suffering, and any other neccesary remedy to make her whole. Further, Complainant would like a change of supervision and front-pay to compensate her for any pay she should have received or the supervisory position for which she was qualified, but for the termination. Complainant would like any official and any unofficial personnel records expunged of all negativr statments. Complainant would like a neutral party to verify her employment thereafter.

20. With respect to the agency personnel action or decision you are appealing, have you, or has anyone on your behalf, filed a grievance under a negotiated grievance procedure provided by a collective bargaining agreement?

[ ] Yes          [X] No

If "Yes," attach a copy of the grievance, enter the date it was filed (month, day, year), and enter the place where it was filed if different from your answer to question 4 in Part 1:

Agency Name:                                        Date Filed:

B

A

City, State, Zip code:

If a decision on the grievance has been issued, attach a copy of the decision and enter the date it was issued *(month, day, year)*:

## PART 3—OPM or Agency Retirement Decision or Action

Complete this part if you are appealing an administrative decision or action by the Office of Personnel Management (OPM) or a Federal agency affecting your rights or benefits under the Civil Service Retirement System (CSRS) or the Federal Employees' Retirement System (FERS). **See 5 C.F.R. 1201.3(a)(6).** If the decision or action is appealable to the Board, you should have received a final decision from OPM or the agency that informs you of your right to file an appeal with the Board.

| 21. In which retirement system are you enrolled? | 22. Are you a. |
|---|---|
| [] CSRS      [] CSRS Offset      [X] FERS<br><br>[] Other, *describe:* | [] Current Employee      [] Annuitant<br><br>[] Surviving Spouse<br><br>[ X] Other, *describe:* Terminated Employee as of July 8, 2005 |

MSPB Form 185, Page 5 (07/03)
5 C.F.R Parts 1201, 1208 and 1209

## PART 3—OPM or Agency Retirement Decision or Action (continued)

| 23. If retired, date of retirement *(month, day, year)*: | 24. Are you appealing an action or decision concerning a retirement coverage error under the provisions of the Federal Erroneous Retirement Coverage Corrections Act (FERCCA)?<br><br>[] Yes          [] No |
|---|---|

25. Describe the retirement decision or action you are appealing.

### Answer either Question 26 OR Question 27, whichever applies to your appeal.

26. If you are appealing an OPM retirement decision, have you received a final or reconsideration decision from OPM?

    [] Yes *(Attach a copy)*          [] No

If "Yes," on what date did you receive the OPM decision *(month, day, year)*?

2.    you are appealing a retirement decision or action by a Federal agency other than OPM, have you received a final decision from that ·ncy?

---

[] Yes *(Attach a copy)*          [] No

If "Yes," on what date did you receive the agency decision *(month, day, year)*?

___

28. Why do you think the decision or action was wrong?




___

29. What action would you like the Board to take in this case (i.e., what remedy are you asking for)?




___

## PART 4—Other Claims

If you completed Part 2 to appeal an agency personnel action or decision or Part 3 to appeal an administrative decision or action affecting your retirement rights or benefits, you may raise certain other claims in connection with that appeal. Such claims must be raised no later than the close of the conference(s) held to define the issues in your appeal. See 5 C.F.R. 1201.24(b). If you wish to raise ⋮  ⋮f these claims at this time, check the appropriate box (or boxes) in this part to indicate the  ⋮ (s) you are raising. Provide information supporting the claim(s), including any information  ⋮ ⋮red by the Board's regulations for the specific type of claim(s), on a separate sheet of paper and attach it to this form. If you prefer, you may raise such claims later—but no later than the close of the conference(s) on your appeal. Remember that you are responsible for proving each claim you raise.

MSPB Form 185, Page 5 (07/03)
5 C.F.R. Parts 1201, 1208 and 1209

---

## PART 4—Other Claims
## (continued)

30. Check the appropriate box (or boxes) for any claim(s) that you wish to raise at this time in connection with the action or decision you are appealing in Part 2 or Part 3, and provide supporting information as an attachment to this form

[X]  A claim that the agency made errors in applying required procedures (harmful error), that the agency action or decision was the result of a prohibited personnel practice, or that the agency action or decision was not in accordance with law. See 5 C.F.R. 1201.56(b) and (c)(3). For prohibited personnel practice claims, also see 5 U.S.C. 2302(b).

[X]  A claim that the agency action or decision was the result of prohibited discrimination (race, color, religion, sex, national origin, disability, age). See 5 C.F.R. 1201.151 and 1201.153. If you previously filed a formal discrimination complaint with the agency concerning the action or decision you are appealing, attach a copy of the complaint. If the agency has issued a final decision on your discrimination complaint, attach a copy of the decision.

[]  A claim that the agency action or decision was based on whistleblowing. See 5 U.S.C. 2302(b)(8), 5 C.F.R. 1209.2(b)(2), and 5 C.F.R. 1209.6(a). If you previously sought corrective action from the Office of Special Counsel (OSC) concerning the same disclosure(s) and the same agency action or decision you are appealing, attach a copy of your request to OSC for corrective action. If you have received written notice from OSC of your right to appeal to the Board, attach a copy of the OSC notice. Also see 5 C.F.R. 1209.6 and 1209.9 if you wish to request a stay of the agency action or decision.

[]  A claim that the agency violated your rights under the Uniformed Services Employment or Reemployment Rights Act (USERRA)

(other than rights related to the Thrift Savings Plan for Federal employees) in taking the action or making the decision. See 38 U.S.C. 4322 and 4324, 5 C.F.R. 1208.11, and 5 C.F.R. 1208.13. If you previously filed a USERRA complaint with the Department of Labor (DOL) on this matter, attach a copy of the complaint. If you have received written notice from DOL that your USERRA complaint could not be resolved, attach a copy of the DOL notice.

[ ]  A claim that the agency violated a law or regulation relating to veterans' preference in taking the action or making the decision. IMPORTANT: If you choose to make your veterans' preference claim in connection with this appeal of an agency action or decision, you may NOT also file a complaint under the redress procedure of the Veterans Employment Opportunities Act (VEOA) with DOL. See 5 U.S.C. 3330a(e) and 5 C.F.R. 1208.26.

## PART 5—IRA Appeal, USERRA Appeal, or VEOA Appeal

Complete the applicable question in this part ONLY if you are filing an Individual Right of Action (IRA) appeal under the Whistleblower Protection Act, a Uniformed Services Employment and Reemployment Rights Act (USERRA) appeal or a Veterans Employment Opportunities Act (VEOA) appeal

Before you may file an IRA appeal with the Board, you must first file a whistleblower complaint with the Office of Special Counsel (OSC) and exhaust the procedures of that office. See 5 C.F.R. 1209.2(b)(1). To pursue redress for a USERRA violation, you may either file a USERRA complaint with the Department of Labor (DOL) or file an appeal with the Board. However, if you filed a USERRA claint with DOL, you must exhaust DOL procedures before you may file an appeal with the [board]. See 5 C.F.R. 1208.11. Before you may file a VEOA appeal with the Board, you must first file a [VEO]A complaint with DOL and allow DOL at least 60 days to try to resolve the matter. See 5 C.F.R. 1208.21.

### Answer Question 31 ONLY if you are filing an IRA appeal.

31. Have you exhausted OSC procedures with respect to your whistleblower complaint, i.e., with respect to the same disclosure(s) and the same agency action or decision underlying your IRA appeal?

                              [ ] Yes          [ ] No

If "Yes," attach a copy of your complaint to OSC, provide the information required by the Board's regulations at 5 C.F.R. 1208.6(a) as an attachment to this form, and explain what action you would like the Board to take in this case. If you have received written notice from OSC of your right to file an IRA appeal with the Board, attach a copy of the OSC notice. Also see 5 C.F.R. 1209.8 if you wish to request a stay of the agency action or decision.

### Answer Question 32 ONLY if you are filing a USERRA appeal.

32. Have you previously filed a USERRA complaint with DOL on this matter?     [ ] Yes          [ ] No

If "Yes," attach a copy of your USERRA complaint to DOL, provide the information required by the Board's regulations at 5 C.F.R. 1208.13(a) as an attachment to this form, and explain what action you would like the Board to take in this case. If you have received written notice from DOL that your USERRA complaint could not be resolved, attach a copy of the DOL notice. If your USERRA [co]mplaint was referred to OSC and OSC declined to represent you, attach a copy of the OSC notice. If OSC is representing you in [yo]ur USERRA appeal, complete Part 8.

[If "N]o," provide the information required by the Board's regulations at 5 C.F.R. 1208.13(a) as an attachment to this form, and explain [wh]at action you would like the Board to take in this case.

## Answer Question 33 ONLY if you are filing a VEOA appeal.

33 Have you filed a VEOA complaint with DOL and allowed DOL at least 60 days to try to resolve this matter?    [] Yes    [] No

If *Yes,* attach a copy of your VEOA complaint to DOL, provide the information required by the Board's regulations at **5 C.F.R. 1208.23(a)** as an attachment to this form, and explain what action you would like the Board to take in this case. If you have received written notice from DOL that your VEOA complaint could not be resolved, attach a copy of the DOL notice and provide the date you received it. If more than 60 days have passed since you filed your VEOA complaint with DOL and your complaint has not been resolved, attach a copy of your notice to DOL stating your intent to appeal to the Board and provide the date you sent it to DOL.

## PART 6—Designation of Representative

Complete this part to designate an organization or a person who has agreed to represent you in your appeal before the Board. **If you are representing yourself, do NOT complete this part.** By designating a representative, you agree to allow the Board to give your representative all information concerning the appeal. Any changes of this designation must be sent in writing to the MSPB office handling the appeal and to the other party. See 5 C.F.R. 1201.31.

34. Do you wish to designate an individual or organization to represent you in this proceeding before the Board? (You may designate a representative at any time. However, the processing of your appeal will not normally be delayed because of any difficulty you may have in obtaining a representative.)

[ ] Yes *(Complete the information below and sign)*    [X] No

DESIGNATION:

"I hereby designate _____ to serve as my representative during the course of this appeal. I understand that my representative is authorized to act on my behalf. In addition, I specifically delegate to my representative the authority to settle this appeal on my behalf. I understand that any limitation on this settlement authority must be filed in writing with the Board."

| Representative's address *(number and street, city, State and ZIP code).* | Representative's telephone numbers *(include area code)* and e-mail address: |
|---|---|
| Address: | Office: |
| City, State, Zip code: | FAX:                     Other. |
|  | E-mail address: |

## SIGN BELOW TO MAKE YOUR DESIGNATION OF REPRESENTATIVE EFFECTIVE

Appellant's Signature _____    Date _____

# LAURA C. JONES
## v.
# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit V

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

LAURA C. JONES,
    Appellant,

v.

OFFICE OF ADMINISTRATION,
    Agency.

DOCKET NUMBER
DC-0752-05-0689-1-1

DATE: December 16, 2005

Matthew Fogg, Washington, D.C., for the appellant.

Victor Bernson, Esquire, Washington, D.C., for the agency.

**BEFORE**
Raphael Ben-Ami
Administrative Judge

## INITIAL DECISION

The appellant timely appealed her removal. The Board generally has jurisdiction over such appeals. *See* 5 U.S.C. §§ 7511-7513, 7701. However, for the following reasons, the appeal is DISMISSED WITHOUT PREJUDICE.

On December 15, 2005, during the scheduled prehearing teleconference, I determined after discussion with the parties that it was appropriate in response to the appellant's request to dismiss her appeal without prejudice to refiling in light of the appellant's pending proceeding before an administrative judge of the Equal Employment Opportunity Commission which may render the instant appeal unnecessary and/or moot. The agency did not object to my dismissal of the appeal on that basis.

There are no Board regulations specifically governing the dismissal of an appeal without prejudice. *See Zell v. Department of the Army*, 57 M.S.P.R. 86, 87 (1993). It is well settled that dismissal of an appeal without prejudice is a procedural option that is committed to the sound discretion of the administrative judge. *See Gidwani v. Department of Veterans Affairs*, 74 M.S.P.R. 509, 511 (1997).

In the interests of fairness and judicial economy, I have determined that good cause exists to dismiss this appeal without prejudice to the appellant's right to refile. Accordingly, the appellant may refile her appeal **no sooner than 36 days after the date of this decision** (which date appears at the top of page 1 of this decision, below the docket number and to the right of the case caption) **and in no event later than February 17, 2006.** Any documents already submitted in this appeal should not be resubmitted with the refiled appeal. In addition, the parties are advised that, pursuant to 5 C.F.R. § 1201.112(a)(5) (*see* "Notice to Parties Concerning Settlement" set forth below), the dismissal of this appeal does not preclude them from submitting a settlement agreement for inclusion in the Board's record.

## DECISION

The appeal is DISMISSED WITHOUT PREJUDICE to the appellant's right to refile as set forth above.

FOR THE BOARD:

Raphael Ben-Ami
Administrative Judge

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the administrative judge may vacate the initial decision in order to accept a settlement agreement into the record. *See* 5 C.F.R. § 1201.112(a)(5).

## NOTICE TO APPELLANT

This initial decision will become final on _____JAN 20 2006_____, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if this initial decision is received by you more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition, with supporting evidence and argument, must be filed with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this

initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. The date of filing by mail is determined by the postmark date. The date of filing by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j).

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

The United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW.
Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be <u>received</u> by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, http://www.mspb.gov. Additional information is available at the court's website, http://fedcir.gov/contents.html. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's <u>Rules of Practice</u>, and Forms <u>5</u>, <u>6</u>, and <u>11</u>.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

# CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

#### Appellant

U.S. Mail              Laura C. Jones

#### Appellant's Representative

U.S. Mail              Matthew Fogg
                       P.O. Box 30956
                       Washington, DC  20030-0956

#### Agency's Representative

U.S. Mail              Victor Bernson, Esq.
                       Office of Administration
                       Executive Office of the President
                       1800 G Street, NW.
                       Washington, DC  20503

December 16, 2005
(Date)

Cynthia L. Boston
Paralegal Specialist

# <u>LAURA C. JONES</u>
## <u>v.</u>
# <u>GEORGE BUSH, President of the United States, et al.</u>

# Civil Action No. 07-2164 (RWR)

# Exhibit W

# INFORMATION FOR INFORMAL COMPLAINT

1. Name of aggrieved: _Laura Jones Whelchel_

2. Work address of aggrieved: _17th & G, NW mailroom_

3. Work telephone(s) of aggrieved: _x57005_

4. Home address of aggrieved: _____

5. Home telephone(s) of aggrieved: _____

6. EEO counselor name: _Shalini Benson_

7. EEO counselor telephone(s): _(202) 395-7837_

8. Date of aggrieved's first contact with EEO counselor: _3/6/04_

9. Date of aggrieved's first meeting with EEO counselor: _4/6/04 - Linda, 4/12/4 - Shalini_

10. Aggrieved's position title/series/grade: _Lead Mail Clerk, WW GS-8-4_

11. Issues aggrieved brought to the EEO counselor (with dates): _____

12. Type of discrimination alleged ("X" as appropriate):

___ Age (give date of birth) _____

_X_ Color (identify color)    _Caucasion_____

___ Disability (identify specific disability or disabilities)  _____

_____

_____

___ National origin (identify country of origin or ethnic group)  _____

___ Religion (identify religion) _____

_X_ Race (identify racial group)    _Caucasion_____

_+_ Sex (identify gender)    _Female_____

___ Reprisal for participation in protected EEO activity (specify the activity with dates

_____

_____

Equal Employment Opportunity Office
Office of Administration
Page 2 of 4

13. Does the aggrieved give permission for the EEO counselor to use the aggrieved's name during the counselor's inquiry ("waives anonymity")? If so, the aggrieved should sign below and date the signature.

_Dawn Jones Whelchel_ _____     _4-15-04_

Signature of the aggrieved                          Date

14. If the matters being complained about occurred more than 45 days prior to contacting an EEO counselor, what was the reason for the delay?  _N A_

15. Has the aggrieved presented the matters being complained about through a grievance or any other official system? If so, explain and provide dates.  _No._

16. What remedy or remedies is the aggrieved seeking?  _Return to job in west wing mail room as lead clerk; printer installed in west wing mailroom; Haskin writing that Laura; Mr. Haskins will be the only ones with the password to billing and; Would to be treated with respect, no her comments about her be - Want coworks to take on more responsibility ( such as printing their own) left alone._

17. Does the aggrieved have a representative at this time?  _No._  _____ (If so, provide name, mailing address, and telephone numbers.)

Name: _____

Mailing address: _____

_____

_____

Telephone: _____

The information I have provided to the counselor and that is included on this form is true.


_Jaun Jones Whelchel_ _____    _4-15-04_ _____
Signature of aggrieved                           Date


_Shalin Benson_ _____    _4/15/04_ _____
Signature of EEO counselor                       Date

- West Wing mailroom - package came in + was distributed without going through special screening procedures

- ① Moved from west wing to ~~east wing~~ old bldg., overheard Ken Haskins say "that'll humble her" - Dan Mercado, supervisor    old bldg.

    - date  late March  ⇒ before or after move?
    - who was he speaking to _____

② (x59143) Mr. Haskins took away Laura's access to billing (or gave password to more people, other than Laura?), yet had her clean up mistakes other people made.

    - date  around early April
    - who else had/has access  Suzanne, Dan Mercado, Tony ____.

③ Haskins said to Laura "when do you have time to document everything?"

        date  early April

        is he aware of her previous eeo activity?  No

④ - Laura has asked for accommodation for her foot injury. Doctor has said to avoid walking. Laura has proposed remedy (work in east wing) closer to parking spot, but not accepted.  4/12/04

⑤ - ~~Haskins~~ (??) has revealed Laura's medical history to other employees, including what medication she's taking

        Date  before Mr. Haskins

        who else was there _____

⑦ parker-
Susan ____

⑥

Dean

- 10 years
  - east wing mailroom

Leo of new bldg

West wing mailroom - but came in ~ few weeks ago
  - only white person in that mailroom, no more

- Supervisor allowed it - Mr. Francisco
  barbra owen - had a few, put mail away
  even things not belong prod.

h/w Mr. Hoskins + she said he knew about package
  - Dropcin is coming    = she should know mail done

award a few weeks ago - smaller one, not big $5k award

Rusty Francisco - Supervisor  ~ almost 2 years
Ken Hoskins - branch chief
(after ~         Ken Miller - Hoskins DMD

Mr. Hoskins - moved work, took areas away to bring site
  - in 52 for a few weeks - we better operate engine
                        we dont need her now
  Hoskins said no need to get high claim
  Roland discuss - had site in 52, not going down
    nasy mess - still running - would rather give it name need
- Hoskins now having later things to bring

- Haskins said to her: "when do you have time to document everything" — said — hastily — laura stood ground
  - he admitted
  - no one ever said anything to her about

told "Dan Mancado — Supervisor in 5— one reads heading
(3 or 4 100 complaints against —
  - want coworkers tell on some of — paroning (Helen Bower-must labels)
  - — in — mail room as lead desk
    - put printer over there
  - in writing laura — haskins only ones of password in Complen —
  - Want — off — no —(no option) — 'Speak english and laura

- R daniel lead clerk — starts trouble — he said demoting —

  - will haskins take away phone line
  - she asked for accommodation — —
  - — —
      Haskins said to laura personally — why not look for new job?

appreciate — happy with salary

      - more work than typical lead clerk or even supervisor

  - medical op— —                    - easy to use none
  - epi pro— radiation                - what laura

<u>Linda</u>

~ Haskins - this is what Laura told me .
≈ Can you share with me your proof / views

— Call him - Say EEO Counselor
   — Waived anonymity - so can say her name
   — arrange appointment discuss matters
   ~ where h/s uninterrupted from work flow —

— call here dates — when did he make reference —
   when did she learn about — how did she learn

— does he think I should talk to Townsend

— Mandate of Complaint process from web - eeoc.gov
   — allows to get complaint — means — formal way

— allegation - pls. respond — is there anything you'd like to
   share that I wouldn't know by only speaking to
   Laura ?

— antidate / primitive issues — bridge problem caused by ____ ~

Mike hewitt @ OA.eop.gov , X56230

Marcus — resolved me mail room case

   — Does anyone there know about former
      Complaint ____ ?

# <u>LAURA C. JONES</u>
# <u>v.</u>
# <u>GEORGE BUSH, President of the United States, et al.</u>

# Civil Action No. 07-2164 (RWR)

# Exhibit X

F.



**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF ADMINISTRATION**
WASHINGTON, D.C. 20503

July 30, 2004

Laura Jones

Dear Ms. Jones:

This letter is notice of your right to file a discrimination complaint on the matters brought to my attention as an EEO official June 16, 2004, as provided for by Federal sector equal employment opportunity (EEO) complaint processing regulations, 29 Code of Federal Regulations (CFR) Part 1614. Because the matters brought to my attention have not been resolved, you are now entitled to file a discrimination complaint. If you wish to pursue these matters further by filing a formal complaint of discrimination, it must be in writing, signed and filed, in person or by mail, within **fifteen (15) calendar days after receipt of this notice.**

I encourage you to use the enclosed individual complaint form; however, you may instead provide a signed statement that is sufficiently precise to describe the actions or practices that form the issue(s) and identify the basis or bases of the complaint. The complaint must contain the telephone number and address where you may be contacted. The complaint must also state whether the complaint matters have been included in a formal grievance or an appeal to the Merit Systems Protection Board. Also, only matters raised during the counseling stage may be included in the formal complaint.

The complaint must be filed in person or by mail and postmarked by the fifteenth day following receipt of this notice, using the following mailing address: Linda Sites, Director of Equal Employment Opportunity (EEO); Office of Administration, ATTN: EEO; 725 17th Street, NW, Room 2200; Washington, DC 20503. For speed of transmission, the complaint may be sent by facsimile to (202) 395-3613.

If you retain an attorney or any other person to represent you, you or your representative must immediately notify the Director of EEO in writing. You must also provide notification of any subsequent changes of your representation and/or official mailing address changes. Failure to do so may result in a determination that you have failed to prosecute your complaint due to mailings that are not responded to.

2

You may address concerns about processing a formal complaint by consulting the U.S. Equal Employment Opportunity Commission (EEOC) web site at http://www.eeoc.gov or by telephoning the Director of Equal Employment Opportunity at (202) 395-7704.

Sincerely,

Shalini Benson
Equal Employment Opportunity Counselor

Enclosure

# LAURA C. JONES
## v.
# GEORGE BUSH, President of the United States, et al.

## Civil Action No. 07-2164 (RWR)

## Exhibit Y

LAW OFFICES

# FARBER TAYLOR, LLC

ONE CENTRAL PLAZA

SUITE 809

11300 ROCKVILLE PIKE

ROCKVILLE, MARYLAND 20852

www.farbertaylor.com

(301) 881-6800

FACSIMILE
(301) 770-3927

MINDY G. FARBER**
R. DOUGLAS TAYLOR JR **°
JAMES E RUBIN**
MARY E. HENRY**
GWENLYNN W. D'SOUZA**

* MARYLAND BAR
† D.C. BAR
° VIRGINIA BAR

September 24, 2004

**BY FACSIMILE (202)395-3613 AND REGULAR MAIL**

Linda Sites
Director, Equal Employment Opportunity
Office of Administration
Executive office of the President
725 17th Street, N.W.
Room 2200
Washington, D.C. 20503

> **Re:    Discrimination Complaint of Laura C. Jones**
> **Complaint No.: OA-04-01**

Dear Ms. Sites:

Laura C. Jones, a long-term federal employee and lead mail assistant in the Office of Administration, Executive Office of the President ("the agency"), Washington, D.C., has retained this employment and labor law firm to represent her in her discrimination complaint.

On behalf of Ms. Jones, we wish to amend the above complaint to add an additional claim of discrimination on the basis of reprisal, race, color, and sex for the three day suspension issued on August 13, 2004 by Jon S. Laurich, Deputy Chief Operating Officer. Mr. Laurich suspended Ms. Jones for supposed insolent behavior. A copy of this decision is attached.

Sincerely,

Mindy G. Farber

enclosure
cc:    Laura C. Jones

# LAURA C. JONES
## v.
# GEORGE BUSH, President of the United States, et al.

# Civil Action No. 07-2164 (RWR)

# Exhibit Z



**Federal Facilitators Group LLC**
5881 Leesburg Pike, Suite 205, Falls Church, VA 22041
Tel. (703) 931-1400/9546  Fax. (703) 931-9572
e-mail: fedfacgp@aol.com

### REPORT OF INVESTIGATION

**AGENCY CASE NUMBER:**                             OA-04-01          JAN 2 8 2005

**FFG NUMBER:**                                    FF-04-OA-2040

**COMPLAINANT:**                                   Laura Jones
                                                   Lead Mail Assistant, Grade 8/4
                                                   Office of Administration (OA)
                                                   Executive Office of the President
                                                   Washington, DC

**ALLEGED DISCRIMINATING OFFICE(S):**              Office of Administration (OA)
                                                   Executive Office of the President
                                                   Washington, DC

**REPRESENTATIVE:**                                Mary Henry, Esq.
                                                   Farber Taylor LLC
                                                   Rockville, MD 20852

**DATE(S) OF ALLEGED DISCRIMINATION/ACTION(S):**   June 16, July 15, and July 19,
                                                   2004

**DATE COMPLAINT FILED:**                          July 15, 2004; Amendment dated
                                                   September 24, 2004

**DATE INVESTIGATION REQUESTED:**                  October 12, 2004

**DATE INVESTIGATOR APPOINTED:**                   October 12, 2004

**DATES OF INVESTIGATION:**                        October 12 – December 31, 2004

**BASE(S):**                                       Race (Caucasian), Color (White),
                                                   Sex (Female), and Prior Protected
                                                   Activity on April 9, 2004

**ISSUES:**

1.  Issuance of a Letter of Reprimand on June 16, 2004.
2.  Reassignment from the West Wing Mailroom to the mailroom at 1800 G Street,
    effective July 19, 2004, and a change in her work schedule from 10:30 am – 7:00 pm to
    9:30 am – 6:00 pm.
3.  Three-day suspension effective July 15, 2004, for "insolent behavior toward her
    supervisors.

**RELIEF REQUESTED:** The Complainant states that she wants:

a.    Removal of Letter of Reprimand;
b.    Removal of 3-day suspension;
c.    Expunge Official Personnel Folder (OPF) of any reference to the Letter of Reprimand and the 3-day suspension;
d.    Reinstatement of her position in the West Wing Mailroom;
e.    Reinstatement of original work schedule of 10:30 a.m. – 7:00 p.m.;
f.    To be shown respect by management;
g.    Reinstatement of original parking space;
h.    Out of pocket medical expenses incurred due to stress from these actions;
i.    Attorney fees; and
j.    Compensatory damages.

I.    **BACKGROUND**

A.    Mr. Kenneth Haskins, Branch Chief, Mail Messenger Operations, and the Complainant's second-line supervisor, issued a Letter of Reprimand to the Complainant on June 16, 2004, for "failure to follow established leave procedures and offensive language." (Exhibit 24)

B.    On July 15, 2004, the Complainant was informed by Mr. Ken Haskins and Mr. Ken Miller, Deputy Director, General Services Division (GSD) (Complainant's third-line supervisor), that she would be reassigned from the West Wing Mailroom to the mailroom at 1800 G Street, N.W., Washington, DC. The Complainant was also told that her work schedule would change from 10:30 a.m. to 7:00 p.m. to 9:30 a.m. to 6:00 p.m. (Exhibit 1)

C.    On July 27, 2004, Mr. Kenneth L. Miller issued the Complainant a "Notice of Proposed Suspension" for three days for "insolent conduct towards supervisors." (Exhibit 25)

D.    On August 13, 2004, the Complainant filed a complaint of discrimination against the Office of Administration (OA), Executive Office of the President (EOP), which was considered filed the same date. On September 24, 2004, an amendment was filed and accepted by the Agency on the issue of the three-day suspension issued on August 13, 2004. (Exhibit 1)

E.    Mr. Ken Hembree, former Supervisor of the Complainant, no longer with the Agency, originally agreed to provide an affidavit to the investigator, but has since decided not to respond.

F.    At the request of the EEO Director, the following clarifying information is being provided in regard to the affidavit of Mr. Robert Wilbon. This information was furnished to the investigator by telephone on January 27, 2005.

Mr. Wilbon retired about two years ago. He stated that he never had any problem with the Complainant's attitude nor her work ethics when he was her supervisor. He bases his statements on his first-hand knowledge of the Complainant and his first-hand knowledge of the operations of the mailrooms, during his tenure.

2

## II.    EVIDENCE AND ANALYSIS

A.    Ms. Laura Jones, Complainant, Lead Mail Assistant, Office of Administration (OA), Executive Office of the President (EOP), states that she believes that due to her prior EEO activity, for filing a complaint on April 15, 2004, she has been a subject of unlawful employment discrimination. (Exhibit 1).

**Issue 1:** The Complainant stated she was issued an official Letter of Reprimand on June 16, 2004, for "Failure to Follow Established Leave Procedures" and "Offensive Language." She also stated that when she was issued the Letter of Reprimand that she requested to have a "witness" and was refused. She stated that she was told by Mr. Haskins that the Personnel Specialist, Mr. Bob McWhirter, who was with him was the "witness."

1.    The Complainant stated that when she arrived at work on Wednesday, June 9, 2004, she was told that volunteers were needed to work on Friday, June 11, 2004, the official "Day of Mourning" for the death of President Reagan. She stated that she was not listed as "essential" but that she volunteered. The Complainant's work schedule was from 10:30 a.m. to 7:00 p.m. She stated that she did not know that she would not be expected to work her established work schedule. (Exhibits 1 and 4)

The Complainant said that when she asked Mr. Ken Haskins if she would have to work the "morning shift" that he did not answer her. She said that she asked him again and he finally told her that she would have to work the "early shift." She then told him that she, therefore, would not be able to volunteer to work on the official Day of Mourning (Federal Holiday). She stated that she could not work the "early shift" since her commute was over 1 ½ hours and she would have to leave her house at 3:00 a.m. in order to get to the White House by 5:00 a.m. (Exhibits 1, 3, and 4)

The Complainant also said that she submitted official Leave Slips (SF-71) for 5 hours on June 9 and no specified number of hours for June 10, 2004 – both SF-71's were signed by the Complainant and dated June 9, 2004. (Exhibit 28)

The Complainant stated that Mr. Haskins issued her an official Letter of Reprimand for being "Absent Without Leave" and not submitting a leave slip for the Federal Holiday. (Exhibits 1, 3, 23, & 24)

The Complainant stated that the Letter of Reprimand also included a charge of "Offensive Language" for allegedly using the term "spic" in a telephone conversation between herself and Mr. Ken Haskins on June 9, 2004. The Complainant said that she was extremely busy that afternoon and that the Mailroom Supervisor, Mr. Don Moncada, had let employees leave early, including the individual who was assigned to assist in lifting heavy boxes. The telephone conversation with Mr. Haskins occurred on June 9, 2004, at approximately 6:15 p.m., when he called to tell her she could go home early (normal departure time was 7:00 p.m.). The Complainant denies that she used the term "spic" to Mr. Haskins during this conversation. (Exhibits 1, 3, 4, & 24)

3

2.  Mr. Kenneth (Ken) Miller, Deputy Director, Executive Office of the President (EOP), Office of Administration (OA), General Services Division (GSD), the White House, GS-301-14, White Male, involved in prior EEO activity, stated that he knew that Ms. Ken Haskins issued a Letter of Reprimand to the Complainant for "misconduct." He also stated that he directed Mr. Haskins to work with the Human Resources Management Division. (Exhibit 5)

3.  Mr. Kenneth (Ken) Haskins, GS-13, Manager, Mail/Messenger Operations, EOP, OA, GSD, the White House, African American Male, involved in prior EEO activity, stated that he issued the Complainant the Letter of Reprimand because she did not submit a leave slip for the Federal Holiday, June 11, 2004, National Day of Mourning for the death of President Reagan. He further stated that he did not request those individuals listed as "essential" to come into work on this date. (Exhibit 6 & 23)

    Mr. Haskins stated that he told the Complainant that she did not have to work the "early shift" on June 11, 2004. He further stated that she was going to work on the "publication and billing process" while there was no one around the interrupt her. (Exhibit 6)

    Mr. Haskins also stated that he issued the Letter of Reprimand because the Complainant stated that "no spic is going to make me leave," referring to two of her Spanish speaking co-workers. (Exhibit 6)

    COMPLAINANT'S REBUTTAL: The Complainant stated that she did not feel that that she needed to submit a leave request for the National Day of Mourning for the death of President Reagan since it was declared a "Federal Holiday" and that Mr. Dewitt Ramsey was a witness to her telling Mr. Haskins that she could not volunteer to come in on that day if she had to work the "early shift" while began at 5:00 a.m. She also said that Mr. Haskins knew that Mr. Ramsey had overheard the conversation. (Exhibits 4 & 23)

    The Complainant stated that Ms. Helen Studgeon was designated as "essential," not her. She further said that every time that she asked Mr. Haskins for clarification of the reporting time for that day, all he would say was, "What do you think I meant?" (Exhibit 4)

4.  Mr. Robert Wilbon, GS-10, Mailroom Supervisor, EOP, OA, GSD, African American Male, no prior EEO activity, stated that managers were not following procedures established by the Office of Personnel Management (OPM). (Exhibit 8)

    Mr. Wilbon stated that he has never heard anyone make a discriminatory remark when he worked in the Mailroom. He further stated that he felt that "they" were treating the Complainant differently because of the color of her skin (White). (Exhibit 8)

5.  Mr. Jon Laurich, GS-301-15, Deputy Chief Operating Officer, EOP, OA, GSD, the White House, White Male, no prior EEO activity, stated that leave slips are not required of employees for designated Federal holidays; however, the Complainant had volunteered to work and she should have

4

notified her supervisor that she was not coming into the office to work. (Exhibit 10)

6.    Mr. Patrick Gavin, WG-6, Motor Vehicle Operator, OA, GSD, the White House, White Male, no designation of prior EEO activity, stated that he did not hear Mr. Haskins tell the Complainant that she did not have to work the early shift on June 11, 2004, the National Day of Mourning for the death of President Reagan.  He also stated that he had "no recollection" that Mr. Haskins told the Complainant that she would work her regular work schedule.  (Exhibit 13)

7.    Mr. Don Moncada, GS-9, Mail Center Supervisor, OA, GSD, the White House, Hispanic Male, involved in prior EEO activity, stated that he did not witness the Complainant tell Mr. Haskins that she did not feel well.  He also stated that the Complainant did not submit a leave slip to him for Friday, June 11, 2004.  (Exhibit 14)

Mr. Moncada also stated that the Complainant used a discriminatory comment towards him by calling him a "spic."  (Exhibit 14)

8.    Mr. Dewitt Ramsey, WG-6, Motor Vehicle Operator, GSD, the White House, African-American Male, no prior EEO activity, stated that he witnessed the Complainant tell Mr. Haskins that she would not be able to work on the National Day or Mourning for the death of President Reagan.  He said that he was sitting in Room 52, using the Computer.  He also stated that he heard Mr. Haskins tell the Complainant that this proclaimed holiday was not a "regular holiday."  (Exhibit 15)

Mr. Ramsey also stated that he has heard employees in the mailroom use profanity and/or derogatory comments.  (Exhibit 15)

9.    Mr. Tony Rivers, GS-7, Mail Clerk, OA, the White House, African-American Male, no prior EEO activity, stated that he has heard profanity used in the mailroom.  (Exhibit 16)

10.   Ms. Susanna Gonzalez, GS-8, Lead Mail Assistant, OA, the White House, Hispanic Female, no designation of prior EEO activity, stated that she heard Mr. Haskins tell the Complainant  that if he "saw a red cow" then we would too.  She said that she felt what he meant was that if he told them to do something then they were to do it.  (Exhibit 18)

Ms. Gonzalez also stated that she feels that the approach of Mr. Ken Haskins and Mr. Don Moncada makes her feel "disrespected."  She also said that she has had to go to Mr. Haskins' office "a couple of times" and tell him that she was not "a child or his wife."  (Exhibit 18)

11.   Ms. Jackie Lawson, GS-9, Client Service Representative, OA, Financial Management Division, the White House, African American Female, no prior EEO activity, stated that she has not heard the term "spic" used during her tenure.  She did say that she has heard profanity used in the Office of Administration, more than once.  (Exhibit 19)

5

**Issue 2:** The Complainant stated that she was reassigned from the West Wing mailroom of the White House to the mailroom at 1800 G Street; her work schedule changed from 10:30 a.m. – 7:00 p.m. to 9:30 a.m. – 6:00 p.m.; and her parking space changed from the Avenue to the Ellipse which caused her to walk six blocks each way and take an extra 15 minutes. (Exhibit 1)

1.  The Complainant states that she was called into Mr. Haskins' office on Thursday, July 15, 2004, at approximately 3:00 p.m., and told that she was being reassigned to the mailroom at 1800 G Street. Her hours would be changed from 10:30 a.m. to 7:00 p.m. to 9:30 a.m. to 6:00 p.m., she would lose her existing parking space "on the Avenue," and would receive a new one on the Ellipse (approximately six blocks from the G Street office). She was told that this transfer would be effective Monday, July 19, 2004. The Complainant stated that the change in her work schedule (hours) would be an undue hardship as her commute was approximately 1 hour and 15 minutes and with the new work schedule her commute would increase to two hours, each way. (Exhibit 1)

    The Complainant asked "why" (she was being transferred) and was told by Mr. Haskins and Mr. Miller that she had "no choice." She asked if she could "clean out" her personal things and was told "no." The Complainant stated that she walked out of the office quickly, as she was about to cry and did not want to cry in front of the two men. (Exhibit 1)

    The Complainant stated that she went back to the mailroom and called Ms. Susie Shannon, Director, Human Resources, and was told she was on vacation. She then asked to speak to Mr. Jon Laurich, Director of Personnel, and was told that he was "out." The Complainant then asked for her call to be transferred to Mr. Tim Campen's office, Director of the Office of Administration, and was told that she should not even attempt to speak to him. (Exhibit 1 & 4)

    The Complainant then walked over to Mr. Campen's office and requested an appointment with Mr. Campen. At that time she looked up and saw Mr. Haskins, Mr. Miller, and Ms. Sandy Evans, Chief Operating Officer. The Complainant stated that Ms. Evans stood in front of her, waving her hands for her (Complainant) to leave while telling her that she would start her "new job" on Monday morning with her new work schedule. At this point Ms. Evans told her to leave the office and go home because she was "too upset to work." The Complainant stated that Ms. Evans was trying to make it sound like she was more "upset" than she really was. (Exhibit 1 & 4)

    The Complainant stated that she then went and asked to speak to Ms. Linda Gambatesa, Director of Oval Office Operations. When the Complainant entered her office she saw that the President was with her and "backed out" and Ms. Gambatesa told her that she would talk to her later. The Complainant stated that Ms. Gambatesa never contacted her. The Complainant said that she left and went back to the mailroom. At this time Mr. Miller and Mr. Rivers came into the mailroom and requested that they escort her out of the White House so that they could "exchange parking permits." (Exhibit 1 & 4)

When they got to the parking space, the Complainant exchanged parking permits with the two men and started her car.   She stated that she was trying to "cool off" her car as it was the middle of July and it was hot.  She looked up and saw that Mr. Miller and Mr. Rivers were standing behind her car.  She said that she got out and asked if there was a problem and was told that everything was "ok" but that they were waiting for her to leave.  She said that she told Mr. Miller that she was embarrassed and asked if it was necessary.  She stated that Mr. Miller then went over to one of the Secret Service officers and told him to "watch and make sure" she left.   The Complainant stated that she got back into her car and began to cry.  (Exhibit 1 & 4)

On Friday morning, July 16, 2004, the Complainant called and left a message for Ms. Harriet Miers, Deputy Chief of Staff.  Ms. Miers returned the Complainant's phone call and the Complainant explained to her what had happened the previous day and how she felt "humiliated in front of co-workers and the Secret Service."  Ms. Miers said that she would get back to the Complainant – she never did.  (Exhibit 1 & 4)

The Complainant stated that on Saturday, July 17, 2004, Ms. Susie Shannon, Director, Human Resources Management Division (HRMD), called her (Complainant) from her vacation and told her not to make another phone call.  She also told the Complainant that she had made employees fear that their "jobs were in jeopardy" because of her (Complainant).  The Complainant said that they talked for awhile and that Ms. Shannon told her that her West Wing pass had been taken away as well as the "Executive Office Building." (Exhibit 1 & 4)

The Complainant states that when she returned to work on Monday, July 19, 2004, she was trying to park in her new designated area (the Ellipse) and was pulled over by the Secret Service and told to wait.  She then said that other Secret Service officers pulled up in their vehicles and waited with her.  She stated that her picture had been circulated among the Secret Service during their meetings and they were told that she was not to be allowed onto the complex.  She further stated that Officer Mark Frownfelter, Executive Office of the President, Security, escorted her from the Ellipse.  She said that he apologized to her for "everything they" were doing to her.  (Exhibit 1 & 4)

The Complainant stated that when she was issued her new badge she found out that her computer privileges had been taken away for "several weeks." (Exhibit 1 & 4)

The Complainant stated that on Tuesday, July 20, 2004, the Secret Service, again, would not allow her on the Ellipse.  The told her that her picture was again being circulated.  She then waited in her car until she was allowed to park in her designated area.  (Exhibit 1)

The Complainant stated that due to the stress caused by these incidents, and the reassignment to 1800 G Street, she became ill and was out of work from July 21-23, 2004.  She said that she saw a physician who instructed her to stay out of work through the next week (July 26-30, 2004).  However, she stated that she returned to work on Monday, July 26, 2004.  The Secret

7

Service stopped her again and requested that she wait when she tried to park in her designated area on the Ellipse. (Exhibit 1)

2.    Mr. Kenneth Miller stated that they had "reassigned" the Complainant to the same position in a different mailroom. He said that they told the Complainant that she was being reassigned to provide her with opportunities to:

a.    cross train with other employees;
b.    learn different, career-enhancing, skills; and
c.    lead a larger mailroom.

He also stated that this reassignment was part of an ongoing series of personnel reassignments in the EOP/OA Mail Messenger Operations. (Exhibit 5)

Mr. Miller stated that the following mailroom employees had also been reassigned:

1 Hispanic Male
3 African American Males
1 Asian American/Pacific Islander Female

Mr. Miller stated that the Human Resources Management Division advised him that he did not have to give the Complainant any advance notice since they "were only reassigning" her to a different mailroom, not a new position or duty station. (Exhibit 5)

Mr. Miller said that he escorted the Complainant out of the building because she had been told to leave the building and he needed to get her parking permit from her. He also said that she was "very emotional at the time." (Exhibit 5)

Mr. Miller affirmed that he told the Secret Service to make sure the Complainant left the parking area after he had escorted her out of the White House. He further stated that she had a security badge that gave her access to the White House. He also said that earlier in the day the Complainant had "inappropriately attempted to contact several senior White House staff members to ask them to intervene on her behalf, and possibly override the decision to reassign her." Mr. Miller stated that he asked the Secret Service to "ensure that the Complainant…not return to the White House." (Exhibit 5)

Mr. Miller stated that he did not have the Complainant's picture circulated to the Secret Service and did not know who had. (Exhibit 5)

Mr. Miller affirmed that the Complainant's e-mail privileges had been taken away because she "had attempted to contact several senior White House staff members to ask them to intervene on her behalf, and possibly override the decision to reassign her." Mr. Miller further stated that the Complainant's actions were "intolerable." (Exhibit 5)

Mr. Miller denied that the Complainant was not allowed to pack her things from her desk. He stated that she was sick the next day, therefore, the OA Security Office's Deputy Director packed her things and locked them in a secure area until she reported to her new duty site. (Exhibit 5)

COMPLAINANT'S REBUTTAL: The Complainant stated that she was the only individual reassigned except for Mr. Tony Rivers who replaced her in the West Wing when she was reassigned to 1800 G Street. She also said that Mr. Rivers was well trained and did not need any "cross-training." She stated that when she was reassigned to 1800 G Street that they then had to reassign Mr. Bobby Strickland since he was in the position to which she was being moved. Mr. Strickland was then reassigned to OEOB, Room 52, which caused them to have two Lead Mail Clerks. Exhibit 4)

She also said that Ms. Helen Studgeon and Ms. Barbara Swann, both African Americans, have been in the mailrooms of the East and West Wings of the White House for over 15 and 20 years and they have never been reassigned for "cross training." (Exhibit 4)

The Complainant denies that she was "visibly upset" when she was walking out of the White House. She said that she was actually saying "hello" and waving to friends on the way out, just as she did everyday. (Exhibit 4)

The Complainant stated that she got "teary eyed" when the U.S. Secret Service approached her when she was letting her car cool down before leaving her designated parking area. She said that she then realized that Mr. Miller and Mr. Rivers had actually "escorted" her out of the White House rather than just exchanging parking permits. (Exhibit 4)

The Complainant stated that she had already had the "cross training" and has the "paper work" to "show it." (Exhibit 4)

3.    Mr. Kenneth Haskins stated the exact same words as Mr. Miller in his response to the question of why the Complainant was reassigned. (Exhibits 5 & 6)

Mr. Haskins stated that they only gave the Complainant four days notice of the reassignment. (She was informed at 3:00 p.m. on Thursday, Saturday and Sunday were the weekend and she was to report to the new duty station on Monday, July 19, 2004.) He further stated that they wanted her to be able to "have the opportunity to train with the Lead Mail Clerk that she was replacing, before he was to take his previously-scheduled leave." (Exhibit 6)

Mr. Haskins stated that Mr. Miller escorted the Complainant to her car only to exchange parking permits. (Exhibit 6)

Mr. Haskins stated the Complainant was not at work on the day after she was told she was being reassigned; therefore, the OA Security Office's Deputy Director packed her things and locked them in a secure area until her return to work at her new duty station. (Exhibit 6)

9

Mr. Haskins denied that he had the Complainant's picture circulated throughout the Secret Service and did not know who had done this. (Exhibit 6)

Mr. Kenneth Haskins stated the exact same words as Mr. Miller in his response to the question of why the Complainant 's e-mail privileges were taken away, except he said that her actions were "inappropriate" rather than "intolerable" as stated by Mr. Miller. (Exhibits 5 & 6)

Mr. Haskins stated that five individuals had also been reassigned. (Exhibit 6)

COMPLAINANT'S REBUTTAL: The Complainant stated that she called Mr. Haskins three mornings in a row from the Ellipse to tell him that the U.S. Secret Service would not allow her access and that her picture had been distributed among the various U.S. Secret Service. She also said that Mr. Haskins knew this because she had to call him each of these days to explain why she was late. (Exhibit 4)

4.    Mr. Restituto (Rusty) Francisco, GS-9, Supervisor, EOP, OA, GSD, Mailroom, the White House, Asian American/Pacific Islander Male, prior EEO activity, stated that he was on leave at the time that the Complainant was reassigned and when he returned he was told that Mr. Tony Rivers had been transferred to the West Wing mailroom. (Exhibit 7)

COMPLAINANT'S REBUTTAL: The Complainant stated that they needed Mr. Rivers "over there on the weekends" to "cover for Mr. Francisco." (Exhibit 4)

5.    Mr. Jon Laurich stated that he was Acting General Services Division (GSD) Chief, at the time, and it was a joint decision between himself and Mr. Kenneth Miller to reassign the Complainant. He further stated that when the previous Chief of GSD left the position, this gave him an "opportunity to reassign some staff in order to provide them cross-training opportunities as well as to learn different skills." He further stated that he felt that the reassignment of the Complainant to be a "routine management action." (Exhibit 9)

Mr. Laurich also stated that he was involved in the decision to take the Complainant's e-mail privileges away from her when she reported to her new duty station. He said this was done because she "had attempted to contact several senior White House staff to ask them to intervene on her behalf." (Exact words used by Mr. Miller and Mr. Haskins, except he stated that her actions were "inexcusable" rather than "intolerable" used by Mr. Miller and "inappropriate" used by Mr. Haskins.) Exhibits 5, 6, & 9)

6.    Mr. Mark Frownfelter, GS-080-14, Branch Chief for Personnel Security, EOP, OA/Security Office, White Male, no prior EEO activity, stated that the Complainant told him that her picture had been placed at a Secret Service post; however, he had not seen it first hand.

Mr. Frownfelter stated that the Complainant's access badge was changed to reflect the change in "her job duties." (Exhibit 12)

7.    Mr. Tony Rivers stated that he was instructed by Mr. Haskins to escort the Complainant out of the White House on the day that she was told that she was being reassigned. He further stated that he had to accompany Mr. Miller because Mr. Miller did not have the appropriate pass to escort the Complainant. (Exhibit 16)

8.    Ms. Susie Shannon denied telling the Complainant not to make any more phone calls. She stated that as the Director of Human Resources she "recommended" to the Complainant that it was in "her best interest" to raise any personnel issues, or EEO issues, through her "chain of command supervisors and/or the EEO Counselor." (Exhibit 17)

Ms. Shannon further stated that she felt it was "inappropriate" for the Complainant to "go outside of her chain of command to ask senior White House officials to intervene on her behalf on her personnel issues." (Exhibit 17)

Ms. Shannon denied that she told the Complainant that employees "feared their jobs were in jeopardy because of her." (Exhibit 17)

Ms. Shannon stated that she did not know that the Complainant was being reassigned until the Complainant contacted her. (Exhibit 17)

Ms. Shannon denied that she told the Complainant that she could not go back into the building to retrieve her personal belongings. She stated that she "directed her" to ask her supervisors how they wanted to handle the situation. (Exhibit 17)

9.    Ms. Sandy Evans, Administratively Determined, Chief Operating Officer, EOP, OA, Office of the Chief Operating Officer, White Female, no prior EEO activity, stated that she was with Mr. Miller and Mr. Haskins in Mr. Campen's office when the Complainant entered the reception area requesting a meeting with Mr. Campen. Ms. Evans stated that the Complainant began to "admonish" them for "unfair treatment regarding her reassignment." (Neither Mr. Miller nor Mr. Haskins stated that the Complainant approached them in the reception area of Ms. Campen's office.) (Exhibit 20)

Ms. Evans also stated that the Complainant was "welcomed to speak to Mr. Campen" after she went through her "chain of command which involved 4 supervisors before reaching Mr. Campen's level." (Exhibit 20)

Ms. Evans stated that she told the Complainant to "go home" because she was "visibly agitated." The Complainant was placed on "Administrative Leave." (Exhibit 20)

**Issue 3:** On July 27, 2004, the Complainant was issued a "Notice of Proposed Suspension," signed by Mr. Kenneth Miller, which stated that he believed she committed "insolent conduct towards supervisors." The memo also stated that it was issued because the Complainant "declined to reply" after she was told she was being reassigned from the West Wing mailroom to 1800 G Street, her work schedule was being changed, and her parking space was being changed. The memo also stated that the Complainant "stormed out of the room." It further stated that the Complainant returned "moments later" and "thrust" her access badge at Mr. Haskins and asked him if he was going to take the badge also. The Complainant gave an oral response on August 5, 2004 to Mr. Jon Laurich and Mr. Laurich upheld the proposed suspension on August 13, 2004. (Exhibits 1, 2, 3, 4, 25, 26, & 27)

1.  The Complainant stated that she was called into Mr. Haskins office on July 27, 2004, and given a "Notice of Proposed Suspension" for "insolent conduct towards supervisors." She said that she left Mr. Haskins' office because she was crying. (Exhibit 4)

    The Complainant also stated that she "only touched Mr. Haskins' badge" and said that she knew that they had both wanted the "dark blue pass" which would give them free access to the White House. The Complainant stated that Mr. Haskins now had her dark blue pass. (Exhibit 4)

    During the meeting on July 27, 2004, the Complainant stated that she told both Mr. Haskins and Mr. Miller that she was being "accused" of so many things that she couldn't keep up. She said that she told them that she was being accused of being hostile and calling someone a "spic." She said that as soon as she said that Mr. Haskins "jumped up" and pointed his finger at her and said "AH-HA, so you did say 'spic'." The Complainant stated that she "certainly did not." (Exhibit 4)

2.  Mr. Kenneth Miller stated that the reason for the three-day suspension was "stated clearly" in his memorandum of July 27, 2004. (Exhibit 5)

3.  Mr. Kenneth Haskins stated that Mr. Miller proposed the three-day suspension. (Exhibit 6)

4.  Mr. Robert Wilbon stated he knew that the Complainant would not be insolent towards any supervisor. He also stated that he felt that the Complainant was being "picked on" by management officials. (Exhibit 8)

    He stated that other individuals in the mailroom do things wrong but that management "doesn't suspend them." (Exhibit 8)

5.  Mr. Jon Laurich stated that he sustained the three-day suspension because the reason for the suspension was sufficiently serious and the Complainant did not present any compelling evidence or reasons to cause him to "change" his mind. (Exhibit 9)

    He also denied telling the Complainant to "shut up." He stated that he may have asked her to "please" let him finish speaking and then he would let her speak "for as long as she wanted to speak." (Exhibit 9)

COMPLAINANT'S REBUTTAL:  The Complainant stated that she gave Mr. Laurich a letter of appeal and told him that she had a witness.  (Exhibit 4)

She also stated that Mr. Laurich told her to "shut up" and it was "pretty loud." (Exhibit 4)

6.    Ms. Marcia Fulham, GS-301-14, Director, General Services Division (GSA), EOP, the White House, White Female, prior EEO activity, stated that she was present when the Complainant gave her oral response to Mr. Jon Laurich relative to the "Notice of Proposed Suspension."  She said that Mr. Laurich acted professionally at all times and handed the Complainant a box of tissue when she became "teary."  (Exhibit 10)

Ms. Fulham also stated that when the Complainant returned to work after the suspension and subsequent sick leave on October 18, 2004, she told her that it was a good time to "start afresh" with her "chain of command."  She also stated that she told the Complainant:

a.    follow her supervisors' orders;
b.    if she felt she was being treated unfairly by a supervisor she should contact the "next higher-level" person in her supervisory chain;
c.    to always act professionally with co-workers; and
d.    to speak to a supervisor if she was upset with a co-worker.

She also told the Complainant that she (Fulham) wanted her to succeed and to be a "valuable contributor to the EOP."  (Exhibit 10)

## II.    SUMMARY OF THE ENVIRONMENT

A.    Mr. Kenneth Haskins has the following number of employees under his supervision:

8    Black Males (30%)
4    Black Females (14%)

6    Asian/Pacific Islander Males (22%)
2    Asian/Pacific Islander Females (7%)

5    White Males (19%)
1    White Female (4%)

1    Hispanic Female (4%)

Representing 12 Blacks (44%); 8 Asian/Pacific Islanders (30%); 6 Whites (22%); and 1 Hispanic (4%).  (Exhibit 22)

B.    The Complainant's "chain of command," as of July 15, 2004, is as follows:

First-Line Supervisor – Mr. Rusty Francisco, Supervisor
Second-Line Supervisor – Mr. Kenneth Haskins, Branch Chief, Mail Operations
Third-Line Supervisor -- Mr. Kenneth Miller, Deputy Director, GSA
Fourth-Line Supervisor -- Name Not Provided, Director, GSA
Fifth-Line Supervisor -- Mr. Timothy A. Campen, Director, OA

**TABLE OF CONTENTS**

**Exhibits**                                                                                                    **Pages**

1.    Formal Complaint of Discrimination, dated July 30, 2004; Amendment to Complaint,
      dated September 24, 2004; Receipt of Complaint dated August 27, 2004          1-17

2.    Acceptance Letter, dated September 13, 2004; Acceptance Letter for the Amendment,
      dated October 5, 2004                                                         1-7

3.    EEO Counselor's Report, dated August 24, 2004m with Attachments               1-9

      a.    Letter of Reprimand from Kenneth Haskins, Branch Chief, Mail Messenger
            Operations, dated June 16, 2004; Policy:  Disciplinary Guidelines       10-22
      b.    EEO Counselor Checklist                                                 23-25
      c.    E-mail from Laura Jones re Schedule, dated June 16 & 17, 2004           26-26
      d.    Information for Informal Complaint, dated June 21, 2004                 27-29
      e.    Agreement to Extend Counseling Period                                   30-30
      f.    Notice of Right to File a Discrimination Complaint                      31-32

4.    Affidavit of Laura C. Jones, Complainant, GS 8-4, Lead Mail Associate, Office of
      Administration (OA), Executive Office of the President (EOP), Washington, DC,
      Caucasian, White Female with prior EEO activity, dated November 29, 2004;
      Rebuttal                                                                      1-14

5.    Affidavit of Kenneth Miller, Third-level Supervisor, GS-301-14, Deputy Director,
      General Services Division (GSD), OA, EOP, Washington, DC, Caucasian, White
      Male with prior EEO activity, dated November 15, 2004                         1-6

6.    Affidavit of Kenneth Haskins, Second-level Supervisor, GS-13, Manager, Mail Room
      Operations, GSD, OA, EOP, Washington, DC, African-American, Black Male with
      prior EEO activity, dated November 15, 2004                                   1-8

7.    Affidavit of Restituto (Rusty) Francisco, Supervisor, GS-9, GSD, OA, EOP,
      Washington, DC, Asian, Brown Male with prior EEO activity, dated November 15,
      2004; Addendum dated November 18, 2004                                        1-5

8.    Affidavit of Robert Wilbon, GS-10/9, Former Mailroom Supervisor, OA, Washington,
      DC, African-American, Black Male, no prior EEO activity, dated December 7, 2004    1-3

9.    Affidavit of Jon Laurich, GS-0391-15, Deputy Chief Operating Officer, OA, EOP,
      Washington, DC, Caucasian, White Male with no prior EEO activity, dated December
      17, 2004                                                                      1-4

10.   Affidavit of Linda Sites, GS-0260-15, Director of Equal Employment Opportunity, OA,
      EOP, EEO Division, Washington, DC, Caucasian, White Female with no prior EEO
      activity, dated December 17, 2004                                            1-2

11. Affidavit of Marcia Fulham, G-301-14, Director, General Services Division, EOP, Washington, DC, Caucasian, White Female with EEO activity not denoted, dated December 16, 2004    1-3

12. Affidavit of Mark Frownfelter, GS-080-14, Branch Chief for Personnel Security, OA, EOP, Security Office, Washington, DC, Caucasian, White Male with no prior EEO activity, dated December 17, 2004    1-3

13. Affidavit of Patrick Galvin, WG-06, Motor Vehicle Operator, GSD, OA, Washington, DC, Caucasian, White Male with no prior EEO activity, dated December 17, 2004    1-2

14. Affidavit of Don Moncado, GS 9/6, Mail Center Supervisor, GSD, OA, Washington, DC, Hispanic, White Male with prior EEO activity, dated December 20, 2004    1-2

15. Affidavit of Dewitt Ramsey, WG-06, Motor Vehicle Operator, GSD, Washington, DC, African-American, Black Male with no prior EEO activity, dated December 13, 2004    1-3

16. Affidavit of Tony Rivers, GS 7/1, Mail Clerk, OA, Washington, DC, Black, Fair Skinned Male with no prior EEO activity, dated December 27, 2004    1-2

17. Affidavit of Susie Shannon, GS-201-15, Director, Human Resources Management Division, Office of the President, OA, Resources Management Division, Washington, DC, Caucasian, White Female with no prior EEO activity, dated December 20, 2002    1-3

18. Affidavit of Susanna Gonzalez, GS 8/4, Lead Mail Assistant, OA, Washington, DC, Hispanic Female with EEO activity not denoted, dated December 22, 2004    1-6

19. Affidavit of Jackie Lawson, GS-9, Client Service Representative, OA, FMD, Washington, DC, African-American, Black Female, with no prior EEO activity, dated December 20, 2004    1-2

20. Affidavit of Sandy Evans, Administratively Determined, Chief Operating Officer, EOP, OA, Office of the Chief Operating Officer, Washington, DC, Caucasian, White Female, with no prior EEO activity, dated December 20, 2004    1-3

21. Mail/Messenger Operations Organization Chart, as of September 2003/2004    1-2

22. Workforce Profile of Personnel Reporting to Kenneth Haskins    1-1

23. Agency Policies and Procedures

    a. Leave Procedures for Mail/Messenger Operations    1-1
    b. OPM Memo re National Day of Mourning for President Reagan    2-2

24. Letter of Reprimand from Kenneth Haskins to Laura C. Jones, dated June 16, 2004    1-2

25. Notice of Proposed Suspension, dated July 27, 2004    1-3

26. Draft Response to Proposed Suspension, dated August 5, 2004    1-2

27. Notice of Decision on Proposed Suspension, dated August 13, 2004    1-2

15

a Jones
-04-01

28.  Request for Leave or Approved Absen

29.  Position Description for Lead Mail Assi

30.  Performance Plan and Performance A

31.  E-mail from Laura Jones to Kenneth H

32.  Medical Documentation of Laura C. Jo

33.  Documentation for Mail Boxes Lifted

34.  Recognition of Complainant

35.  Notice of Employees Reassigned for C

36.  Documentation Request and Receipt