## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                            )
LAURA C. JONES,                             )
                                            )
             Plaintiff,                     )
                                            )
      v.                                    )          Civil Action No. 07-2164 (RWR)
                                            )
GEORGE W. BUSH, *et al.*,                   )
                                            )
             Defendants.                    )
_____ )

## <u>MEMORANDUM OPINION</u>

*Pro se* plaintiff Laura Jones brought this employment discrimination action under Title VII of the Civil Rights Act of 1964 ("Title VII"), *see* 42 U.S.C. § 2000e *et seq.*, as amended, and the First Amendment to the United States Constitution, against former President Bush, the Director of the Office of Administration ("OA") in the Executive Office of the President ("EOP"), and nine other White House employees. Defendants filed a motion to dismiss or, in the alternative, for summary judgment. Because plaintiff failed to exhaust administrative remedies regarding certain claims, to demonstrate that adverse employment actions have been taken, to establish a First Amendment violation, and to rebut sufficiently defendants' non-discriminatory reasons for their employment actions, the Court granted defendants' motion by minute order. This Memorandum Opinion sets forth the reasons for the decision.

## I.  BACKGROUND

"Plaintiff Jones (White) was employed by the [OA-EOP], assigned to the mailroom" in the West Wing of the White House, Amended Complaint for Damages and Equitable Relief ("Am. Compl.") at 3 (page numbers designated by the Court), and "was the only white employee in a predominantly non-white mailroom."  *Id.* at 7.  Her official title was Lead Mail Assistant, Grade 8.  Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defs.' Mem."), Ex. B (Position Description) at 1.  The major duties of her position were to:

> Perform[] mail and administrative functions to deliver and meter mail, to solicit and forward feedback from customers, to offer suggestions to improve work processes, to assist and educate customers, and to plan and record daily work activities.

*Id.*, Ex. B at 2.  Plaintiff's work hours were 10:30 a.m. to 7:00 p.m.  *See id.*, Ex. E (Information for Informal Complaint dated June 21, 2004) at 1.  Her immediate supervisor was Restituto ("Rusty") Francisco (Asian American/Pacific Islander male); her second-line supervisor was Kenneth Haskins (African American male); her third-line supervisor was Kenneth Miller (white male); and her fourth-line supervisor was Jon Laurich (white male).  *See id.*, Ex. C (Laurich Aff.) at 1, Ex. Q (Motion for Findings and Conclusions Without a Hearing) at 5 & Ex. Z (Report of Investigation dated January 28, 2005) at 2, 10 and 13.

### A.  *The March 24, 2004 Unscreened Box Incident*

According to plaintiff, on March 24, 2004, the following events occurred:

> [A]n unsecured box entered the White House mailroom en route to President Bush and his immediate staff.  [Plaintiff] noticed that the box had not been processed according to stringent security

procedures, which required that all packages addressed to the White House be radiated to prevent contamination by chemical or biological agents.  In the wake of the Ricin attacks on the US Capitol just two months earlier and the Anthrax attacks of 2001-02, the plaintiff and her co-workers were taking [Ciprofloxacin] as a precautionary measure, and a premium was placed on the importance of security, particularly in mail and package handling.

When [plaintiff] saw the unsecured box, [she] informed her supervisor, Rusty Francisco (Asian), and was told that he had authorized Barbara Swan (Black) to allow the box to bypass security at the request of [a] White House staffer . . . who wanted to deliver the box to President Bush, Vice President Dick Cheney, and the entire Executive staff.  Plaintiff expressed concern over the security threat and was told by a subordinate to leave the matter alone.  When she emailed Ken Haskins (Black), the mailroom branch chief, she was told to drop the matter.  Haskins dismissively said, "When I see a red bull, you see a red bull."

Am. Compl. at 3-4.

Plaintiff believed that "the response[s] from her subordinate and her supervisor [were] disrespectful," and attributed the responses to "the fact that she was the only white staff member in the mailroom." *Id*. at 4.  She reported this incident to Linda Sites (white female), the OA-EOP's Equal Employment Opportunity ("EEO") Director, on April 6, 2004.[1]  *Id.*; Defs.' Mem., Ex. W (Information for Informal Complaint dated April 15, 2004) at 1.  Plaintiff alleged

---

[1]    Although certain of defendants' exhibits indicate that plaintiff's prior EEO activity occurred on April 9, 2004, *see, e.g.,* Defs.' Mem., Ex. K at 2; *see id.*, Ex. R at 2, the amended complaint and other of defendants' exhibits indicate that the prior EEO activity occurred on April 6, 2004, *see, e.g.,* Am. Compl. at 4; Defs.' Mem., Ex. W at 1.  The discrepancy in the dates has no apparent effect on the merits.

3

discrimination based on color, race and sex, Defs.' Mem., Ex. W at 2, and she requested the

following relief:

> Return to job in West Wing mailroom as lead clerk; printer installed
> in West Wing mailroom; have in writing that [plaintiff and Haskins]
> will be the only ones with the password for billing and[] wants to be
> treated with respect, not hear comments about [illegible and] wants
> [coworkers] to take on more responsibility (such as printing their
> own [illegible]) left alone.

*Id.*, Ex. W at 4.[2]

On April 15, 2004, EEO Director Sites met with plaintiff, Haskins, Francisco and an EEO

counselor, Shalini Benson, allegedly "to discuss the situation and try to dissuade [p]laintiff from

filing an EEO complaint." Am. Compl. at 4. Sites allegedly instructed Benson to counsel

plaintiff, "and Benson did so, eventually advising [p]laintiff of her right[] to bring an EEO

complaint." *Id.*[3]

### B. Assignment to Work on June 11, 2004 and Letter of Reprimand

---

[2] Plaintiff believed that "[h]er workload had been significantly increased since
filing her EEO complaint," Am. Compl. at 5, presumably a reference to the informal EEO
complaint she filed on April 15, 2004. On June 9, 2004, plaintiff e-mailed Hawkins to request a
desk audit. *Id.* According to plaintiff, "she was being overworked and severely stressed, [while]
none of her coworkers experienced a similar increase in work during the same period." *Id.*

[3] Defendants represent that plaintiff completed an Information for Formal
Complaint Form on April 15, 2004, Defs.' Mem. at 3 n.6, but the exhibit to which their
memorandum refers is entitled "Information for Informal Complaint," *id.*, Ex. W at 4.

According to plaintiff, on June 9, 2004, she "told Haskins she was willing to volunteer to work her usual shift on June 11, [2004,] a National Day of Mourning in honour of the dead [sic] of President Reagan." *Id*. at 5.  She stated that Haskins "would not confirm the shift she was expected to work," and, because of other commitments she could not work a shift other than her usual shift and "told Haskins to disregard her volunteer request." *Id.*  "Haskins subsequently assigned [p]laintiff to a shift other than her usual one, such that she was unable to work." *Id.*

According to defendants, on June 9, 2004, plaintiff "volunteered to work on Friday, June 11, 2004, . . . [was] placed on the work schedule for Friday, June 11, 2004, . . . [and was] notified to report for [her] regular scheduled tour of duty which [was] 10:30 a.m. to 7:00 p.m." Defs.' Mem., Ex. D (June 16, 2004 Letter of Reprimand) at 1.  Plaintiff neither submitted a request for leave for Friday, June 11, 2004, nor reported for duty as assigned, nor telephoned the office to request leave for the day, thus violating established leave procedures and OA Disciplinary Guidelines. *Id.*, Ex. D at 1; *see id.*, Ex. M (Haskins Aff.) at 2-3.

Also on June 9, 2004, plaintiff had a telephone conversation with Haskins about several matters, including an incident where two of her co-workers "were engaged in . . . a personal conversation, with [plaintiff] present . . . in Spanish," making plaintiff "feel uncomfortable." Defs.' Mem., Ex. D at 2.  Plaintiff alleged that management was "attempting to force [her] to leave by placing a great deal of pressure on [her] and that [she was] the 'last one around.'" *Id.*, Ex. D at 2.  Plaintiff concluded the conversation "by stating that 'no spic is going to make [her] leave' or words to that effect." *Id.*, Ex. D at 2.  For this reason, plaintiff was charged with using

offensive language, another violation of OA Disciplinary Guidelines. *Id.*, Ex. D at 2; *see id.*, Ex. M at 2.

On June 16, 2004, plaintiff received a Letter of Reprimand for her failure to follow established leave procedures and for her use of offensive language. Defs.' Mem., Ex. D at 1-2. It was "a formal disciplinary action" made part of plaintiff's "Official Personnel Folder . . . for a period not to exceed one (1) year from June 11, 2004," the date on which plaintiff violated the OA-EOP leave procedures. *Id.*, Ex. D at 2. This action prompted plaintiff to pursue an informal complaint of discrimination based on her color (Caucasian), race (Caucasian), sex (female), and reprisal for participation in protected EEO activity in April 2004. *Id.*, Ex. E at 1-2.

### C. Reassignment and Three-Day Suspension

According to plaintiff, she was "reassigned from the 'West Wing' mailroom [to another mailroom at] 1800 G Street[, N.W.], a move that came with a rescission of her security clearance, a reduction in assignment prestige, and a change in work hours." Am. Compl. at 5. In addition, "[p]laintiff received a three-day suspension for 'insolent behavior towards her supervisor' on July 15, 2004, and a Letter of Reprimand (LOR) was placed in her file."[4] *Id.*

According to defendants, on July 15, 2004, Miller and Haskins informed plaintiff of her reassignment from the mailroom in the West Wing of the White House to another mailroom two

---

[4]     The record reflects only one Letter of Reprimand dated June 16, 2004.

blocks away at 1800 G Street, N.W., and of a one-hour adjustment of her work hours, from 10:30 a.m. to 7:00 p.m., to 9:30 a.m. to 6:00 p.m.  Defs.' Mem., Ex. F (Miller Aff.) at 1; *id.*, Ex. G (Notice of Proposed Suspension dated July 27, 2004) at 1.  Miller explained the reassignment as follows:

> We reassigned the [plaintiff] to the same position in a different mailroom . . . [as] part of an ongoing series of personnel reassignments in [OA-EOP] Mail Messenger Operations which were intended to make our operations more effective and efficient, and to provide our customers with the best possible service.  We explained to the [plaintiff] that we were reassigning her to the same position in a different, larger mailroom to provide [her] with opportunities to: (1) cross-train with other employees, ensuring continuity of operations in the event that the [plaintiff] or one of her co-workers was on leave; (2) learn different, career-enhancing skills, which in turn add value to the entire organization; and, (3) lead a larger mailroom, given that the [plaintiff] had indicated her desire to qualify for a supervisory position in the future, and one of OA's core values is to encourage its employees to seek and take responsibility.

*Id.*, Ex. F at 2; *see id.*, Ex. M at 3-4.  Six mailroom employees were reassigned at this time: one Hispanic Caucasian male, three African American males, one Asian (Filipino) female, and plaintiff, a Caucasian female.  *Id.*, Ex. F at 3.

Plaintiff "responded to the news of [her] pending reassignment with considerable hostility."  Defs.' Mem., Ex. G at 1.  Miller described the events as follows:

> [Plaintiff] indicated that [she] did not wish to comply [with the reassignment], and stood to leave the room.  At this point, [Miller] expressly directed [plaintiff] to report to [her] new work location at

7

9:30 a.m., on Monday, July 19, 2004, and asked if [she] understood. [She] declined to reply.  Instead, [she] stormed from the room, and returned only moments later at which time [she] thrust [her] access badge within centimeters of Mr. Haskins['] face and asked if he planned to take [her] badge also.  Mr. Haskins did not respond to [her] overly aggressive, insolent conduct, but instead told [her] that [she] would receive whatever access badge [she] needed to perform [her] duties.  [She] then left the room a second time.  Given [her] unpredictable emotional condition, the Chief Operating Officer, Dr. Sandra Evans, placed [her] on administrative leave with pay for the remainder of the day and directed [her] to go home and attempt to calm [her]self.

*Id.*, Ex. G at 1.

Miller explained that the reassignment "to a new mailroom, in a different building . . . required a change to [plaintiff's] security access level and parking."  Defs.' Mem., Ex. F at 3. Plaintiff was to be assigned a parking space on the Ellipse, six-blocks away from the 1800 G Street mailroom.  *Id.*, Ex. Z at 6.  Miller suggested that he "walk [plaintiff] to her car to get her parking permit since she had been instructed to go home, and, besides, [he] was concerned because she was very emotional at the time."  *Id.*, Ex. F at 3; *see id.*, Ex. Z at 6.  Because plaintiff "parked on East Executive Avenue, which gave her immediate access back into the White House, and [because] she appeared upset," Miller "asked the Secret Service to ensure that [plaintiff] did not return to the White House."  *Id.*, Ex. F at 3.[5]  Further, because plaintiff "had

---

[5]        According to plaintiff, when she returned to work on July 19, 2004, Secret Service officers stopped her on her way to her new parking space on the Ellipse and escorted her away.  Defs.' Mem., Ex. Z at 7.

inappropriately attempted to contact several senior White House staff members to ask them to intervene on her behalf, and possibly override the decision to reassign her," her "e-mail privileges were temporarily suspended after her reassignment." *Id.*, Ex. F at 3.[6]

Plaintiff's "insolent conduct towards supervisors" at the July 15, 2004 meeting with Miller and Haskins prompted Miller to propose a three-day suspension. *Id.*, Ex. G at 1. Miller took into account "the circumstances and gravity of [her] misconduct" as well as the "aggravating factor that [she had] received a reprimand for misconduct only one month [earlier]." *Id.*, Ex. G at 2. Specifically, on "June [16], 2004, [plaintiff] received a reprimand for failing to follow established leave procedures and for using offensive language in the workplace." *Id.*, Ex. G at 2. Laurich sustained the charge of insolent behavior toward supervisors, and the suspension was effective on August 19, 2004, August 24, 2004 and August 25, 2004. *Id.*, Ex. H (Notice of Decision on Proposed Suspension dated August 13, 2004) at 1.

Plaintiff notified Benson of her reassignment, and further alleged that, on July 20, 2004, her picture had been "distributed at meetings with [the] Secret Service . . . , and that [Secret Service personnel] were told to deny her access to the White House complex." *Id.*, Ex. E at 1. Plaintiff asked that she be "returned to her previous work schedule . . . in the West Wing

---

[6]      Plaintiff attempted to contact Susie Shannon, Director of Human Resources, Jon Laurich, Deputy Chief Operating Officer, OA-EOP, Tim Campen, Director, Office of Administration, Sandy Evans, Chief Operating Officer, Linda Gambatesa, Director, Oval Office Operations, and Harriet Miers, then-Deputy Chief of Staff. Defs.' Mem., Ex. Z at 6-7.

mailroom," and she sought a written apology from Miller.  *Id.*, Ex. E at 2.  These matters were

not resolved informally, and on July 30, 2004, plaintiff was advised in writing of her right to file

a formal EEO complaint.  *Id.*, Ex. X (Letter from S. Benson to plaintiff dated July 30, 2004) at 1.

Plaintiff took sick leave the day after her reassignment.  *Id*., Ex. F at 4.  "[T]he OA

Security Office's Deputy Director packed [plaintiff's] things and locked them in a secure area

until she returned to work."  *Id.*, Ex. F at 4.

### D. Formal EEO Complaint

On July 30, 2004, plaintiff filed a formal complaint of discrimination. Am. Compl. at 2; *see* Defs.' Mem., Ex. I (Formal Complaint of Discrimination) at 1; *see id.*, Ex. Z at 2. It alleged discrimination on the basis of race, color, and sex, and reprisal for prior protected activity in April 2004. *Id.*, Ex. I at 1. To her complaint plaintiff attached a nine-page narrative statement describing, among other events, the circumstances surrounding the Letter of Reprimand, her reassignment to the 1800 G Street mailroom, and her three-day suspension. *See generally id.*, Ex. I (Attach. to Formal Complaint) at 1-7. The OA-EOP's EEO Director acknowledged in writing receipt of the complaint (assigned No. OA-04-01), and interpreted plaintiff's claim as follows:

> [T]he OA discriminated against you because of your race (Caucasian), color (Caucasian), sex (female), and reprisal for prior protected activity on April 9, 2004, in the following actions:
>
> a. Placement of a letter of reprimand in your personnel file on June 16, 2004;
>
> b. Your reassignment beginning July 19, 2004, from the West Wing mailroom to the mailroom at 1800 G Street and a change in your work hours from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:00 p.m.

*Id.*, Ex. I (Letter from L. Sites, Director of Equal Employment Opportunity, OA-EOP, to plaintiff dated August 27, 2004) at 1.[7] Because plaintiff's nine-page narrative statement not only

---

[7]     Defendants' counsel represents that plaintiff's "formal complaint was dated July 30, 2004, but was received by facsimile and determined to be filed on August 13, 2004." Defs.'

"included the claims stated above, but . . . also included additional information," the EEO

Director treated the statement as "background information" for the complaint.  *Id.*, Ex. I at 1.

Similarly, upon review of the copy of the proposed notice of suspension, the Director considered

it "background information for the issue of [her] reassignment."  *Id.*, Ex. I at 1.  The Director's

letter continued as follows:

> If you believe that your claims and/or bases have not been correctly
> stated, please notify me, in writing, within 10 calendar days of
> receipt of this letter.   State the claim(s) and basis/bases of
> discrimination that you believe to be correct [sic].   If I have not
> heard from you within the specified time frame, I will assume that
> the claims and/or bases are correct as stated, and decisions for
> acceptance and/or dismissal will be based upon the information
> provided and as cited above.

*Id.*, Ex. I at 1.  The Director received no response from plaintiff; she then issued a formal

acceptance of plaintiff's discrimination complaint and specified the claims accepted for

investigation as set forth in her August 27, 2004 letter.  *Id.*, Ex. J (Letter from L. Sites to plaintiff

dated September 13, 2004) at 1-2.

Plaintiff, who then was represented by counsel, amended her formal EEO complaint "to

add an additional claim of discrimination on the basis of reprisal, race, color, and sex for the

three day suspension issued on August 13, 2004[.]"  Defs.' Mem., Ex. I (Letter from M.G.

---

Mem. at 6 n.8; *see id.*, Ex. J (Letter from L. Sites, EEO Director, OA-EOP, to plaintiff dated
September 13, 2004).

Farber, Esq., to L. Sites dated September 24, 2004).  This additional claim was accepted for

investigation, and plaintiff's complaint as amended read as follows:

> Due to her race (Caucasian), color (Caucasian), sex (female), and
> reprisal for prior protected activity on April 9, 2004, the aggrieved
> was subjected to discrimination by the Office of Administration
> (OA), Executive Office of the President (EOP), in the following
> actions:
>
> a.  Placement of a letter of reprimand into her personnel file on June
> 16, 2004;
>
> b.  Her reassignment beginning July 19, 2004, from the West Wing
> mailroom to the mailroom at 1800 G Street and a change in her work
> hours from 10:30 a.m. - 7:00 p.m. to 9:30 a.m. - 6:00 p.m.;
>
> c.  Her three-day suspension for insolent behavior on July 15, 2004,
> toward her supervisors.

Defs.' Mem., Ex. K (Letter from L. Sites to M.E. Henry, Esq., dated October 5, 2004) at 2; *see*

*id.*, Ex. R (Determination of Claims Before the Commission dated January 27, 2006) at 1.

Again, the Director explained that the narrative statement attached to the original formal

complaint would be treated as "background information for her complaint."  *Id.*, Ex. K at 1.

Plaintiff was advised of her right to request, after receipt of the report of investigation of her

complaint, either a final agency determination by the OA based on the investigation record or a

hearing before an Administrative Law Judge ("ALJ") of the Equal Employment Opportunity

Commission ("EEOC").  *Id.*, Ex. K at 3.  Plaintiff requested a hearing, and the EEOC received

her request on February 25, 2005.  *See id.*, Ex. R at 2.

### E.  *Removal from Federal Service*

According to plaintiff, she "was removed from the federal service on July 8, 2005, after a series of escalating, unwarranted disciplinary actions progressed against her."  Am. Compl. at 5.

According to defendants, the decision to remove plaintiff from federal service was based on plaintiff's disorderly and insolent conduct and failure to follow instructions arising from an incident on May 20, 2005, involving her supervisor, Anita Cox-Harris, and a colleague, Danilo Ibanez.  *See* Defs.' Mem, Ex. L (Notice of Proposed Removal dated June 1, 2005) at 1.  The incident was described as follows:

> During the course of routine office conversation, [plaintiff] remarked that [she] had not yet had lunch that day because of [her] excessive workload.  [Her] supervisor then reminded [her] that it is [plaintiff's] responsibility to notify [her] whenever [she] need[s] extra help so that she can make appropriate arrangements to assist [plaintiff].  In response, [plaintiff] became increasingly agitated and belligerent, excessively loud, and began making demeaning remarks about other colleagues not present, including accusing them of gross dereliction of duty.  Mr. Ibanez left the office momentarily to complete an assignment, and while he was gone, [plaintiff] also began accusing him of gross dereliction of duty.  Ms. Cox-Harris directed [plaintiff] to calm down, lower [her] voice, and cease making such abusive and demeaning comments concerning [her] colleagues.  When Mr. Ibanez returned, Ms. Cox-Harris asked [plaintiff] to come closer to her desk so that she and Mr. Ibanez might discuss with [her] the accusations and concerns [she] raised.  At this time, [plaintiff] rolled [her] chair from behind [her] desk to a position directly in front of [her] supervisor's desk, and adjacent to Mr. Ibanez's desk.  In [her] hand [plaintiff] was holding large metal scissors, approximately 8 1/4 inches in length.  As discussion commenced, once again [plaintiff] became increasingly agitated, belligerent, and excessively loud.  Ms. Cox-Harris then told [her] at

least three separate times to lower [her] voice, but [plaintiff] refused. Mr. Ibanez noticed that, in [her] agitation, [plaintiff] began gesticulating sharply with the scissors. He became very concerned that [plaintiff] might injure [her]self or strike Ms. Cox-Harris, when suddenly [plaintiff] rose from [her] chair and slammed the scissors, points-down, into Ms. Cox-Harris's brand new desk. The scissors struck with such force that the desk received two deep gouge marks and one long scrape, approximately 4 1/2 inches in length. The considerable force of the impact also apparently caused the scissors to fly out of [plaintiff's] hand and shoot across Ms. Cox-Harris's desk. [Plaintiff's] actions and attitude reflected such a severe loss of emotional and personal control that Mr. Ibanez leapt from his chair to restrain [plaintiff], only he was too late to stop [her] from slamming the scissors into [her] supervisor's desk.

*Id.*, Ex. L at 1-2.

Plaintiff appealed her removal to the Merit Systems Protection Board ("MSPB") on August 8, 2005. *See* Defs.' Mem., Ex. U (MSPB Form 185) at 4-5. Although plaintiff "proceeded to conduct discovery and argue her case before the [MSPB]," *id.*, Ex. R at 2, she asked to "dismiss her appeal without prejudice to refiling in light of the . . . pending proceeding before an administrative judge of the [EEOC]," the resolution of which may have rendered the MSPB appeal "unnecessary and/or moot." *Id.*, Ex. V (December 16, 2005 Initial Decision) at 1. The MSPB administrative judge granted plaintiff's motion "[i]n the interests of fairness and judicial economy." *Id.*, Ex. V at 2.

### F. Proceedings Before the EEOC

On December 14, 2005, plaintiff moved to amend her complaint before the EEOC by adding a claim pertaining to her removal from federal service. *See* Defs.' Mem., Ex. R at 2. Plaintiff asserted that her removal claim had been raised with the EEOC, in telephone calls she made and fax transmissions she sent to the EEOC's National Call Center in June 2005. *See id.*, Ex. R at 2-3. According to plaintiff, Call Center staff instructed her to send documents to the Call Center, yet these submissions lacked instructions or a statement of plaintiff's intentions, and they failed to reach the ALJ. *See id.*, Ex. R at 3. Nor did plaintiff follow up in any way before her attorney contacted the ALJ by telephone on December 5, 2005. *Id.* Noting that plaintiff had raised "exactly the same claim before the MSPB in August [2005]," *id.*, Ex. R at 2, the ALJ determined that, "[i]f [she] sincerely believed that she had the same matter before the [EEOC], she acted improperly by filing the same claim before the [MSPB]." *Id.*, Ex. R at 2. Further, the ALJ found that plaintiff's submissions to the EEOC's National Call Center did not amount to a proper motion to amend. *See id.*, Ex. R at 3. Moreover, none of the submissions was served on the OA-EOP, and absent a certificate of service, the EEOC would not have accepted them. *Id.*, Ex. R at 3. The ALJ denied plaintiff's motion to amend, so that "[t]he only claims before the [EEOC were] the original three claims accepted by the [OA-EOP] in 2004." *Id.*, Ex. R at 4. Plaintiff's removal claim, then, was not before the EEOC.

Notwithstanding plaintiff's hearing request, the ALJ found that plaintiff "ha[d] not shown that there [were] any issues requiring a hearing[.]" Defs.' Mem., Ex. S (April 26, 2006 Decision)

at 2.  Accordingly, the ALJ made his decision based only on the Report of Investigation and the OA-EOP's unopposed motion for summary judgment.  *Id.*, Ex. S at 1-2.

The ALJ found that plaintiff failed to show that the OA-EOP's "explanations for the suspension, the reprimand or reassignment, were pretext for discrimination or retaliation," *id.*, Ex. S at 6, and he granted summary judgment in the OA-EOP's favor, *see id.*, Ex. S (April 26, 2006 Order Entering Judgment).  On May 23, 2006, the OA-EOP issued its final order, and on June 22, 2006, plaintiff appealed it to the EEOC, which, in turn, affirmed the OA-EOP's final order.  *See* Defs.' Mem., Ex. A (January 30, 2007 Decision) at 1.  Plaintiff timely filed a request for reconsideration which the EEOC denied on August 6, 2007.  Defs.' Mem., Ex. T (August 6, 2007 Denial) at 1.

Plaintiff filed in this Court an amended complaint alleging four claims: retaliation for having exercised her free speech rights in the workplace; retaliation for having filed an EEO complaint in April 2004; racial discrimination in employment; and race-based hostile work environment.

## II.  DISCUSSION

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) on the ground that the amended complaint fails to state claims upon which relief can be granted.  A motion to dismiss on the ground that a plaintiff failed to exhaust her administrative remedies properly is analyzed under Rule 12(b)(6).  *See, e.g., Hansen v. Billington*, 644 F. Supp. 2d 97,

102 (D.D.C. 2009).  Rule 12(b)(6) tests the legal sufficiency of a complaint.  *See Browning v.*
*Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In considering a Rule 12(b)(6) motion, the court
treats the factual allegations of a plaintiff's complaint as if they were true, and draws all
reasonable inferences stemming from such factual allegations in plaintiff's favor.  *See Maljack*
*Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Atherton*
*v. District of Columbia Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), *cert. denied*,
559 U.S. 1039 (2010).  A claim is facially plausible "when the plaintiff pleads factual content
that allows the court to draw a reasonable inference that the defendant is liable for the
misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  Although
"detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, a
plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the
elements of a cause of action" to provide the "grounds" of "entitle[ment] to relief[.]"  *Twombly*,
550 U.S. at 555-56.  Plaintiff's complaint need not, however, plead facts establishing a prima
facie case of discrimination.  *Swierkiewicz v. Sorema S.A.*, 534 U.S. 506, 508 (2002); *see also*
*Twombly*, 550 U.S. at 569-70 (citing *Swierkiewicz* approvingly).  Nor must the Court "accept
inferences drawn by plaintiff[] if such inferences are unsupported by the facts set out in the
complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), or "a legal

conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (citation omitted); *see also*

*Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "[A] naked assertion . . . gets the complaint close

to stating a claim, but without some further factual enhancement it stops short of the line

between possibility and plausibility." *Twombly*, 550 U.S. at 557.

 "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to

and not excluded by the court, the motion must be treated as one for summary judgment under

Rule 56." FED. R. CIV. P. 12(d).  Here, in any event, defendants sought, in the alternative,

summary judgment, which the Court generally should render "if the movant shows that there is

no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(a).  The moving party bears the burden of demonstrating the absence

of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A

material fact is one "that might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If material facts are at issue, or,

though undisputed, are susceptible to divergent inferences, summary judgment is not available."

*Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994) (citing *Alyeska Pipeline Serv. Co. v. U.S. Envtl.*

*Prot. Agency*, 856 F.2d 309, 314 (D.C. Cir. 1988)); *see Anderson*, 477 U.S. at 248 (stating that

summary judgment is not appropriate "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party").

 The party opposing a motion for summary judgment "may not rest upon the mere

allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is

a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citing former FED. R. CIV. P. 56(e)); *see*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding that the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts"); *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101

F.3d 145, 150 (D.C. Cir. 1996).

Under the local rules of this Court, an opposition to a summary judgment motion must

"be accompanied by a separate concise statement of genuine issues setting forth all material facts

as to which it is contended there exists a genuine issue necessary to be litigated, which shall

include references to the parts of the record relied on to support the statement."  LCvR 7(h)(1).[8]

"As the Court of Appeals for the District of Columbia Circuit has emphasized, '[LCvR 7(h)(1)]

places the burden on the parties and their counsel, who are most familiar with the litigation and

the record, to crystallize for the district court the material facts and relevant portions of the

record.'"  *Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 579 F. Supp. 2d 89, 91 (D.D.C. 2008)

(quoting *Jackson*, 101 F.3d at 151 (discussing predecessor rule to LCvR 7(h) (additional citation

omitted)).  Thus, when facts are not controverted in opposition to a summary judgment motion,

the Court "may assume that facts identified by the moving party in its statement of material facts

are admitted."  LCvR 7(h)(1).  When facts are disputed, however, "[c]redibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury

functions, not those of a judge[.]"  *Anderson*, 477 U.S. at 255.

---

[8]     Plaintiff did not submit such a statement.

### A.  Claim One: Retaliation for the Exercise of Plaintiff's
### First Amendment Right to Free Speech[9]

Plaintiff alleged that defendants retaliated against her because she "spoke up on a matter of high public importance when she reported the unscreened package on March 24[, 2004]." Am. Compl. at 6.  Defendants argued that plaintiff's First Amendment "claim fails because her speech was not protected by the First Amendment" for two reasons: (1) the March 24, 2004 unscreened box incident "[did] not appear to be of high public importance," and (2) plaintiff "was speaking about something that had to do with her official duties," giving defendants the "discretion to restrict her speech."  Defs.' Mem. at 17-18.  Because matters outside of the pleadings were taken into account concerning this claim, the claim was assessed for whether summary judgment was warranted.

No government employer may compel its employees "to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, *Will Cnty., Ill.*, 391 U.S. 563, 568 (1968);

---

[9]     Defendants "noted that [p]laintiff seeks no different relief under her First Amendment claim as she seeks in her Title VII claim," and that "Title VII is 'an exclusive, preemptive, administrative [and judicial] scheme for redress of federal employment discrimination' on the basis of race, religion, sex and national origin."  Defs.' Mem. at 19 n.20 (quoting *Brown v. General Servs. Admin.*, 425 U.S. 820, 821 (1976)).  They moved in the alternative to dismiss plaintiff's First Amendment claim for lack of subject matter jurisdiction. *See id*.  Plaintiff presented her First Amendment claim as one separate from her Title VII claims, however, and it has been treated accordingly.

*see Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) ("The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment."); *Connick v. Myers*, 461 U.S. 138, 142 (1983) (stating that a government employer may not "condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression").  Additionally, "as a general matter[,] the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)) (additional citations omitted).  In order to succeed on a claim of retaliation in violation of First Amendment free speech rights, plaintiff must prove "that her conduct was constitutionally protected, and that it was a 'substantial' or 'motivating' factor in the government's treatment of her." *Velikonja v. Gonzales*, 362 F. Supp. 2d 1, 24 (D.D.C. 2004) (citing *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996)), *aff'd in relevant part*, 466 F.3d 122, 124 (D.C. Cir. 2006) (per curiam); *Lloyd v. City of St. Charles*, No. 4:07CV01935, 2009 WL 485078, at *3 (E.D. Mo. Feb. 26, 2009) ("To establish a First Amendment retaliation claim, a plaintiff must prove that he engaged in protected activity and that this activity was a substantial or material factor in his employer's decision to take an adverse employment action."), *aff'd*, 360 F. App'x 713 (8th Cir. 2010) (per curiam); *see also Trulock v. Freeh,* 275 F.3d 391, 404 (4th Cir. 2001).

With respect to the first element, in order to determine whether a public employee's speech is protected by the First Amendment, the D.C. Circuit instructs:

> The threshold question for a public employee's First Amendment claim is whether the employee spoke as a citizen on a matter of public concern.   If so, [her] speech is protected unless the government can justify treating its employees differently from other citizens.   But if the employee spoke pursuant to [her] official duties, [she] cannot claim constitutional protection.

*Winder v. Erste*, 566 F.3d 209, 214 (D.C. Cir. 2009) (citations and internal quotation marks omitted).   Whether an employee's speech is constitutionally protected is a matter of law, *see Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1249 (10th Cir. 2008), and resolution of such a matter focuses on whether the speech "stemmed from and [was of] the type of activit[y] that [the employee] was paid to do[,]" *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007).   For example, if the employee were required to report certain events, her speech on such matters would not be protected under the First Amendment.   *See, e.g., Gresham v. District of Columbia*, 639 F. Supp. 2d 17, 19 (D.D.C. 2009) (concluding that a police captain spoke without First Amendment protection when he reported misconduct as he was obligated to do under the police department's General Orders).   And speech directed to a superior "within an employee's chain of command is often found to be pursuant to that employee's official duties." *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010); *see Weintraub v. Bd. of Educ. of City Sch. Dist. of New York*, 593 F.3d 196, 205 (2d Cir.) (teacher's complaints to his immediate supervisor about officials' failure to discipline a student), *cert. denied*, __ U.S. __, 131 S. Ct. 444 (2010); *Davis v. McKinney*, 518 F.3d 304, 315 (5th Cir. 2008) (reports of internal auditor to her immediate supervisor and division head, "in other words, up the chain of command seeking redress for what she felt was an inadequate response to the findings of her

investigation"); *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007) (correctional officer's reports to Assistant Superintendent "pursuant to her responsibility as a correctional officer to inform her superiors of a possible breach in prison search policy, especially one involving two senior prison officers"); *Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006) (university employee's internal report made pursuant to her official responsibilities as a financial aid counselor alleging improprieties in supervisor's handling of federal financial aid funds).

In this case, the matter about which plaintiff spoke was the handling of a package addressed to the President, the Vice President, and other senior White House staff following a supervisor's approval for bypassing established security procedures at the request of a White House staffer.  Plaintiff argued that the timing of her speech makes its content a matter of public concern because "the Ricin attacks at the Capitol" occurred three months earlier, "and the Anthrax mailings had occurred only a few years prior" to this incident.  Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss or for Summary Judgment ("Pl.'s Opp'n") at 3.  She explained that all mail at the White House was "to undergo significant screening and radiation processes" in order to protect high-profile targets such as the President of the United States, and that the March 24, 2004 incident arose from "a security breach and a potential threat to the health and safety of the President, his family, and his immediate staff."  *Id.* In this way, she claimed to have spoken "outside of her official duties when she raised . . . concerns," *id.*, about the unscreened package because "she in no way dealt with security as part of her official functions[,]" *id.* at 4.

The safety of the President and others in the White House is certainly of grave importance.  However, plaintiff's official job duties principally involved the delivery of mail.  Only in the course of her official duties did plaintiff become aware of the package, and only as a mailroom employee did she inform her supervisors and others of the situation and learn that supervisors had authorized and ratified its unscreened delivery.  Whether their judgment to bypass usual screening procedures was wise or not, they supervised delivery decisions and could insist on unfettered execution of them.  Under these circumstances, plaintiff's speech was not protected by the First Amendment because it stemmed from a matter within the scope of her official duties.  *See Bowie v. Maddox*, 653 F.3d 45, 48 (D.C. Cir. 2011) ("Because [plaintiff] spoke as a government employee, the district court rightly granted summary judgment in favor of [his] employer on his First Amendment retaliation claim."), *cert. denied*, __ U.S. __, 132 S. Ct. 1636 (2012); *Winder*, 566 F.3d at 215-16; *Wilburn v. Robinson*, 480 F.3d 1140, 1151 (D.C. Cir. 2007); *Rohrough v. Univ. of Colo. Hosp. Auth.*, No. 06-cv-00995, 2007 WL 3024449, at *2 (D. Colo. Oct. 16, 2007) (granting summary judgment for former employer where nurse whose reports of and complaints about inadequate staffing in hospital's heart transplant unit fell within her "overarching job responsibility as a nurse . . . to ensure patient safety and welfare"), *aff'd*, 596 F.3d 741 (10th Cir. 2010).

Furthermore, plaintiff in her opposition to defendants' motion has not demonstrated that her speech was a substantial or motivating factor prompting the alleged retaliation.  Nor has plaintiff refuted the bases independent of her speech that defendants proffered for the official

employment actions taken.  The material facts were not in dispute and defendants were entitled

to summary judgment on plaintiff's First Amendment retaliation claim.

> ### B.  Claims Two, Three and Four under Title VII:
> *Retaliation on the Basis of Protected EEO Activity, Race Discrimination,
> and Hostile Work Environment*[10]

Title VII provides that "[a]ll personnel actions affecting [federal government] employees

. . . shall be made free from any discrimination based on race, color, . . . [or] sex."  42 U.S.C. §

2000e-16(a).  It also "prohibits the federal government . . . from retaliating against employees for

engaging in activity protected by Title VII."  *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir.

2008); 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to

discriminate against any of his employees . . . because [she] has . . . made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this

subchapter.").  A hostile work environment claim is cognizable under Title VII "only when the

---

[10]      Title VII applies to each office, agency or other component of the Executive
Office of the President, *see* 3 U.S.C. §§ 401(a)(4), 402(2), 411, and plaintiff's employing agency,
the Office of Administration, is a component of the Executive Office of the President.  *See*
Executive Order No. 12,028, 42 Fed. Reg. 62,895 (Dec. 12, 1977).  The proper defendant to a
civil action brought by an aggrieved party under Title VII is "the head of the department, agency,
or unit" where the alleged discriminatory acts occurred.  42 U.S.C. § 2000e-16(c).  In this case,
Alan Swendiman, who was the Director of the Office of Administration at all times relevant to
the complaint, *see* Defs.' Mem. at 1 n.1, is the proper defendant.  Plaintiff's Title VII claims
against former President George W. Bush, as well as the nine individuals plaintiff purports to
name as parties to this action – Kenneth Haskins, Marcia Fulham, Anthony Scafidi, Linda Sites,
Susan Shannon, Victor Bernson, Sandra Evans, Linda Gambatesa, and Harriet Miers – will be
dismissed.

offensive conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 77 (D.D.C. 2005) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)) (bracketed language in original), *aff'd*, 187 F. App'x 1 (D.C. Cir. 2006) (per curiam).

## 1.  Retaliation

Plaintiff alleged that, almost immediately after she "filed an EEO complaint . . . [she] began experiencing harassment and hostile working conditions including a revocation of her high-level security clearance, letters of reprimand, a change in working location to a less prestigious and lower-ranked site, the loss of computer privileges, being prevented from retrieving her personal effects . . . , and ultimately being placed under surveillance by the . . . Secret Service" which "listed her in [its] 'be on the look-out' bulletin."  Am. Compl. at 6.  She further alleged that the supervisors responsible for these actions "were aware of her [EEO] complaint as they were in the meeting with [EEO Director] Sites in which the complaint was discussed."  *Id.*

Defendants argued that the retaliation claim must be dismissed because plaintiff "has not alleged that she engaged in protected activity."  Defs.' Mem. at 29.  Focusing solely on plaintiff's report in April 2004 of the March 24, 2004 unscreened box incident, defendants asserted that "complaining to the EEO Director . . . and being 'disrespected' do not rise to the

level of activities protected under Title VII," *id.*, and, therefore, the retaliation claim must be dismissed, *id.* at 30.

The record of this case included a document not only reflecting plaintiff's first contact with an EEO counselor on April 6, 2004, but also suggesting that she filed an informal discrimination complaint on April 15, 2004. *See id.*, Ex. W. Defendants presented no argument that plaintiff's contacts with the EEO counselor on April 6, 2004 and April 15, 2004 are not protected activities for purposes of Title VII. Dismissal of the retaliation claim on this ground was not warranted.

Where, as here, a plaintiff offered no direct evidence of retaliation, the analysis proceeds as follows:

> [R]etaliation claims based on circumstantial evidence . . . trigger the familiar burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]. Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that [she] engaged in statutorily protected activity; (2) that [she] suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two. If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions. If the employer does so, the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation.

*Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (internal quotation marks and citations omitted); *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008) (stating that a successful claim of retaliation under Title VII generally requires a plaintiff to show that "she suffered (i) a materially adverse action (ii) because . . . she had brought or threatened to bring a discrimination claim"); *Manuel v. Potter*, 685 F. Supp. 2d 46, 65 (D.D.C. 2010) ("To establish a prima facie case of retaliation, the plaintiff must demonstrate that: (1) [she] engaged in statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two." (internal quotation marks and citations omitted)).  To establish a causal connection, a plaintiff may show that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity."  *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)).

Presuming that plaintiff's contacts with the EEO counselor in April 2004 were protected activities for purposes of Title VII, and that defendants' actions occurred "almost immediately thereafter," Am. Compl. at 6, she made out the first and third elements of a prima facie retaliation claim.  Two of plaintiff's supervisors presumably were aware of plaintiff's protected activity because they attended a meeting on April 15, 2004 regarding plaintiff's April 6, 2004 informal charge of discrimination.  *See* Am. Compl. at 4.  Plaintiff's retaliation claim failed, however, because she failed to demonstrate that she suffered a materially adverse action.

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). "Unlike discriminatory actions, retaliatory actions need not be employment related or occur in the workplace, to be prohibited by Title VII . . . nor must they result in a materially adverse change in the terms or conditions of one's employment." *McLaughlin v. Holder*, 828 F. Supp. 2d 230, 239 (D.D.C. 2011) (internal quotation marks, brackets, and citation omitted). In the context of retaliation, "[a]n employment action is materially adverse where it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (citing *Burlington*, 548 U.S. at 68).

### a.  Letter of Reprimand

According to defendants, plaintiff "has not alleged that Defendants' actions dissuaded her, or would have dissuaded a reasonable person, from making a charge of discrimination." Defs.' Mem. at 30. In fact, the Letter of Reprimand prompted plaintiff to file an informal complaint of discrimination on the same date. Wholly absent from plaintiff's submissions was any argument or evidence showing that she would have been dissuaded from pursuing a discrimination complaint if she had known that a Letter of Reprimand would issue. "Actionable retaliation claims are limited to those where an employer causes 'material adversity,'" not lesser harms," *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (quoting *Burlington*, 548 U.S. at 68), and plaintiff has not demonstrated that she suffered any identifiable harm, for example, by

having lost pay or benefits because of this disciplinary action, *see Baloch*, 550 F.3d at 1199, or

opportunities for future career advancement, *see Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir.

2009).

b.  Reassignment, Change in Work Hours, and Security Clearance

A transfer which strips an employee of responsibilities may be considered a materially

adverse employment action, as its consequences may affect the conditions or privileges of the

employee's employment.  *See Geleta v. Gray*, 645 F.3d 408, 411-12 (D.C. Cir. 2011) (finding

that a reasonable jury could conclude that a transfer resulting in "a complete loss of supervisory

responsibilities" and "narrower and less important programmatic responsibilities" than plaintiff

held in the previous position is a materially adverse employment action); *Holcomb*, 433 F.3d at

902 (finding that a "drastic reduction in her work responsibilities," even without a reduction in

grade, pay or benefits, may constitute an adverse employment action).  "Where, as here, the

plaintiff allege[d] retaliation based on a reassignment, the fact-finder must compare the position

the plaintiff held before the transfer to the one [she] holds afterwards."  *Pardo-Kronemann*, 601

F.3d at 607.  Missing from plaintiff's opposition, however, was any showing that her position in

the 1800 G Street mailroom differed significantly from her position in the West Wing mailroom,

or that her prospects worsened with the reassignment.  And if plaintiff's reassignment properly

were characterized as a lateral transfer, with no reduction in pay or benefits, her unsupported

claims as to the inferiority of the position at the 1800 G Street mailroom did not amount to an

actionable injury absent a showing of "some other materially adverse consequences affecting the

terms, conditions, or privileges of her employment or her future employment opportunities such

that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible

harm." *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999), *abrogated on other grounds by*

*Steele v. Schafter*, 535 F.3d 689 (D.C. Cir. 2008).  Plaintiff made no such showing.

Nor did plaintiff point to any evidence in the record to show that a one-hour change in

work hours had "'materially adverse consequences affecting the terms, conditions, or privileges

of [plaintiff's] employment . . . such that a reasonable trier of fact could find objectively tangible

harm.'"  *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008) (quoting *Forkkio*

*v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)), *cert. denied*, 555 U.S. 1101 (2009); *see*

*Brodetski v. Duffy*, 141 F. Supp. 2d 35, 44 (D.D.C. 2001) ("Although plaintiff allege[d] that,

because of the schedule revisions, he was forced to come in two hours early for his shift, 'a mere

inconvenience' is not sufficiently adverse to sustain a prima facie case.") (citation omitted).

Although plaintiff may have preferred the West Wing mailroom and the previous work hours,

and was dissatisfied with the reassignment, such intangible harms did not rise to the level of

adverse employment actions, and, therefore, did not support a Title VII retaliation claim.  *See*

*Forkkio*, 306 F.3d at 1130-31 (concluding that neither a reassignment depriving plaintiff of

prestige nor a supervisor's alleged undermining of plaintiff's authority rises to the level of an

adverse employment action where plaintiff's pay increased, benefits were unchanged, and job

responsibilities did not significantly change); *Jones v. Potter*, 301 F. Supp. 2d 1, 13 (D.D.C.

2004) (finding that temporary transfer which did not result in loss of grade level or pay did not amount to an adverse employment action).

Plaintiff's reassignment resulted in "a lower security clearance," Pl.'s Opp'n at 5, and by "security clearance," plaintiff presumably was referring to "a security badge that gave her access to the White House."  Defs.' Mem., Ex. F at 3.[11]  Neither the amended complaint nor the opposition to defendants' motion articulated materially adverse consequences of the change in plaintiff's security access level.  At most, the "lower security clearance" resulted in an intangible harm, akin to the alleged loss of prestige associated with reassignment to a position outside of the West Wing.  As is stated above, loss of prestige was not an actionable harm.  Similarly, neither plaintiff's alleged loss of computer privileges (by which she presumably means the temporary suspension of e-mail privileges after her reassignment) nor defendants' alleged interference with retrieving her personal property rose to the level of materially adverse actions.

Plaintiff neither argued nor pointed to evidence in the record showing that a reasonable employee would have been dissuaded from pursuing a discrimination complaint if she had known of a reassignment to an equivalent position with no diminution in pay or benefits, a one-

---

[11]     It is not clear that plaintiff ever had been granted a security clearance giving her access to classified materials.  Even if she had such a clearance, "an adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII."  *Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999).

hour change in work hours, and an adjustment in security access level commensurate with the new position.

### c.  Surveillance

Although plaintiff alleged that she was placed under Secret Service surveillance because of her protected activity, she failed to describe the surveillance itself or any tangible harm stemming from it.  Again, there was no showing by plaintiff that a reasonable employee would have been dissuaded from pursuing a discrimination claim had she known of Secret Service surveillance.  *See Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 254 (W.D.N.Y. 2011) (finding that plaintiff who "has not put forth any evidence to raise a genuine issue of fact" as to whether "[b]eing monitored at work" would dissuade a reasonable employee from engaging in protected activity did not suffer adverse employment action).  The surveillance, too, may simply have caused an intangible harm, such as embarrassment or loss of prestige, which cannot support a Title VII claim.  *See, e.g., Brown v. Georgetown Univ. Hosp.*, 828 F. Supp. 2d 1, 9 (D.D.C. 2011) (finding that being escorted off the premises may have embarrassed the plaintiff, but "such subjective injury is not an adverse action for the purposes of Title VII").

None of the employment actions allegedly taken in retaliation for plaintiff's pursuit of a discrimination claim amounted to a materially adverse action cognizable under Title VII.  Even if plaintiff had succeeded in showing a materially adverse action taken in retaliation for her protected activity, she offered no response to defendants' legitimate nondiscriminatory reasons for issuing the Letter of Reprimand, reassigning plaintiff to the 1800 G Street mailroom,

changing her work hours, and adjusting her security access level to that commensurate with her new work location.   No reasonable jury could infer from the record in this case retaliation due to plaintiff's pursuit of a discrimination claim.   Accordingly, summary judgment for defendants was warranted on plaintiff's retaliation claim.

## 2.  Race Discrimination

"[T]wo essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of [her] race . . . ."  *Baloch*, 550 F.3d at 1196; *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  Plaintiff attributes the following allegedly adverse employment actions to her race: (1) her supervisors' disrespectful treatment and dismissive attitude towards her legitimate concerns relating to the March 24, 2004 unscreened box incident; (2) her transfer to the 1800 G Street mailroom; (3) the change in work hours; (4) the Letter of Reprimand;[12] and (5) "several other adverse employment actions."  Am. Compl. at 7.

Defendants argued that the first four alleged actions are not adverse employment actions for purposes of stating a Title VII claim, *see* Defs.' Mem. at 20-24, and that plaintiff has not

---

[12]      The sole Letter of Reprimand, dated June 16, 2004, was issued because plaintiff failed to follow established leave procedure and used offensive language, not "for 'insolence toward a supervisor'" as her Amended Complaint asserts.  *See* Am. Compl. at 7.

exhausted her administrative remedies with respect to the "several other adverse employment actions" she allegedly suffered, *see id.* at 13-15.

Generally, an employment action does not amount to discrimination unless it has 'materially adverse consequences affecting the terms, conditions, or privileges of [plaintiff's] employment . . . such that a reasonable trier of fact could find objectively tangible harm,'" *Ginger*, 527 F.3d at 1343 (quoting *Forkkio*, 306 F.3d at 1131).  For purposes of a race discrimination claim, "[t]he D.C. Circuit defines adverse employment action as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Aliotta v. Bair*, 576 F. Supp. 2d 113, 120 (D.D.C. 2008) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)), *aff'd*, 614 F.3d 556 (D.C. Cir. 2010); *see Forkkio*, 306 F. 3d at 1130 ("Actions short of an outright firing can be adverse within the meaning of Title VII, but not all lesser actions by employers count.").  "While this [C]ircuit has not exhaustively defined what constitutes an adverse employment action under Title VII, courts have consistently focused on ultimate employment decisions such as hiring, granting leave, promoting and compensating" employees, *Dobbs v. Roche*, 329 F. Supp. 2d 33, 41 (D.D.C. 2004) (citations and internal quotation marks omitted), and have excluded "'[p]urely subjective injuries,' such as dissatisfaction with reassignment, public humiliation, or loss of reputation."  *Nichols v. Truscott*, 424 F. Supp. 2d 124, 136 (D.D.C. 2006) (quoting *Holcomb*, 433 F.3d at 902).

### a.  "Disrespectful Treatment"

The alleged disrespectful treatment plaintiff suffered, such as having a subordinate "wave[] a finger in her face . . . in front of other coworkers" and having supervisors "treat[] her with disrespect and . . . dismiss[] her legitimate concerns," Am. Compl. at 7, did not rise to the level of an adverse employment action. *See Burlington*, 548 U.S. at 68 (snubbing by supervisors and co-workers ); *Lawson v. Pepco*, 721 F. Supp. 2d 1, 5 (D.D.C. 2010) (other employees who "spoke rudely to [plaintiff] and criticized his performance"); *Vines v. Gates*, 577 F. Supp. 2d 242, 256 (D.D.C. 2008) (co-workers who "mistreated [plaintiff] by engaging her in verbal altercations and not speaking to her"). Such acts of disrespect or rudeness are nothing like the ultimate employment decisions typically deemed adverse, and plaintiff made no showing that the conduct of her coworkers or supervisors negatively affected the terms or conditions of her employment.

### b.  Reassignment, Change of Hours, and Security Clearance

Plaintiff asserted that her position at the 1800 G Street mailroom "had fewer responsibilities, more limited supervisory authority, and a lower security clearance."  Pl.'s Opp'n at 5.  Further, she argued that the reassignment could be deemed an adverse employment action absent reduced pay or benefits if, for example, "it can be shown that the position . . . would result in fewer career advancements."  *Id.*  The 1800 G Street mailroom location is not as prestigious as the West Wing location, she argued, and "[i]n a city where distance is inversely proportionate to power and authority, the transfer also indicated a significant loss of prestige for Plaintiff and her position."  *Id.*

Nothing in the record suggested that plaintiff's reassignment to the 1800 G Street mailroom in any way affected her pay, grade, benefits, or opportunities for advancement.  Even if plaintiff's responsibilities in the new location were somehow reduced, "the removal of responsibilities does not *alone* constitute an adverse action when the employee has been laterally transferred to a new position at the same pay and grade level."  *Martin v. Locke*, 659 F. Supp. 2d 140, 149 (D.D.C. 2009) (emphasis in original).  Plaintiff offered only "generalized claims about the importance, quality, and scope of her duties," *id.* at 148, and her unsupported assertions did not establish a viable claim.  *See Jordan v. Evans*, 355 F. Supp. 2d 72, 79-80 (D.D.C. 2004) ("Although she has alleged that the change to the 'pay banding' system will 'significantly' change her opportunity to earn bonuses, she has not alleged any facts to support this contention or to shed doubt on the [defendant's] description of the [system's positive] impact on her pay and benefits.").

Furthermore, the intangible harms of loss of prestige and dissatisfaction with a work assignment simply did not rise to the level of adverse employment actions.  *See O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) ("[B]eing shifted to an essentially equivalent job that [an employee does] not happen to like as much does not a Title VII claim create."); *Forkkio*, 306 F.3d at 1130-32 (concluding that neither a reassignment depriving plaintiff of prestige nor a supervisor's alleged undermining of plaintiff's authority rises to the level of an adverse employment action where plaintiff's pay increased, benefits were unchanged, and job responsibilities did not change significantly); *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir.

2002) (finding that "public humiliation or loss of reputation does not constitute an adverse employment action under Title VII"); *Lloyd*, 2009 WL 485078, at *5-6 (finding that police officer's loss of prestige stemming from previous position in Detective Bureau, loss of cell phone, take home car and clothing allowance, and loss of income from off-duty work with reassignment were not adverse employment actions); *Riding v. Kaufmann's Dep't Store*, 220 F. Supp. 2d 442, 466 (W.D. Pa. 2002) (finding that reassignment from fashion photographer to merchandise photographer upon return from maternity leave "bruised plaintiff's ego" but did not constitute tangible adverse employment action); *see also Bouknight v. District of Columbia*, 680 F. Supp. 2d 96, 104 (D.D.C. 2010) (finding that plaintiff who was transferred and "offered no evidence whatsoever to substantiate . . . conclusory allegations of inconvenience and financial loss" did not establish adverse employment action).

Plaintiff was no more successful in showing that a one-hour change in her work hours comprises an adverse employment action.  It was evident that plaintiff was dissatisfied with her new schedule, but, at most, the new work hours caused her some inconvenience.  She failed to establish that this minor adjustment had any impact, adverse or otherwise, on her pay, benefits, or other terms of her employment.  *See Mylett v. City of Corpus Christi*, 97 F. App'x 473, 476 (5th Cir. 2004) (per curiam) ("[O]ppressive change of hours, denial of particular shifts, and humiliation . . . are not adverse employment actions."); *Grube v. Lau Indus.*, 257 F.3d 723, 728 (7th Cir. 2001) (change in working hours did not rise to the level of adverse employment action where change was unaccompanied by any change in pay, title, or significantly diminished job

responsibilities); *Bouknight*, 680 F. Supp. 2d at 104 (lateral reassignment which caused plaintiff "substantial inconvenience," absent "evidence . . . to substantiate . . . conclusory allegations of inconvenience and financial loss" or other evidence as to "the nature of the transfer and how it affected his hours, his wages, his responsibilities or any of the terms and conditions of his employment[,]" did not constitute adverse employment action); *Sellers v. U.S. Dep't of Defense*, 654 F. Supp. 2d 61, 96 (D.R.I. 2009) (four hour change in working hours for a period of only four weeks is not sufficient to rise to the level of an adverse employment action); *see also Gee v. City of Lawrence*, No. 1:07-cv-01604, 2009 WL 1196407, at *7-8 (S.D. Ind. May 1, 2009) (finding that alleged acts of retaliation, including "being given additional job duties, subjected to changes in dress code, receiving unwarranted disciplinary reprimands, and being subjected to changes in hours of employment" did not "rise to the level of severity necessary to be considered adverse employment actions").

Nor has plaintiff succeeded in demonstrating an adverse affect on the terms and conditions of her employment arising from the change in security access level associated with her reassignment to the 1800 G Street mailroom.  Plaintiff may have been unhappy with having her access to the West Wing denied, but "not everything that makes an employee unhappy is an actionable adverse action."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (citations omitted).

c.  Letter of Reprimand

40

The Letter of Reprimand reflected no impact on plaintiff's pay, grade, benefits, responsibilities, or opportunities for advancement.  In such circumstances, a letter of reprimand which, as in this case, had no affect on the terms and conditions of plaintiff's employment did not constitute an adverse employment action.  *See Baloch*, 550 F.3d at 1199 (concluding that letter of counseling, letter of reprimand and unsatisfactory performance review were not adverse employment actions); *Stewart*, 275 F.3d at 1136 (noting that "formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits do not constitute adverse employment actions"); *Kline v. Springer*, 602 F. Supp. 2d 234, 242 (D.D.C. 2009) (finding that a letter of reprimand was not an adverse employment action), *aff'd sub nom. Kline v. Berry*, 404 F. App'x 505 (D.C. Cir. 2010) (per curiam); *Runkle v. Gonzales*, 391 F. Supp. 2d 210, 225 (D.D.C. 2005) ("Formal letters of admonishment and disciplinary notices that have no effect on an employee's grade or salary level, job title, duties, benefits or work hours, for example, do not constitute adverse actions.").

d.  "Other Adverse Employment Actions"

Insofar as plaintiff alleged she "suffered several other adverse employment actions" in violation of Title VII, *see* Am. Compl. at 7, defendants argued that she failed to exhaust these claims administratively before filing this lawsuit.  *See* Defs.' Mem. at 14.  Specifically, defendants referred to plaintiff's apparent attempts to base her claim of discrimination on a significant increase of her workload following the filing of an informal EEO charge in April 2004 and receipt of an "official write-up," neither of which was included in the formal EEO complaint.  *Id.*  Plaintiff responded that "these acts of discrimination were named and discussed in detail elsewhere in the brief and were specifically pleaded in [her] original complaint before the EEOC."  Pl.'s Opp'n at 1.  Presumably, plaintiff's reference to "other adverse employment actions" included not only the alleged disrespectful treatment received from her co-workers, reassignment to the 1800 G Street mailroom, change in work hours, and the Letter of Reprimand, *see* Am. Compl. at 7, but also allegations pertaining to her increased workload, security clearance, and three-day suspension, *id.* at 5, as well as her placement on a Secret Service "watchlist," *id.* at 4.

"[B]efore filing suit, an individual alleging that a federal agency engaged in employment discrimination must seek administrative adjudication of the claim."  *Scott v. Johanns*, 409 F.3d 466, 468 (D.C. Cir. 2005).  The D.C. Circuit summarizes the administrative process as follows:

> Under regulations promulgated by the [EEOC] pursuant to Title VII, the employee [begins] by filing a complaint with her agency.  29 C.F.R. § 1614.106(a).  The employing agency then conducts an

> investigation and, if the employee so requests, refers the matter to
> an EEOC administrative judge for a hearing. *Id.* §§ 1614.106(e)(2),
> 1614.108-09.   After the employing agency investigates, or the
> administrative judge issues a decision, the employing agency must
> take "final action." *Id*. § 1614.110.  If the employee never requests
> a hearing, the agency's final action must "consist of findings . . . on
> the merits of each issue . . . and, when discrimination is found,
> appropriate remedies and relief." *Id*. § 1614.110(b).  If the employee
> requests a hearing, the employing agency's "final order shall notify
> the complainant whether or not the agency will fully implement the
> administrative judge's decision." *Id*. § 1614.110(a).  An employee
> who is aggrieved by the agency's final disposition of her complaint
> may then either appeal to the EEOC or file suit in federal court
> pursuant to 42 U.S.C. § 2000e-16(c).  *Id*. § 1614.110.

*Payne v. Salazar*, 619 F.3d 56, 58 (D.C. Cir. 2010).  "In filing a civil action in district court

following an EEO complaint, an employee may only file claims that are like or reasonably

related to the allegations of the [EEO] charge and grow[] out of such allegations."  *Baird v.*

*Snowbarger*, 744 F. Supp. 2d 279, 286-87 (D.D.C. 2010) (quoting *Park v. Howard Univ.*, 71 F.

3d 904, 907 (D.C. Cir. 1995) (internal quotation marks omitted)), *vacated in part on other*

*grounds sub nom. Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011).

Based on plaintiff's formal EEO complaint, as amended, the OA-EOP's EEO Director

accepted for investigation a claim that three actions constituted discrimination based on race,

color, sex and reprisal for prior protected activity in April 2004: the June 16, 2004 letter of

reprimand, the July 19, 2004 reassignment to the 1800 G Street mailroom, and the three-day

suspension for insolence toward her supervisors.  The nine-page narrative statement submitted

with plaintiff's formal EEO complaint provided greater detail of the circumstances surrounding

43

the March 24, 2004 unscreened box incident, increased workload following the filing of an

informal EEO charge in April 2004, and receipt of an "official write-up," that is, the June 16,

2004 Letter of Reprimand.  The statement also mentioned her transfer, change of work hours, the

taking of a pass granting her access to the West Wing (and issuance of a new pass giving her

access to the 1800 G Street mailroom), and distribution of her picture to the Secret Service.  In

other words, all of the actions plaintiff alleges were discriminatory appeared in some form in

nine-page narrative statement.  A fair reading of this statement reflected that plaintiff adequately

exhausted her administrative remedies as to these actions, which either are described in the

narrative statement and are like or are reasonably related to the allegations of her formal EEO

complaint.

Had these actions been treated as separate claims, however, none would have succeeded,

as none constitutes an adverse employment action for purposes of Title VII.  As is stated above,

neither the alleged disrespectful treatment, Letter of Reprimand, reassignment, change in work

hours, nor adjustment to plaintiff's security clearance comprised an adverse employment action.

Remaining for consideration, then, were plaintiff's allegations regarding her increased workload,

the three-day suspension, and Secret Service surveillance.

*i.* Increased Workload

Plaintiff's amended complaint and opposition to defendants' motion offered no detail as

to plaintiff's workload before the initiation of her discrimination claim, the link between the

alleged increase in workload to plaintiff's race, or the impact of the increased workload on

plaintiff.  "Scarce resources and increased workloads are familiar complaints in virtually every

workplace and every industry, but they do not give rise to a discrimination claim under Title

VII," *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 73 (D.D.C. 2007) (citations omitted), and

plaintiff made no showing that an increased workload amounted to an adverse employment

action.  *See Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 282 (D.D.C. 2011) (finding claims

that plaintiff "was deprived of a reasonable number of attendants compared to other employees

and that he was over-worked" did not amount to adverse employment actions); *Brodetski*, 141 F.

Supp. 2d at 45 (finding no adverse employment actions in the claim that defendants distributed

workload unevenly by overloading plaintiff with assignments).

### *ii.* Three-Day Suspension

Nothing in the record suggested that plaintiff's suspension deprived her of pay or

otherwise caused her financial hardship or loss of benefits or privileges.  Under these

circumstances, the three-day suspension did not comprise an adverse employment action

sufficient to sustain a race discrimination claim under Title VII.  *See Breaux v. City of Garland*,

205 F.3d 150, 158 (5th Cir. 2000) (administrative leave with pay pending investigation and

return to pre-leave position); *Dodge v. City of Belton, Mo.*, No. 10-0038, 2011 WL 529708, at *3

(W.D. Mo. Feb. 4, 2011) (suspension with pay, absent argument as to "how his suspension with

pay produced a material employment disadvantage"); *Brown*, 828 F. Supp. 2d at 9 (suspension

with pay pending investigation for gross misconduct); *Harper v. Potter,* 456 F. Supp. 2d 25, 29

(D.D.C. 2006) (seven-day disciplinary suspension that allowed plaintiff to remain on the job and

in pay status); *see also Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("We have held that a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." (citations and internal quotation marks omitted)).

### *iii.* Surveillance

Practically nothing is known of the surveillance plaintiff alleged was conducted, and plaintiff failed to articulate any tangible harm stemming from it. It does not appear that Secret Service officers denied plaintiff entry to her assigned workplace or otherwise interfered with her work or personal life. Absent any showing that this alleged surveillance had any impact at all, or that the surveillance was initiated because of plaintiff's race, it does not support a Title VII claim.

Even if plaintiff had managed to demonstrate an adverse employment action, at the summary judgment stage the Court would "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494 (citation omitted). Defendants have shown that plaintiff's violations of OA Disciplinary Guidelines prompted issuance of the Letter of Reprimand, plaintiff's reassignment came about in a series of personnel reassignments in the mail operations area, and that her conduct toward her supervisor prompted the three-day suspension. Plaintiff offered no

evidence at all from which a reasonable jury could conclude that defendants discriminated

against plaintiff on the basis of her race by taking these and the other alleged adverse

employment actions.  Accordingly, summary judgment for the defendants on plaintiff's race

discrimination claim was warranted.

### 3.  Hostile Work Environment

Plaintiff allegedly "was repeatedly and severely harassed in a pervasive manner,

including disrespect by multiple coworkers in front of others, because she was the only white

staffer in the mailroom."  Am. Compl. at 8.  For example, plaintiff's "subordinate waved a finger

in her face and told her to back off."  *Id.*  This conduct "was offensive to [p]laintiff, and would

likely be offensive to a reasonable person in a similar situation due to its ongoing and

humiliating nature."  *Id.*  As a result of coworkers' behavior, plaintiff "was stripped of any

credibility she once had with her coworkers, leading to an unreasonable interference with her

ability to do her job."  *Id.* at 8-9.  Defendants argued that this hostile work environment claim

must be dismissed because plaintiff failed to exhaust her administrative remedies prior to filing

this lawsuit.  *See* Defs.' Mem. at 32-33.  Plaintiff countered that "[e]ach claim of race . . .

discrimination . . . was either contained properly in the original EEO complaint or accepted one

month later by EEO as a permissible amendment to [p]laintiff's original complaint."  Pl.'s Opp'n

at 2.

As is discussed above, "before filing suit, an individual alleging that a federal agency

engaged in employment discrimination must seek administrative adjudication of the claim."

*Scott*, 409 F.3d at 468.  The exhaustion requirement is less stringent for hostile work

environment claims than it is for discrete claims of discrimination or retaliation, however.  *See*

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) (concluding "that a Title VII

plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within

the appropriate time period . . . .   [H]owever, [a hostile work environment claim] will not be

time barred so long as all acts which constitute the claim are part of the same unlawful

employment practice and at least one act falls within the time period"); *see also Nurriddin v.*

*Goldin*, 382 F. Supp. 2d 79, 107 n.10 (D.D.C. 2005) (recognizing that, "[u]nlike discrete claims

of discrimination and retaliation, the exhaustion requirement on a hostile work environment

claim is less stringent . . . [and the p]laintiff need only have filed an EEO complaint alleging

some of the claims that comprise the hostile work environment claim"), *aff'd sub nom. Nurridin*

*v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1243 (2008).  A plaintiff may

adequately exhaust administrative remedies without specifically alleging a hostile work

environment claim in her formal EEO complaint if the hostile work environment claim is "like or

reasonably related to the allegations . . . [in the formal EEO complaint] and grows out of such

allegations."  *Roberson v. Snow*, 404 F. Supp. 2d 79, 96 (D.D.C. 2005) (citing *Jones v.*

*Billington*, 12 F. Supp. 2d 1, 7 (D.D.C. 1997)); *accord Na'im v. Rice*, 577 F. Supp. 2d 361,

369-70 (D.D.C. 2008).

Nowhere in the administrative proceedings did plaintiff mention, suggest, or pursue a

discrete hostile work environment claim.  A fair reading, though, of the nine-page narrative

statement plaintiff submitted with her formal EEO complaint, a document which OA-EOP's

EEO Director accepted as background information to support the discrimination claim, reflected

that plaintiff adequately exhausted her administrative remedies as to her hostile work

environment claim.  The events described in the narrative are like or reasonably related to the

allegations of her formal EEO complaint.  That plaintiff survives defendants' exhaustion

argument did not mean success, however.  The hostile work environment claim failed because

the record failed to substantiate it.

"A hostile work environment claim is composed of a series of separate acts that

collectively constitute one unlawful employment practice," *Morgan*, 536 U.S. at 117 (internal

quotation marks and citation omitted), and a successful claim generally requires that a plaintiff

"show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult'

that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment.'"  *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation omitted)).  "[T]he workplace environment

becomes 'hostile' for purposes of Title VII and legal relief [available] only when the offensive

conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment.'"  *Childs-Pierce*, 383 F. Supp. 2d at 77 (quoting *Oncale*, 523 U.S.

at 81) (bracketed language in original); *Singletary v. District of Columbia*, 351 F.3d 519, 526

(D.C. Cir. 2003) (stating that a hostile environment exists "[w]hen the workplace is permeated

with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (citations and internal quotation marks omitted).  The behavior must be "so objectively offensive as to alter the conditions of the victim's employment." *Oncale*, 523 U.S. at 81 (internal quotation marks omitted).

A court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance.  *See Harris*, 510 U.S. at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *Baloch*, 550 F.3d at 1201.  "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).  A court must therefore "exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination," lest "the federal courts . . . become a court of personnel appeals."  *Id.*

Aside from plaintiff's conclusory allegations of events purportedly in support of her hostile work environment claim, she pointed to no document or other evidence in the record which, viewed objectively, establishes the existence of a hostile work environment.  She thus failed to meet her burden on summary judgment.  *See, e.g., Morgan v. Vilsack*, 715 F. Supp. 2d 168, 184 (D.D.C. 2010) ("As severe as the subjective hostility appeared to plaintiff during [her] tenure . . . , unless [she] can offer concrete proof of objectively severe and consistent hostile actions, [her] claim cannot be sustained."); *Diggs v. Potter*, 700 F. Supp. 2d 20, 52 (D.D.C.

2010) (rejecting plaintiff's hostile work environment claim where he "has done nothing more than reassert his disparate treatment and retaliation claims – all of which are discrete employment actions – and baldly claim that these same actions constitute a hostile work environment"); *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 225 (D.D.C. 2010) (finding that plaintiff "failed to satisfy the required elements of her racially hostile work environment claims" with assertions that supervisor spoke to her in a belittling tone, ignored her altogether, made sarcastic remarks and displayed a dismissive attitude), *aff'd*, 407 F. App'x 490 (D.C. Cir. 2011) (per curiam); *Porter v. Jackson,* 668 F. Supp. 2d 222, 236 (D.D.C. 2009) (granting summary judgment for employer where, even accepting as true plaintiff's allegations that comments were "impolite, rude, and insensitive, plaintiff has not shown that she was subject to the level of severe and pervasive harassment necessary to maintain a claim for a hostile work environment under Title VII"), *aff'd*, 410 F. App'x 348 (D.C. Cir. 2010) (per curiam); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54-55 (D.D.C. 2004) (concluding that the plaintiff's allegations that her immediate supervisor froze her out of important meetings, humiliated her at those meetings she did attend, refused her request to be excused from a hearing and criticized her in an abusive manner did not amount to severe and pervasive treatment sufficient to alter the conditions of her employment for hostile work environment claim); *see also Nurriddin*, 382 F. Supp. 2d at 108 (observing that incidents bearing no relation to the plaintiff's protected class cannot be used to support a hostile work environment claim).

A hostile work environment claim "is not a cause of action for the ordinary tribulations of the workplace . . . and not everything that makes an employee unhappy is an actionable adverse action." *Baird*, 744 F. Supp. 2d at 295 (citations and internal quotation marks omitted).  And "hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class."  *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009).  Aside from conclusory allegations of the complaint, nothing links the actions comprising the hostile work environment claim to plaintiff's race.  Accordingly, summary judgment for defendants on plaintiff's hostile work environment claim was warranted.

## III.   CONCLUSION

Plaintiff has not established a claim of retaliation for the exercise of her First Amendment rights or for her engagement in activity protected under Title VII.  Nor has plaintiff demonstrated discrimination based on her race or a hostile work environment.  Accordingly, the defendants' motion has been granted.  A final order accompanies this Memorandum Opinion.

Signed this 14th day of February, 2016.


/s/
RICHARD W. ROBERTS
Chief Judge